58 P.3d 545

Mr. and Mrs. DOE PARENTS NO. 1, individually and as Guardians Ad Litem for their minor child, Doe Minor Girl No. 1; and Mr. and Mrs. Doe Parents No. 2, individually and as Guardians Ad Litem for their minor child, Doe Minor Girl No. 2, Plaintiffs–Appellants/Cross–Appellees,

v.

STATE of Hawai'i, DEPARTMENT OF EDUCATION, Defendant–Appellee/Cross–Appellant,

and

Lawrence J. Norton; Marie Valerie Norton; John Does 1–10; Jane Does 1–10; Doe Corporations 1–10; Doe Partnerships 1–10; and Doe Governmental Entities 1–10, Defendants.

Nos. 23899, 23901.

Supreme Court of Hawai'i.

Nov. 27, 2002.

As Amended Dec. 2nd and 5th, 2002.

36

Mark S. Davis (Anne L. Williams with him on the briefs), of Davis Levin Livingston Grande, for the plaintiffs-appellant/cross-appellees Doe Parents No. 1 and Jane Doe No. 1, and Doe Parents No.2 and Jane Doe No. 2.

Charles F. Fell, Deputy Attorney General, for the defendant-appellee/cross-appellant State of Hawai'i, Department of Education.

MOON, C.J., LEVINSON, NAKAYAMA, and RAMIL, JJ., and ACOBA, J., concurring separately.

Opinion of the Court by LEVINSON, J.

The plaintiffs-appellants/cross-appellees in this consolidated appeal [1] are two minor children and their respective parents [hereinafter, collectively, the "plaintiffs"], all of whom have consented to the disclosure of their identity in connection with this case.[2] Doe Parents No. 1 are retired Lieutenant Colonel Ira Steven Davis and Cynthia Davis, and Jane Doe No. 1 is their daughter, Melony Fay Davis (Melony). Doe Parents No. 2 are George Benjamin Draughn and Mary Draughn, and Jane Doe No. 2 is their daughter, Nicole Draughn (Nicole). The State of Hawai'i Department of Education (DOE) is the defendant-appellee/cross-appellant. In their complaint, the plaintiffs named as a codefendant, and the DOE subsequently filed a cross-claim against, Lawrence J. Norton (Norton), Melony's and Nicole's (the girls') teacher; Norton, however, did not enter an appearance at trial, the circuit court dismissed all of the parties' claims against him, *see infra* section III.B, and he is not a party to this appeal.[3]

The plaintiffs appeal from the judgment of the first circuit court, the Honorable Sabrina S. McKenna presiding, awarding the plaintiffs forty-nine percent of their total damages—*i.e.*, damages in the amount of $432,200.00 to the Draughns collectively and in the amount of $429,251.00 to the Davises collectively—on their negligence and negligent infliction of emotional distress (NIED) claims against the DOE. On appeal, the plaintiffs challenge the circuit court's apportionment of liability between the DOE and Norton, advancing several arguments in support of their contention that the DOE should be liable to them in the total amount of their damages.

The DOE cross-appeals, arguing that the circuit court, for various reasons, erred in holding it liable to the plaintiffs at all. In essence, the DOE contends (1) that, pursuant to Hawai'i's State Tort Liability Act (STLA), Hawai'i Revised Statutes (HRS) ch. 662 (1993 & Supp.2001), it is immune from the plaintiffs' claims and (2) that, even if the STLA does not afford it sovereign immunity, the circuit court erred in determining (a) that it had been negligent and that its negligence was a legal cause of the plaintiffs' injuries and (b) that the plaintiffs were not required to establish physical injury in order to prevail on their NIED claim.

As to the DOE's cross-appeal, we hold as follows: (1) to the extent that the plaintiffs predicate their negligence and NIED claims upon the DOE's negligent retention and supervision of Norton, that the STLA's intentional tort exception does not insulate the DOE from liability; (2) that, under the circumstances of this case, the plaintiffs could obtain relief in the absence of physical injury; (3) that, insofar as the. DOE should have anticipated the reasonably foreseeable threat that Norton posed to students, the DOE was subject to a duty to take whatever steps were reasonable to ensure that he did not molest Melony and Nicole; (4) that the foregoing duty ran not only to the students in the DOE's custody, but also to the students' parents; (5) that the DOE breached the duty of care that it owed to Melony and Nicole and their respective parents in (a) reinstating Norton, after he had been acquitted in connection with a prior allegation of molestation, without conducting a reasonably thorough investigation, (b) failing to supervise or restrict Norton's conduct once he had resumed exhibiting the behaviors that led to the prior

1. The plaintiffs' appeal in this matter was docketed under No. 23899; the defendant's appeal was docketed under No. 23901. On January 30, 2001, this court ordered consolidation of these appeals for briefing and disposition under No. 23899. Oral argument was heard on January 10, 2002.

2. Initially, the plaintiffs proceeded with their lawsuit under pseudonyms. However, by the time that the matter went to trial, the plaintiffs had moved to the mainland and consented to the disclosure of their identities in connection with

the remainder of the trial and appellate proceedings.

3. The plaintiffs also named Norton's wife, Marie Valerie Norton, as a codefendant in their complaint, and the DOE filed a cross-claim against her. However, the circuit court dismissed the plaintiffs' claims against Marie Norton prior to trial and, insofar as the DOE advanced no evidence at trial supporting its cross-claim against her, the circuit court entered judgment in favor of Marie Norton and against the DOE in connection with the DOE's cross-claim.

accusation, (c) questioning Mélony and Nicole and exacting their disclosures that Norton had molested them, in violation of the DOE's own apparent policy against doing so, given that school administrators are not generally trained to conduct such inquiries, and (d) failing to notify Melony's and Nicole's respective parents of their accusations against Norton; and (6) that the DOE's negligence was a legal cause of the plaintiffs' psychological trauma resulting from Norton's foreseeable molestation of Melony and Nicole.

As to the plaintiffs' appeal, we hold that the circuit court erred in apportioning liability between the DOE and Norton and, therefore, that the DOE is liable to the plaintiffs for the full extent of their damages. Thus, we vacate the circuit court's final judgment and remand this matter to the circuit court for the entry of an amended final judgment consistent with this opinion.

## I. BACKGROUND

### A. Factual Background

On January 22, 1990, the DOE hired Norton to teach fourth graders at Mōkapu Elementary School [hereinafter, "the school" or "Mōkapu"], which is located within the Kaneohe Marine Corps Air Station (KMCAS), a United States military base.[4] At the time Norton was hired, the DOE did not conduct background and criminal history checks of prospective teachers or other employees.[5] Although Norton had "an extensive prior history of pedophilia" at the time that the DOE hired him, his history was not reflected in any public records.

During his first year-and-a-half of teaching at the school, students and parents, as well as school faculty and administrators, came to

respect and like Norton. However, during the 1991 fall semester, and again during the 1994–95 school year, several fourth and fifth grade students accused Norton of molesting them. Before relating the circumstances of Norton's molestation of Melony and Nicole during the 1994–95 school year, we set forth the circumstances under which a Mōkapu student first accused Norton of molestation.

### 1. T.Y.'s accusation

Shortly into the 1991 fall semester, a fourth grade student, identified throughout these proceedings as "T.Y.," accused Norton of fondling her breast and touching her bare thigh. It appears that Norton (1) routinely issued hall passes to students so that they could visit him in his classroom during their lunch recess and (2) routinely hugged them as they left to start their afternoon classes. T.Y. asserted that Norton had fondled her in the course of giving her one of these routine hugs while she was alone with him during a lunch recess. Eventually, on February 19, 1992, Norton was indicted in connection with T.Y.'s allegation and charged with committing the offense of sexual assault in the third degree.[6] During this five-month period, the DOE's administrative "investigation" into T.Y.'s allegation was conducted primarily by Donna Estomago, Mōkapu's vice-principal at the time the allegation was made.

After Norton was indicted, John Sosa, the DOE Windward District Superintendent, conducted a "second" DOE administrative "investigation" into T.Y.'s allegation. Sosa sought to determine what action, if any, the DOE should take, including whether to recommend to the DOE's Superintendent, Charles Toguchi, that Norton be terminated or reinstated to a teaching position. In con-

4. The Mōkapu school faculty and its administrators are DOE employees whom the base commander grants permission to enter KMCAS.

5. Subsequent to hiring Norton, however, the DOE apparently adopted administrative rules requiring criminal history and background checks for new employees. The new rules went into effect on June 29, 1992, but exempted all salaried employees, such as Norton, who had been continuously employed since June 30, 1990, from retroactive application.

6. Although not enumerated in the circuit court's findings of fact, we presume that Norton was charged with violating HRS § 707–732(1)(b) (1993), which proscribes in relevant part "knowingly subject[ing] to sexual contact another person who is less than fourteen years old." Pursuant to HRS § 707–700 (1993), "sexual contact" means in relevant part "any touching of the sexual or other intimate parts of a person not married to the actor, ... whether directly or through the clothing or other material intended to cover the sexual or other intimate parts."

ducting his investigation, Sosa solicited and received information and recommendations from Emiko Sugino, the DOE's Personnel Director, Jacquelin Gordon, the DOE's Windward District Personnel Specialist, and Mōkapu's principal, James Schlosser, and vice-principal, Estomago. After a jury acquitted Norton on January 11, 1993 in the criminal trial arising out of T.Y.'s allegations, the DOE reinstated him to a teaching position without conducting any further administrative investigation into the matter. The remainder of this subsection details Estomago's initial "school-level" investigation and Sosa's subsequent "district-level" investigation of T.Y.'s accusation.[7]

### a. *Estomago's "school-level" investigation*

Donna Estomago was Mōkapu's vice-principal in September 1991, and, at that time, Carol Ching was the school's principal. Late in the afternoon of September 23, 1991, at approximately 4:30 or 5:00 p.m., a military Criminal Investigation Division (CID) investigator, Michael Crecelius, who was also a parent of a Mōkapu student, informed Estomago of T.Y.'s accusation and that CID was referring the matter to the Honolulu Police Department (HPD) for further investigation. According to Estomago, Crecelius informed her of the allegation as a "heads-up," rather than as a "formal" matter, and forewarned her to expect a request from T.Y.'s parents that the girl be removed from Norton's fourth grade class. Estomago informed Ching of T.Y.'s allegation that evening.

Also during the evening of September 23, 1991, Estomago telephoned Norton. According to Estomago, it is "typical procedure" to talk to the staff member involved when "something" arises. According to Norton, there were usually numerous children in his classroom during recesses when his class was not in session, and, thus, he did not specifically recollect T.Y. being alone with him. Norton confirmed, however, that many of the children hugged him often, usually when he was seated at his desk, and that, as he spoke

to a child, his arm would occasionally encircle the child's waist.

Unbeknownst to Estomago, the HPD detective assigned to the case had instructed T.Y.'s parents not to speak to school officials until he notified them that they were free to do so. Consequently, when Estomago observed T.Y. and her mother at the school bus stop on the morning of September 24, 1991, approached them, and inquired whether she would be seeing T.Y.'s mother later that morning, the mother shook her head negatively, appearing to Estomago to be confused. Similarly, T.Y.'s parents attended an evening open house in Norton's classroom on September 25, 1991, but said nothing either to Norton or Estomago about their daughter's allegations.

On September 26, 1991, Estomago telephoned Crecelius in an effort to discover why she had not been contacted by either T.Y.'s parents or the HPD. After checking with the HPD, Crecelius informed Estomago that the HPD detective assigned to the case had instructed T.Y.'s parents not to speak to anyone about the matter until the detective directed them to do so. Subsequently, on September 27, 1991, T.Y.'s mother requested that her daughter be removed from Norton's classroom. Estomago granted the mother's request, but asked her to meet with Norton and school administrators to discuss T.Y.'s allegations. T.Y.'s mother replied that she first wished to discuss Estomago's request with her husband.

On September 30, 1991, as T.Y. was in the process of moving her belongings out of her desk in Norton's classroom, Norton attempted to explain "his side of the story" to T.Y.'s mother; T.Y.'s mother "did not react" to Norton. Norton reported the incident to Estomago, but Estomago apparently did not report it to Ching. However, Norton did report to Ching that T.Y. later visited him in his classroom during the lunch recess with a group of other children and had solicited a hug from him; Ching told Norton that T.Y.'s mother should be informed of the visit and appears to have relayed Norton's report to

---

7. The DOE's apparent practice is that, when such an accusation is leveled against a teacher, the school conducts an initial "school-level" investigation and, subsequently, the district conducts a "district-level" investigation.

Estomago. Later that evening, Ching returned a telephone call from T.Y.'s mother and informed her of T.Y.'s visit to Norton during recess.

October 4, 1991 was Ching's final day as principal and, the following day, Estomago became acting principal until sometime in November, when James Schlosser was appointed Mōkapu's principal. HPD Detective Tejada first contacted the school with respect to T.Y.'s allegations on October 11, 1991; Detective Tejada informed Estomago that he would be interviewing both Norton and T.Y. in connection with his investigation of the matter. The detective cautioned Estomago that Norton should not remain in the classroom pending the criminal investigation. However, "surprised" that the HPD was investigating the matter and believing T.Y.'s allegations to be false, Estomago surmised that the detective's admonition was based upon caution rather than necessity (insofar as Tejada had not yet investigated the matter), disregarded the detective's suggestion, and did not communicate it to any of her superiors.

The following week, on October 18, 1991, Estomago first informed her superior—the DOE's Deputy District Superintendent, Jacqueline Heupel—of the HPD's investigation; Heupel instructed Estomago not to discuss the incident further. However, on October 30, 1991, Estomago contacted Deputy Attorney General Russell Suzuki, as well as the DOE's Personnel Director, Sugino, because a school counselor had received a telephone call from a parent regarding T.Y.'s allegations. Yet, when Schlosser became Mōkapu's principal in November, neither Estomago nor anyone else informed him that the HPD was investigating Norton or that T.Y. had accused him of molesting her. Meanwhile, Norton remained teaching, and the DOE granted him tenure on January 22, 1992, while the HPD's investigation was still pending. Indeed, according to Estomago, "nothing more happened or was said about"

the matter from mid-October 1991 until Norton was indicted in mid-February 1992.

### b. . Sosa's "district-level" investigation

An indictment in the T.Y. case was returned on February 19, 1992, which, as we have noted, accused Norton of committing third degree sexual assault. According to Sosa, at around the time of the indictment, he obtained "jurisdiction" over the DOE's administrative investigation into Norton's alleged misconduct.

Sosa had learned of the indictment as the result of a media inquiry late in the afternoon of February 19, 1992. Shortly thereafter, he discussed the situation with Donald Nugent, the DOE's Assistant Superintendent of Personnel Services, and, subsequently that evening, with District Personnel Specialist Gordon.

Gordon had learned of the indictment as a result of Sugino's inquiries that afternoon. After unsuccessful attempts to contact Schlosser and Estomago, Gordon spoke with Mōkapu's former principal, Ching, who related that Estomago "had investigated the incident" and that Estomago's "investigation indicated that the accusation was unfounded." Ching asserted that she believed the military CID had investigated the matter and had "dropped" it. Even so, Ching informed Gordon that, "[t]o be on the safe side," T.Y. had been transferred to another fourth grade class and that T.Y.'s mother "seemed to be satisfied" with this solution.

Because Sosa and Gordon were unable, despite their repeated attempts, to contact Schlosser until later that evening, Sosa instructed Gordon to contact Norton directly and to inform him that he would be placed on administrative leave.[8] Gordon promptly did so.[9] Shortly after 7:00 p.m., Sosa succeeded in contacting Schlosser and discussed with him what "steps to take regarding [the] school, parents, teachers[,] and students, and

---

8. It appears that another DOE Personnel Specialist, Barbara Nagaue, had advised Gordon that Norton should be placed on administrative leave, that Gordon shared the suggestion with Sosa, and that Sosa decided to follow it.

9. Although the circuit court found that Schlosser "placed" Norton on administrative leave on the evening of February 19, 1992, the record reflects that it was Gordon who first informed Norton of the DOE's action.

the need to review [the] records with" Estomago.

Estomago first learned of the indictment from Schlosser, and her reaction was one of "horror" because she "believed in [her] heart that there was nothing that had transpired[.]" When Schlosser learned of the indictment from Sosa, it was the first he had heard of T.Y.'s accusation against Norton. While discussing the indictment, Estomago informed Schlosser that her "investigation" of the initial allegation during the fall semester had unearthed "no evidence to substantiate" T.Y.'s allegations.

The following morning, on February 20, 1992, Sosa contacted Estomago, who "briefed" him "on the incident from her perspective." Also that morning, Schlosser spoke with the students in Norton's class and, subsequently, conducted two assemblies, during which he noted that it was important not to "judge or gossip" about the matter and that the school counselor would be available throughout the day for the students. During the assemblies, some children became upset at the allegations and scrutinized their fellow students to determine who had accused Norton, a "beloved" teacher. Parents also became upset upon learning that Norton had

been removed from his teaching position. No other student came forward with any additional allegations against Norton after learning of the indictment.[10]

That afternoon, Sosa arranged a meeting with Gordon, Schlosser, Ching, and Estomago in order to "clarif[y] notes and statements"; in the course of the meeting, Sosa "stressed the seriousness of the matter and pointed out the importance of DOE personnel to bring these types of cases to closure." The circuit court inferred that Sosa had faxed the results of this meeting to DOE Personnel Director Sugino. In a memorandum prepared by Sugino, dated February 20, 1992 and directed to DOE Superintendent Toguchi, Sugino asserted that "[i]nitial review of the situation indicates that this concern surfaced last fall ... and an investigation was conducted by the school. It was determined at that time that the concern was adequately resolved."[11]

Also on February 20, 1992, Sosa transmitted a memorandum to Norton, which confirmed that Norton was being placed on a ten-day administrative leave with pay and that he would "be contacted by [Sosa's] office during this leave to report[ ] to a specified

---

10. At some point before March 2, 1992, at which time it was forwarded to DOE Windward District Personnel Specialist Gordon, Estomago prepared a memorandum entitled "Summary of Teacher/Parent Response to Larry Norton," which the circuit court expressly found reflected her bias in favor of Norton, and which states in full as follows:

> Mr. Norton has been a warm, caring, friendly, very responsive teacher and fellow staff member. He has extended himself to the community and to the staff[,] getting into activities that extend beyond the work day.
>
> His routine at school is predictable. At recess time in the morning his room is full of children who choose to stay in the room. At lunch, he usually walked his children to the cafeteria, come [sic] to the office to use the Xerox and then returned to his classroom[,] which he kept open for the children to return to. His room always had children in it.
>
> It is apparent that he is well thought of in the community as an overwhelming number of parents have expressed their support for him because their children hold him in such high esteem.
>
> There is actually nothing that has been reported to give credence to the likelihood of the charge—nothing in his words or actions to

indicate the verity of the charge. The children do indeed flock to him and hug him and are hugged in return, but there have been no reported improprieties beside what is presently charged.

This summary is affixed to a cover sheet directed to Gordon from Schlosser, bearing the date March 2, 1992; however, the summary and cover sheet are together attached to Ching's "summary of events" that occurred between September 23, 1991 and October 4, 1991, bearing Ching's signature and the date February 2, 1992.

11. During her testimony, Estomago was asked on cross-examination by plaintiffs' counsel whether, at the time that "these allegations came up," anyone thought about consulting an expert on pedophilia to determine whether Norton fell into a pedophile profile. Estomago responded:

> Not when there hadn't been reason to investigate. I just wanted to get some information of facts. I wasn't going to assume that a person is guilty. I mean[,] I collected whatever facts, and I went with the trust that had been built on a relationship and had never had an indication, never. I mean[,] I never had any child or parent approach me. I only heard good. So the frame was only from that.

place as part of [the DOE's administrative] investigation." It appears that nothing further occurred, however, until the ten-day period was due to expire, on March 4, 1992, at which time it was necessary for Sosa to determine whether to maintain Norton on administrative leave.

On March 2, 1992, Schlosser transmitted Estomago's "Summary of Teacher/Parent Response to Larry Norton" to Gordon, *see supra* note 10. On March 3, 1992, Sosa transmitted a request to Toguchi that the DOE extend Norton's administrative leave "until the investigation is completed and a decision is made regarding" Norton's employment status. Toguchi appears to have approved Sosa's request either that day or on March 4, 1992, and, in any event, approved Sosa's request in writing a week later, on March 10, 1992.

Also on March 4, 1992, presumably before Toguchi had approved his request, Sosa presided over a conference with Gordon, Norton, and Norton's Hawai'i State Teachers' Association (HSTA) representative, Samuel Moore, the purpose of which was to determine "what[ ] action would be appropriate." At the conference, Norton informed the others that an "[arrest] warrant was issued on March 3, 1992" and that his arraignment was scheduled to occur on March 12, 1992, at which time he would enter a plea of not guilty and a trial date would be set. Norton reiterated, as he had previously related to Estomago, that he did not recall any circumstances that would have given rise to T.Y.'s accusations. Norton related that, on the advice of his attorney, he had refused to take a lie detector test and refused to answer any questions during the HPD's investigation. Norton queried why he had been placed on administrative leave, which he "felt was a judgment that he was guilty." In response, someone at the conference told him that the administrative leave was to protect him and

the DOE "from further problems." Gordon's minutes of the conference conclude with an entry, which asserts that

[i]t was agreed that the [DOE] and [the] HSTA would pursue avenues to expedite [Norton's criminal] trial. This is important because of the transiency of the population of Mōkapu Elementary School. If delayed for a long time, many potential witnesses would no longer be in Hawai'i. Mr. Norton was advised to have his attorney get depositions from potential witnesses.[12]

On May 11, 1992, Sugino informed Sosa that the prosecutor assigned to Norton's case would be providing the DOE with a copy of a videotaped interview of T.Y. that had been conducted at the Children's Advocacy Center, as well as a transcript of the grand jury proceedings. Sugino's memorandum to Sosa notes that Sugino would inform Sosa when the DOE had actually obtained the videotape in order to "make the arrangements for the viewing by you and your principal." Sugino remarked that, "[w]ith this additional information, the [DOE] will be in a better position to determine the appropriate action." In closing, Sugino conveyed the importance of Sosa's investigation of Norton's alleged misconduct and reassured Sosa that, "[b]ecause we recognize the individual's rights balanced with our concerns for the welfare of the students, every effort shall be made to assist *you in your investigation of this matter,* so that a proper decision can be determined." Subsequently, Sosa received and reviewed the videotape. At trial, Sosa asserted that he "was objective about looking at what was presented on the [video] tape" and acknowledged that it made him "concerned enough that [he] wanted to sit down with Mr. Norton[,] ... have him view [it,]" and hear Norton's "side of the story."

On June 18, 1992, Schlosser sent a memorandum to Sosa, recommending that "any

---

12. The circuit court found that this meeting, particularly the agreement to expedite Norton's trial, as well as advising Norton to obtain depositions from potential witnesses, reflected Sosa's and Gordon's bias in Norton's favor before the DOE's administrative investigation was complete. The circuit court found Gordon's bias further reflected in a memorandum she sent to

Norton on April 27, 1992—which purports to have attached copies of "investigation notes" prepared by Estomago, Ching, and Schlosser, as well as notes of Sosa's March 4, 1992 conference—with the notation: "I hope this helpful to you. Please let us know if you need anything else."

action on Lawrence Norton by the [DOE] be postponed until the outcome of his [criminal] trial[,] which is scheduled this month." In the memorandum, Schlosser stated that he had contacted Norton, requested an interview with him and his HSTA representative, and offered to "share a viewing" of the videotape with Norton. Norton initially replied that he would consult his attorney, but that he wanted to cooperate with the DOE. However, Norton's HSTA representative subsequently informed Schlosser that Norton's attorney had advised Norton not to talk to anyone about the case. Schlosser's memorandum closed with the observation that "[o]ur consideration of the outcome of the court case will allow the [DOE] to fairly judge Mr. Norton's conduct with regard to this accusation." [13]

On June 26, 1992, Sosa mailed a memorandum to Norton that reiterated the substance of Schlosser's June 18, 1992 memorandum, renewed his offer to view the videotape, and invited Norton to a conference about the matter:

As part of the [DOE's] administrative investigation of the alleged sexual assault, I viewed the videotape, and I would like to afford you the opportunity to view this videotape, and to give your version of the facts giving rise to the allegations, and to respond to the questions which I have concerning the statements made by the student. . . .

Please call my secretary . . . on or before July 9, 1992 to schedule or decline this conference.

Norton accepted the offer to participate in a conference with Sosa, and, consequently, on July 7, 1992, Sosa and Gordon met with Norton, Moore (Norton's HSTA representative), and Norton's attorney, Clifford Hunt.

Sosa opened the meeting by noting that he could support Schlosser's recommendation to table the investigation until the conclusion of Norton's criminal trial, or he could recommend to the DOE Superintendent such disciplinary action as suspension, reassignment, or termination. Sosa asserted that he "wanted to hear what [Norton] had to say," so that his decision would, hopefully, be better informed. Those present at this meeting initially clarified the particular documents that had been shared with Norton up to that time, after which Gordon agreed to produce documents that Norton and his attorney believed had not yet been provided to them.[14] Norton's attorney supported Schlosser's recommendation and remarked that Norton's trial was scheduled to commence on August 24, 1992, but that a delay was possible. Moore also supported Schlosser's recommendation, remarking that, "earlier[,] the school did an investigation and found the charges at that time to be groundless and that the Marine Corps[,] through whatever mechanism that they [use to] investigate things, did so and found the charges to be groundless[.]" Moore advocated that Norton "should be kept on full pay and benefits until this thing has been adjudicated through a competent court."

Norton declined to view the videotape, his attorney remarking that they had already done so. During the remainder of the meeting, Sosa posed a number of specific questions to Norton, which he had formulated after viewing the videotape, in connection with T.Y.'s accusation and Norton's attempt to confront T.Y.'s mother on the day that T.Y. had removed her belongings from Nor-

13. At trial, Sosa testified that he did not specifically recall Schlosser's recommendation, but did recall that

there was an agreement. We talked about it with Mrs. Sugino and those of us investigating the case that[,] as time went on in terms of the investigation of this matter, that he was indicted[,] and we were not able to get information regarding the particulars of the case. We weren't able to talk to the family, to the child, to the police, any of those parties to get information. And since he was indicted, that it

seemed prudent at that point in time to allow that process to take its course because those people would be in a position to gather the evidence that would determine whether he was guilty or not guilty of that particular charge.

14. It is unclear from the record whether Norton had subpoenaed the DOE's documents regarding their investigation of T.Y.'s accusations or whether the DOE was simply being generous in sharing its documents with him for the purposes of his criminal trial.

ton's classroom.[15] Norton declined to answer any of Sosa's questions, invoking his "constitutional right to remain silent" in light of the pending criminal charge against him. Sosa concluded the meeting by indicating that he would notify Norton of his decision regarding Schlosser's recommendation, but that further review would be necessary in the event that any additional information was obtained. At trial, Sosa acknowledged that, at this point in his administrative investigation, Norton had "pretty much stonewalled" his attempt to obtain information.

On August 13, 1992, Superintendent Toguchi notified Norton that he would remain on administrative leave with pay "until a decision is made regarding the investigation of the serious complaint made against you by the parents of one of your students" and that he "should be available for meetings" regarding the matter. As of August 14, 1992, Sosa "had no information at all," other than T.Y.'s videotaped allegations. Consequently, upon a deputy attorney general's suggestion, relayed to Sosa by Sugino, Sosa contacted Norton to "offer[him] the option of obtaining a medical examination to determine [his] fitness to resume teaching duties."[16] During the telephone conversation, Sosa "made it clear to [Norton] that [he] needed additional information" upon which "to base [his] decision to return [Norton] to the classroom." Sosa also informed Norton that, in the event Norton declined to submit to such an examination, he "would re-think [his] options and inform [Norton] of [his] subsequent decision."[17] Norton opted to discuss Sosa's offer with his attorney and, after doing so, refused it without explanation.

Regarding the foregoing, Sosa testified at trial as follows:

Well, we were faced with a situation of where we had had an employee that's been out of the classroom for that period of time. I'm not sure how many months it was already—on paid leave. We had no

15. The questions that Sosa posed to Norton regarding T.Y.'s accusation concerned whether: (1) he had touched T.Y.'s bare back, her underarm, or her breast by reaching under her blouse; (2) he had touched T.Y. on her arm or her bare thigh at any time; (3) he had, in fact, said to T.Y., "Where's my hug?" and had then proceeded to hug her; and (4) he had, as a matter of practice, asked children for hugs and then, in fact, hugged them. Sosa's questions regarding Norton's confrontation with T.Y.'s mother were couched as follows:

[T.Y.'s mother] states that you spoke to her the day that [T.Y.] was transferring her class, which was approximately one week after the initial reporting by her daughter to her. She claims that you came up to her and asked her, ... "... can I talk to you[,]" and then you told her[,] "I don't doubt that whatever [T.Y.] is saying, she is lying[,]" and then it was followed with[,] "I don't believe that she is not lying." Basically[,] in the tape there was confusion over what that statement was, but with further clarification, it comes out ... that you [were saying] that you "don't believe that she is lying."

[T.Y.'s mother] states that she told you that in most sexual abuse cases the person would not, would deny touching the child. So my questions are, three questions, One: Did you talk to [T.Y.'s mother]? Secondly, in your viewpoint, what was the essence of your conversation with [T.Y.'s mother]? [A]nd three, [d]id you say to [T.Y.'s mother,] "I am a grandpa figure to these kids"? That is also mentioned.

16. In this connection, the circuit court received into evidence an unsigned and undated handwritten memorandum, the authenticity of which the parties stipulated to, that appears to have been directed to Sosa. Sosa, however, testified that he had no specific recollection of the document; nonetheless, his testimony does not conflict with its substantive content. The memorandum noted that Sugino had suggested that Sosa telephone Norton to " 'feel him out' on the possibility of an Independent Medical Exam by a specialist who is knowledgeable in the area of sex abuse" and proposed two such specialists—one of whom was "Dr. Jack Annon"—between whom Norton could choose in the event he did not select his own. The memorandum asserted that, "[i]f the examination indicates that there is no problem, [Norton] can return to a teaching position" and noted that "[b]oth [Sugino] and the AG's office suggest that this call be made before we put anything in writing." At trial, Jack Annon, Ph.D., testified, as an expert in "the treatment of pedophiles," that someone from the DOE had indeed contacted him once, asking whether he would be available to undertake an examination of a teacher; he responded that he would be, but the DOE never contacted him further in this regard.

17. At trial, Sosa confirmed his deposition testimony that it was "not uncommon" for the DOE "to ask employees if they would undergo some sort of medical review, whether it be a physical or[,] in this case, a mental review, as a matter of process, in ... gathering more information in a particular case."

information or little information other than the videotape regarding the allegations, and we were not able to conduct a thorough investigation. At that point in time, the other issues were going through the process in terms of the other trial [*i.e.,* Norton's criminal trial] and that sort of thing and on those charges.

So the issue was—and if I remember somewhere along the line—during that summer, the union asked if we would be placing him back into the classroom position. So we needed to make some determination as to whether or not—obviously, our concern was for the safety of the kids—whether or not we should put him back in the classroom. So then the discussion came around to the possible examination of a medical physician to give us some information regarding this person's state of mind and functioning ability at that point. So that's the context as to how the discussion came about to consider that as an option.

However, Sosa denied being aware that the purpose of such an examination would have been to determine whether Norton was in fact a pedophile or that the two psychologists proposed by the DOE to perform the examination, *see supra* note 16, were specialists in "deviant sexual behavior."

At trial, Sosa acknowledged that, so far as he knew, the DOE made no further attempts to investigate the matter once Norton refused to submit to the offered examination. Nevertheless, on September 22, 1992, Sosa informed Norton that he would be reassigned

for the 1992 fall semester to a non-teaching position, rather than being subjected to disciplinary action, because "our investigation of the concerns regarding the allegation of your misconduct ... indicates insufficient evidence to take any disciplinary action at this time."

c. *The DOE's conduct after Norton's acquittal of the criminal charges in the T.Y. matter*

(1) *The DOE assumes that Norton's acquittal "absolved" him of the charge of having molested T.Y.*

On January 11, 1993, the jury in Norton's criminal trial rendered a "not guilty" verdict. Effective January 25, 1993, the DOE reinstated Norton to his previous fourth-grade teaching position without conducting any further investigation. Each of the DOE administrators involved appears to have believed that the jury's "not guilty" verdict was synonymous with a determination beyond a reasonable doubt that Norton was, in fact, innocent.[18] Indeed, in a letter to KMCAS base command, dated February 2, 1993, Sosa noted that, "[i]n view of [his] acquittal," the fact that T.Y. was no longer a student at Mōkapu, and "indications of support by other parents at the school and the school administration," Norton was reinstated to his former teaching position, because, "[i]n summary, both the administrative and criminal investigation/prosecution processes have essentially absolved Mr. Norton[.]"[19]

In the interim between Norton's acquittal and reinstatement, the DOE made no at-

---

18. Estomago testified that "it was like, you know, he was acquitted[,][a]nd everyone believed that it was only right that it be so[,] because he was innocent[,][b]ecause he was a good man that had been maligned. That's how it appeared to everybody." Schlosser testified, "I had faith that this had gone through a trial ... and [that] the truth would emerge[;] ... and so[,] because he was exonerated, he came back and I assume[d] that he was fit to teach." In a memorandum dated January 12, 1993, Sugino noted that the DOE could "take action, based on" the prosecutor's "statements that [Norton] has been acquitted" and that, "[b]ased upon the information of [Norton's] acquittal," the DOE could reassign Norton to his "old position." Sugino's memorandum also reflects that Schlosser supported Norton's reinstatement to his former teaching position: "It was my understanding that the present principal, Mr. Jim Schlosser[,] and Mr.

Norton himself would like to return to Mōkapu[.]" The circuit court found that, although Schlosser testified that he did not recommend that Norton be reinstated to a teaching position, he, nonetheless, was "in favor of Norton returning to the school."

19. Sosa's February 2, 1993 letter to Lt. Col. Messere was in response to Messere's letter noting Norton's recent reinstatement and requesting "your administrative review of this matter to determine whether reinstatement ... is in the best interest of all parties, most specifically[,] the residents of this installation whose children attend Mōkapu school." The base commander, Col. Richard Crawford, had directed that Messere, his executive officer at the time, write the letter. Col. Crawford had assumed that the DOE would conduct an "in-depth investigation" de-

tempt, despite the fact that his right against self-incrimination no longer obtained, to question Norton or to have him submit to the proposed psychological examination.[20] Nor, indeed, had the DOE, at any time during its investigation, sought Norton's medical records or attempted to interview his friends or family members.[21] In sum, and despite his representations to the contrary to Lt. Col. Messere, Sosa acknowledged at trial that Norton had "stonewalled" the DOE's investigation and that the investigation had not produced "any evidence in favor of" him and had failed to "absolve" him.

### (2) Schlosser's "advice" to Norton after his reinstatement

Soon after Norton was reinstated, Schlosser "cautioned" him, because it was the "judi-

cious thing to do," against physically touching students in any manner that might be misinterpreted. Indeed, when Schlosser became aware that Norton had been seen hugging students, he remarked to Norton that, if it had been he that had been accused, he "wouldn't be anywhere near a kid." However, because he thought that Norton's union contract precluded any differential treatment among teachers, Schlosser did not impose any restrictions upon Norton's conduct or subject him to any special supervision.

Norton resumed his practice of issuing hall passes to students, including fourth and fifth grade girls with light colored hair (as had been T.Y.'s), so that they could visit him during lunch recesses. While the students were visiting him, Norton would offer them

spite Norton's acquittal in the criminal trial. In an initial conference with other military officers, including a Judge Advocate General, Col. Crawford was advised that, absent some "grounds" to do so, he should not preclude Norton from entering the military base in order to go to his job. In the meantime, when the indictment was returned in early 1992, Crawford had issued an order barring Norton from entering the base. After Norton's acquittal, Crawford was never informed that the DOE had not conducted such an "in-depth investigation," and, indeed, "was told by everybody at the head of the [DOE] administration, all the way up to Mr. Sosa, that the gentleman was highly thought of and he was a well-respected teacher. And that they didn't think the allegations were substantiated, and that [he] shouldn't worry." However, Crawford testified that, had the DOE informed him that it had not completed its investigation (specifically, had he "known they had done no psychic evaluation or any inquiry into his background"), he would not have automatically precluded Norton from entering the base but, rather, would have once again consulted his advisors and, in all likelihood, would have requested that additional precautions be taken, such as increased supervision, in order to protect the children.

**20.** Had he been consulted, Dr. Annon would have informed the DOE that it should not infer that Norton was innocent on the basis of his acquittal in a criminal trial and would have educated the DOE regarding the cyclical nature of pedophilia and the common characteristics of pedophiles. He would have further informed them that being well-liked by his peers and the children was also not a basis upon which to rule out pedophilia, but was, in fact, consistent with a pedophile profile. Dr. Annon would have advised the DOE to conduct an extensive investigation into Norton's background, including inter-

viewing family members and friends, as well as have Norton submit to a psychological examination. Had Norton undergone a psychological examination, Dr. Annon opined that it would have been unlikely that he would have avoided detection as a pedophile if, in fact, he was one. Had the DOE insisted on reinstating Norton without heeding the foregoing advise, Dr. Annon would have suggested numerous precautions be taken to avoid any further incident such as that alleged by T.Y.; for example, Dr. Annon advised that the DOE instruct Norton to leave his classroom door open at all times and to avoid physical contact with the children or contacting them at all after school hours, as well that the DOE prohibit Norton from being alone with a child; in addition, he would have instructed the DOE regarding what "indicators" might raise "red flags."

In Dr. Annon's opinion, in light of the information then available to the DOE, reinstating Norton to a teaching position without imposing any restrictions upon his contact with the children or taking any precautions in this regard constituted "a real risk" to the children. In the event that it were established that Norton was a pedophile, Dr. Annon would not have recommended reinstatement under any conditions.

**21.** The record suggests that, had the DOE done so, Norton's niece, Diana Bassen, may have informed the DOE, as she subsequently informed a prosecutor in 1995, that Norton had molested her on three occasions when she was between the ages of ten and twelve, one of the incidents also involving her cousin, who was a year younger than she. Pretrial, the parties disputed the admissibility of Bassen's letter; eventually, however, the circuit court received it into evidence without objection by the DOE; the DOE does not challenge the letter's admissibility on appeal.

candy and solicit hugs from the girls before they left to attend their afternoon classes; he would not, however, routinely hug the boys that visited him. Apparently, Norton was the only teacher to issue hall passes for the purpose of simply visiting with children during lunch recesses, as opposed to ensuring that they completed unfinished homework assignments.

In early January 1995, approximately one or two weeks into the spring semester, Schlosser became aware that Norton had recommenced issuing hall passes to students. Schlosser was "concerned" about the passes because, according to his deposition testimony, they caused "confusion," as students would "collect" them and use them without proper authorization. He was not "concerned," however, about Norton using the passes in order to be alone with a female student; this was because he would frequently roam the halls during lunch recess and observe numerous children in Norton's room. Moreover, Schlosser harbored "no concern about [Norton] being inappropriate" with the children. To the contrary, it appears, as Schlosser conveyed to Norton in early January 1995 (before any further allegations against Norton surfaced), that Schlosser believed that teachers should have the prerogative of physically interacting with and touching students.[22]

### 2. The 1995 allegations against Norton, including those that predicate the present matter

#### a. A.C.'s accusation that Norton molested her in C.P.'s presence

On the afternoon of Friday, January 13, 1995, two fifth grade students, identified herein as A.C. and C.P., reported to Amy Arakaki, Mōkapu's vice-principal at the time, that Norton had rubbed A.C.'s chest beneath an outer shirt but over a second, inner shirt.[23] Norton had invited A.C. to visit him during the lunch recess; because she did not like being outdoors during the recess, she would accept Norton's standing invitation two or three times a week. According to the girls, as A.C. sat in a chair near Norton's desk, Norton, seated in his own chair some two feet away from A.C., said, "Come here, I want a hug." A.C. rolled her chair closer to Norton, stood up, pushed the chair underneath Norton's desk, and hugged Norton. She then retrieved the chair from underneath Norton's desk and resumed sitting in it. Norton proceeded to rub A.C.'s shoulder and neck with his left hand; he tickled her neck, then moved his hand down across her chest, between the two shirts that she wore. He rubbed her chest for several seconds.

A.C. attempted to move away from Norton, but Norton pressed her back into the chair; at that point, she did not know what to do. C.P., who was A.C.'s friend, was present at the time and became frightened when she saw Norton's hand slip between A.C.'s two shirts. Running to one of the room's doors, she yelled to A.C. to "come on" because a friend of theirs was "by our class[room]," and, presumably, it was time for afternoon classes to begin. A.C. stood up and ran to C.P., and both girls then proceeded to their afternoon class.

Later that afternoon, A.C. requested that she and C.P. be excused from class to talk to the school counselor or the vice-principal;

22. Schlosser's deposition and trial testimony are not entirely consistent with regard to whether Schlosser approved of Norton's post-reinstatement conduct in connection with students visiting and hugging; in his deposition testimony, Schlosser asserted that he "believe[d] that teachers should be able to physically interact and touch students"; however, at trial he testified that he did "not expect [Norton] to be hugging children [or] touching children," even though he was "in favor of" the children visiting Norton's classroom during lunch recesses, despite T.Y.'s allegations. Schlosser's deposition testimony, however, suggests that, as a matter of DOE "unspoken policy," teachers were generally discouraged from touching students in any manner that might be misinterpreted and that Schlosser personally disagreed with this policy. Thus, it appears that Schlosser "cautioned" Norton against touching the students in any manner that might be misinterpreted, but also informed Norton that he (Schlosser) was personally in favor of teachers touching students in an appropriate manner.

23. It appears that Norton had previously touched A.C.'s chest once when she was a fourth-grader during the 1994 fall semester, but that, when A.C. had reported this prior incident to her mother, her mother responded that it was probably an accident.

because the former was busy, the girls related the incident to Arakaki. In addition to describing Norton's conduct to Arakaki, A.C. asserted that she did not want to get Norton into trouble and that Norton previously had informed A.C. that a prior student had accused him of touching her in the past. Arakaki drafted a memorandum directed to Schlosser regarding the incident and also attempted to contact Schlosser, who was "off-campus" that day, by telephone.

Arakaki did not succeed in speaking with Schlosser until the evening. Meanwhile, she telephoned Norton at approximately 2:30 p.m., left a message for him, and received his return call at approximately 6:30 p.m. She informed Norton of A.C.'s allegations and that he was being placed on administrative leave as of Tuesday (Monday was a holiday), so that the school could conduct an investigation. Arakaki further informed Norton that she had not yet been able to inform Schlosser of A.C.'s allegations, but that Schlosser would be contacting him in order to schedule a meeting with him.

On Saturday, January 14, 1995, at the request of A.C.'s mother, Schlosser met with A.C., C.P., and their respective mothers; A.C.'s mother asked to be informed of the "status" of the incident. Schlosser assured A.C.'s mother that he would conduct an investigation independently of any HPD investigation that might be conducted. On the same day, Schlosser interviewed both A.C. and C.P., who confirmed what they had previously told Arakaki. Schlosser "believed [A.C.] absolutely."

On Monday, January 16, 1995, a holiday, Schlosser contacted Norton, confirming that he was placed on administrative leave and scheduling a meeting with him, in the principal's office of a different school, to take place on the following day in order to discuss A.C.'s accusation. However, the DOE's Windward District Personnel Specialist at the time, Francine Honda, instructed Schlosser on Tuesday, January 17, 1995, to postpone his meeting with Norton so that he could gather more information and obtain the

consent of A.C.'s and C.P.'s parents to disclose their statements to Norton. Schlosser, nonetheless, kept his scheduled meeting with Norton in order to simply tell him that any discussion of A.C.'s and C.P.'s allegations would be postponed. Norton related to Schlosser that his attorney had advised him not to discuss the matter with anyone.

### b. *Melony's and Nicole's allegations*

On Tuesday, January 17, 1995, C.P. provided Schlosser with the names of other students whom she believed had been present in Norton's classroom at the time he allegedly rubbed A.C.'s chest. As a result, on Wednesday, January 18, 1995, Schlosser summoned approximately eight to ten students into his office and interviewed them in connection with A.C.'s accusation. Among these students were Melony and Nicole. Schlosser interviewed Melony and Nicole, as well as other students, a second time on the following day, Thursday, January 19, 1995.[24]

### (1) *Schlosser's first interviews of Melony and Nicole*

Schlosser interviewed Melony and Nicole separately on Wednesday. He issued excuse slips for them, summoning them to his office from their afternoon classes. Both girls felt nervous about being summoned to the principal's office, did not know why he had summoned them, and initially believed that they were "in trouble." Neither had been called to the principal's office before.

When he interviewed them, Schlosser asked each girl whether she had observed anything unusual in Norton's classroom during the lunch recess on Friday. He had each of them describe, using a diagram he had drawn of Norton's room, where Norton, A.C., and C.P. had been located at the time Norton allegedly touched A.C. Apparently, neither Melony nor Nicole had witnessed the incident. Melony and Nicole did not, during this initial interview, inform Schlosser that Norton had previously touched each of them in a manner that had made them feel "uncomfortable."

---

**24.** The record reflects that Schlosser also interviewed H.D., one of Melony's and Nicole's friends, who, like Melony and Nicole, reported to

Schlosser that, "when we go and see [Norton], he sort of rubs our butt[s]" in the course of giving each of the girls a hug.

**(2)** *Schlosser's second interviews of Melony and Nicole*

On Thursday, January 19, 1995, Schlosser once again summoned Melony and Nicole to his office.[25] This time, he questioned both girls at the same time, asking them whether Norton had ever touched them. Both Melony and Nicole described Norton's practice of hugging them before they left to attend afternoon classes and reported that Norton had touched them in a manner that made them feel "uncomfortable"; each girl physically demonstrated the way Norton had touched her.

In a subsequent criminal proceeding against Norton arising out of Melony's and Nicole's accusations, Melony testified that, in the course of a routine hug before she left for her afternoon class, Norton hugged her in a manner that she did not think was "okay" and that made her feel "uncomfortable." This hug occurred at some point during the 1994 fall semester. She had been visiting Norton during the lunch recess; before leaving, she "went to give him a hug," and, while hugging her, "he put his hand down my back and then start[ed] to go down, and he touched me on my butt." Norton was sitting at the time, while she stood beside him; he hugged her with his left arm. This hug was "different" than other hugs she had received from Norton; it made her "fe[e]l uncomfortable" because his left hand, which he had "cupped," came to a stop on her buttocks (over her clothes) for approximately five seconds until she walked away from Norton. Melony testified that she was "really mad" at Norton because of this hug, but that she did not tell anyone about it at the time because she "didn't think it was against the law" and she did not want to get Norton into trouble. As a result of the hug, Melony altered the manner in which she would hug Norton; instead of standing next to or in front of him, she would approach him from behind his chair and hug him over his back.

At the same criminal proceeding against Norton, Nicole described three incidents during the 1994 fall semester and the first weeks of the 1995 spring semester in which Norton touched her in a manner that was "uncomfortable." One of the incidents occurred in October 1994, approximately a week before Halloween. As he was hugging her, Norton placed two of his fingers inside the back pocket of her pants, rubbing her "butt" for approximately five to ten seconds, until she walked away from him. Throughout the course of this hug, Nicole kept her arms at her sides and did not return Norton's hug. Although she believed that Norton had been rubbing her buttocks intentionally, and despite the fact that the incident made her "uncomfortable," she did not become angry because she did not realize that what Norton had done was "wrong." As a result of the incident, Nicole also changed the manner in which she hugged Norton, shortening the amount of time that she permitted the hugs to last. Nonetheless, apparently on two other occasions, Norton rubbed her waist and buttocks in a similarly "uncomfortable" manner.

Nicole identified one of the incidents during which Norton had rubbed her buttocks as having occurred in early January 1995 and as having involved much the same behavior as Melony had described. Norton had hugged her from a sitting position, while Nicole was standing before him. His hands dropped down her back and "rubbed" her buttocks "back and forth" for approximately five to ten seconds, until she walked away. She described a line forming so that the girls could all receive a hug before leaving for their afternoon classes. Although other girls were behind her in line, they were "doing other stuff" at the time and, apparently, did not observe Norton rubbing Nicole's buttocks. Like Melony, Nicole did not tell anyone about the incidents because she did not want to get herself or Norton into trouble. Moreover, Nicole did not know whether the touchings were "big enough" to tell someone about. Instead, Nicole tried to "put it behind [her] and forgot about it."

In the course of interviewing them on Thursday, January 19, 1995, Schlosser told

---

**25.** At trial, Schlosser testified that Melony and Nicole came to see him of their own accord and that he did not summon them from class for a second interview. However, the circuit court found the girls' version—*i.e.,* that he summoned them—to be more credible.

Melony and Nicole that what Norton had done was criminal, but that neither of them were in trouble. However, at trial and in a pretrial deposition, Schlosser testified that he believed, at the time he heard their allegations, that the conduct they described constituted "brushings," rather than inappropriate sexual touchings or "fondling." Yet, in his deposition testimony, Schlosser admitted that he did not know what constituted a criminal sexual offense.

Apparently believing that both girls had disclosed to their respective parents the incidents they had described to him, Schlosser did not inform the girls' parents that he had interviewed them, nor did he relay what the girls had stated to him regarding Norton. As it happens, however, neither of the girls had told their parents about Norton's hugs or about being called into Schlosser's office and interviewed.[26] Schlosser did not "d[o] anything" because he was waiting for the girls' parents to contact him. He believed that "[i]t was inappropriate for [him] to conduct any type of investigation because it's [DOE] policy not to do that." Indeed, as he stated to H.D.'s parents, *see supra* note 25, who had contacted him on January 24, 1995 because H.D. had revealed to them that she, too, had been "patted on the butt" by Norton, he believed that he "could not interview" H.D. about her allegations. According to Schlosser, "Chapter 19 [of Hawai'i Administrative Rules Title 8] . . . states that in any kind of sexual misconduct [case], [the] school is not to do the investigation; that it is up to other agencies to do the investigation, because school level people are not trained

adequately to—to deal with that very sensitive and unique issue." Thus, Schlosser asserted that, once he had initially interviewed students, he did not further "investigate" A.C.'s, H.D.'s, Melony's, or Nicole's allegations.

### c. Prosecution of Norton in connection with A.C.'s, Melony's, and Nicole's accusations

The record is unclear as to who informed either the military CID or the HPD of Melony's and Nicole's allegations. However, as of January 17, 1995, the HPD was conducting its own investigation—at least with regard to A.C.'s accusation, if not Melony's and Nicole's. Moreover, it appears that, initially, the military CID investigated Melony's allegations and, around January 24, 1995, transferred her case to the HPD. In any event, Norton was eventually prosecuted in connection with A.C.'s allegations, and, in a separate prosecution, in connection with Melony's and Nicole's accusations.[27] He was indicted in connection with A.C.'s allegations on January 26, 1995. Eventually, on November 30, 1995, Norton pled no contest to the charges set forth in the indictment relating to A.C. It was not until May 3, 1996, however, that the DOE finally terminated Norton based on his misconduct with A.C. On May 13, 1996, Norton was sentenced to one year of incarceration; at his sentencing hearing, Norton admitted that he had a prior history of pedophilia.[28]

---

26. Melony's mother learned that Melony had reported being touched by Norton from a police detective, who telephoned her around January 25, 1995 to inform her that the case was being handled by the HPD. Nicole's mother first learned that Norton had been accused of molesting A.C. from a newspaper article on a Sunday morning in January 1995; while speaking to Nicole about the article, Nicole informed her of Schlosser's interviews with her and of Norton's hugs.

27. It appears that Norton was not prosecuted with regard to H.D.'s allegation because her parents did not wish her to testify in a criminal trial.

28. In this regard, in an article published on May 16, 1996, the Honolulu Advertiser reported that prosecuting attorney Keith Kaneshiro announced

that Norton had, at the sentencing hearing, confessed to molesting two dozen children. Pretrial, the parties disputed the evidentiary admissibility of the newspaper article, the DOE contending that Norton's admission was contained in a sealed document in the criminal proceeding. The circuit court, however, allowed the article into evidence, noting that it "would not consider it on the basis of the truth of the matter asserted of prior molestations," but, rather, was admitting "it for the limited purpose on the issue of damages to the [p]laintiffs in viewing that article." Thus, as a finding of fact under the heading of "additional facts relevant to damages," the circuit court found that, "[a]t the sentencing hearing, Norton admitted his prior history of pedophilia."

Meanwhile, with regard to Melony's and Nicole's accusations, Norton was indicted on May 2, 1996. The prosecution vigorously urged Melony's and Nicole's parents to have their daughters cooperate in prosecuting Norton so that he would be disabled from molesting other children. In May 1997, the criminal proceeding arising out of Melony's and Nicole's accusations went to trial, but resulted in a mistrial because the jury could not reach a verdict; both families were informed that the jury's final vote had been eleven in favor of conviction and one for acquittal. Norton was retried in December 1997; the jury acquitted him.

### B. *Procedural Background*

On November 29, 1996, while the criminal proceeding in connection with Melony's and Nicole's allegations was pending, the girls' parents, in their individual capacities and on behalf of their daughters, filed a complaint against, *inter alia*, Norton and the DOE. The complaint asserted several distinct claims for relief, among them (1) an intentional tort claim against Norton, (2) a claim "in *respondeat superior*" against the DOE as Norton's employer, (3) a negligence claim against the DOE "as a separate and independent tort from the wrongful acts and omissions of . . . Norton," and (4) a negligent infliction of emotional distress claim "as to all defendants." As to their negligence claim against the DOE, the plaintiffs averred in relevant part that the DOE "had a duty to each of the [p]laintiffs" to: (1) "conduct a meaningful investigation and background search prior" to reinstating Norton; (2) supervise Norton's "unusual behavior," such as his practice of "secreting himself in his classroom during the lunch hour and issuing hall passes to young girls," given T.Y.'s prior allegations; (3) promptly notify the police and a student's parents, upon learning of allegations of a teacher's sexual abuse of the student; (4) train its employees "in the monitoring and investigation of matters involving sexual abuse by its teachers and to avoid incompetent, harmful investigations of such allegations"; (5) "avoid urging" the military to withdraw Norton's *persona non grata* status and "avoid personally vouching" for him "in a manner that resulted" in the military

not precluding him from entering KMCAS; and (6) notify parents "before their child is interviewed by any [DOE] official or employee about potential sexual abuse by a teacher." Because various DOE employees had breached the foregoing duties, the plaintiffs contended that the DOE was liable to them for its negligence "for failing to have exercised reasonable due care to avoid the injury[,] which was foreseeable under the circumstances."

The plaintiffs further alleged that, as a result of Norton's and the DOE's conduct, Melony and Nicole both "suffered grievous and permanent injuries, mental and emotional distress." Similarly, the plaintiffs alleged that each girl's parents "individually suffered serious and grievous mental and emotional distress arising out of the injuries subjected to their minor children[,] which has required extensive counseling to the entire family and which has resulted in substantial and permanent emotional distress." The plaintiffs sought "compensatory and punitive damages against [Norton] . . . and compensatory damages as to all Defendants arising out their injuries" and, therefore, prayed for "general, special and punitive damages as provided by law[.]"

In its answer to the complaint, the DOE, *inter alia*, asserted sovereign immunity as a defense and contended that, in any event, Norton's intentional tort was a superceding cause of the plaintiffs' injuries. Coupled with its answer, the DOE asserted a cross-claim, *inter alia*, against Norton.

At trial, the parties stipulated that Norton had an "extensive prior history of pedophilia," and the DOE did not dispute that he had molested Melony and Nicole. The plaintiffs introduced transcripts of the testimony that the girls gave in connection with the criminal prosecution of Norton into evidence, and neither girl testified at the civil trial in this matter. All four parents testified, however, as did Beverly James, an expert in clinical social work, specializing in childhood trauma.

The plaintiffs did not contend that either Melony or Nicole had been physically injured by Norton's molestation of them, at least not in the sense that either required medical care. Rather, the plaintiffs asserted that

their injuries were psychological in nature.[29] James testified that the plaintiffs' psychological disorders were permanent and would require extensive treatment, which she quantified. The plaintiffs did not, however, make any effort to isolate the precise sources of their sundry psychological disorders and traumas; for example, James testified that, in assessing each plaintiff's psychological injuries and damages, she considered the "totality" of the circumstances, including Norton's molestation of the girls, the school and criminal investigations, and the effect of testifying in the criminal proceedings. It is significant that, on appeal, the DOE does not contest the nature or extent of the plaintiffs' injuries.

Because of a contemporaneous voluntary bankruptcy proceeding involving Norton, the circuit court dismissed all of the plaintiffs' claims against him.[30] With regard to the plaintiffs' claims against the DOE, the circuit court determined that the DOE was not liable to the plaintiffs under the doctrine of *respondeat superior* for Norton's molestation of Melony and Nicole (molestation of students not being within the scope of his employment), but that the DOE was liable to the plaintiffs on their negligence and NIED claims. The circuit court further ruled that the STLA, HRS ch. 662, did not insulate the DOE from liability for its negligence and NIED. We discuss the circuit court's analysis in relevant part *infra* in section III.

29. More specifically, the record reflects that all six plaintiffs have developed post traumatic stress syndrome. In addition, Melony has developed oppositional defiant disorder, attachment disorder, and attention deficit disorder. Moreover, James, the plaintiffs' expert, characterized Melony's and Nicole's psychological injuries as "developmental injuries." All of the parents testified as to their feelings of helplessness and their difficulty in coping with not being able to protect their respective children. Melony's and Nicole's mothers also testified at length about their anger and frustration over not having been informed by Schlosser of his interviews with the girls or their revelations to him. In addition to other impacts on the family dynamics of the Davises and the Draughns, both girls have been unable to hug their respective fathers as a result of their psychological injuries. The girls' parents also testified regarding the contrasts in the girls' respective behavior before and after Norton molested them. In this regard, we note that Melony suffered from some psychological problems before Norton molested her.

30. The dismissal of the plaintiffs' claims against Norton came about as follows. On July 29, 1998, Norton filed a voluntary bankruptcy petition. As a result of his bankruptcy petition, the plaintiffs' tort action naming Norton as a defendant was automatically stayed, apparently by operation of statute. However, on a motion filed in the bankruptcy court by the plaintiffs in the present matter, the bankruptcy court modified the automatic stay. The bankruptcy court noted that the automatic stay affected only the plaintiffs' claims against Norton, but not those against his codefendants. The bankruptcy court also noted that, as a result of the bankruptcy proceeding, Norton lacked the funds to hire an attorney to represent him in defending against the plaintiffs' claims. Consequently, the bankruptcy court ordered that the plaintiffs' tort action could "proceed with the full cooperation and participation of [Norton], including his appearance as a trial witness and as to such discovery as [might] be

conducted" in their tort action, but that "no judgment may be obtained against [Norton] nor may the [plaintiffs] request any monetary award as to [Norton] without further order of this court." As of the time that the present matter proceeded to trial in January 2000, it appears that no further order had issued from the bankruptcy court.

After trial, it appears that the parties informed the circuit court that, on December 8, 1999, the bankruptcy court had discharged Norton's preexisting debts. In its order dismissing the plaintiffs' claims and the DOE's cross-claim against Norton, the circuit court remarked in relevant part as follows:

It has now come to the court's attention that on December 8, 1999, this bankruptcy case was closed with Lawrence J. Norton's preexisting debts deemed discharged.

In the [present matter], Plaintiffs' claims and Defendant State of Hawai'i Department of Education's cross-claim against Lawrence J. Norton had not been resolved due to this court's understanding that the bankruptcy case remained open.

The new information received by the court indicates that Lawrence J. Norton's preexisting debt has been deemed discharged.

Pursuant to its inherent powers, this court therefore orders ... that any remaining claims against Defendant Lawrence J. Norton in [the present matter], including, but not limited to, Plaintiffs' claims and Defendant State of Hawai'i Department of Education's cross-claim, are hereby dismissed with prejudice.

Subsequently, in its final judgment, the circuit court incorporated the foregoing order as follows: "Pursuant to this [c]ourt's order dated March 8, 2000, claims against Defendant Lawrence J. Norton were dismissed because they were discharged in bankruptcy." On appeal, none of the parties challenge the circuit court's dismissal of their respective claims against Norton.

The circuit court determined that the plaintiffs' total damages were as follows: for Nicole, general damages of $400,000 and special damages of $50,000 and for each of her parents, general damages of $200,000 and special damages of $15,000; similarly, for Melony, general damages of $400,000 and special damages of $50,000 and for each of her parents, general damages of $200,000 and special damages of $13,750. Because Norton's conduct, however, was also a substantial factor in causing the plaintiffs' injuries, the circuit court determined that the DOE's "degree of fault" in causing the plaintiffs' injuries was forty-nine percent. Accordingly, the circuit court entered judgment, with regard to the plaintiffs' negligence and NIED claims in favor of the plaintiffs and against the DOE, in an amount representing forty-nine percent of their total damages;[31] but with regard to the *respondent superior* claim, the circuit court entered judgment in favor of the DOE and against the plaintiffs.

## II. *STANDARDS OF REVIEW*

### A. *Statutory Interpretation*

 "The interpretation of a statute ... is a question of law reviewable *de novo.*" *In re Jane Doe, Born on June 20, 1995*, 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001) (citations, quotation signals, and brackets omitted) (ellipsis points in original). In construing a statute, "our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *Id.* at 191, 20 P.3d at 624 (citations omitted). Moreover, "we must read statutory language in the context of the entire statute and construe it in a manner consistent with [the statute's] purpose." *Id.* (citations omitted). We "may also consider '[t]he spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning.' " *Id.* (quoting HRS § 1-15(2) (1993)) (additional citation

omitted). Similarly, " '[l]aws *in pari materia,* or upon the same subject matter, shall be construed with reference to each other,' " and, thus, " 'what is clear in one statute may be called upon in aid to explain what is doubtful in another.' " *Id.* (quoting HRS § 1-16 (1993)) (additional citation omitted).

### B. *Findings Of Fact And Conclusions Of Law*

#### 1. *Duty of care*

 ... The existence of a duty, that is, whether such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other—or, more simply, whether the interest of a plaintiff who has suffered invasion is entitled to legal protection at the expense of a defendant—is entirely a question of law....

*Ruf v. Honolulu Police Dep't,* 89 Hawai'i 315, 320, 972 P.2d 1081, 1086 (1999) (citations omitted) (some ellipsis points added and some in óriginal). Accordingly, this court reviews a trial court's conclusion of law with regard to the duty of care that a defendant owes to a plaintiff in a negligence action *"de novo* [,] under the right/wrong standard" of review. *Id.* (citations omitted). As such, this court "examine[s] the facts and answer[s] the question [*i.e.*, whether the defendant owes the plaintiff a duty of care and, if so, the scope of that duty] without being required to give any weight to the trial court's answer to it." *Id.* (citations omitted). This is because a trial court's "conclusion of law is not binding upon [an] appellate court and is freely reviewable [on appeal] for its correctness." *Id.* (citations omitted) (some brackets added and some omitted).

#### 2. *Breach of duty and legal causation*

 Whether there was a breach of duty or not, *i.e.*, whether there was a failure on the defendant's part to exercise reasonable care, is a question for the trier

---

31. Specifically, the circuit court awarded Nicole's parents, in their capacity as Nicole's guardians ad litem and Melony's parents, in their capacity as Melony's guardians ad litem, general damages in the amount of $196,000 and special damages in the amount of $24,500 each. In their individual capacities, the circuit court awarded Nicole's mother and father $98,000 in general damages and $7,350 in special damages each and Melony's mother and father $98,000 in general damages and $6,375 in special damages each.

of fact. "For 'under the prevailing rule[,] duty ... is bounded by the foreseeable range of danger,' and 'reasonable foreseeability of harm is the very prototype of the question a [trier of fact] must pass upon in particularizing the standard of conduct in the case before it.' "

*Knodle v. Waikiki Gateway Hotel, Inc.,* 69 Haw. 376, 385, 742 P.2d 377, 383 (1987) (citations omitted) (some brackets added and some omitted) (ellipsis points in original). Similarly, "[t]he presence of a reasonably close connection between the defendant's conduct and the plaintiff's injury, *i.e.*[,] 'whether the breach of duty was more likely than not a substantial factor in causing the harm complained of[,] is normally a question for the [trier of fact] too.' " *Id.* (citations omitted) (some brackets added and some omitted). Accordingly, absent uncontroverted evidence from which only one inference can reasonably be drawn, the questions of breach of duty and legal causation constitute questions of fact, reviewable on appeal only for clear error. *See, e.g., Taylor–Rice v. State,* 91 Hawai'i 60, 69–70, 979 P.2d 1086, 1095–96 (1999); *Knodle,* 69 Haw. at 387–89, 742 P.2d at 384–85.

 A finding of fact is clearly erroneous "when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." *In re Jane Doe,* 95 Hawai'i at 190, 20 P.3d at 623 (citation omitted). " 'Substantial evidence' ... is credible evidence [that] is of sufficient quality and probative value [as] to enable a person of reasonable caution" to draw a conclusion. *Id.* (citation and some quotation signals omitted) (ellipsis points in original).

## C. *Credibility Of Witnesses*

 "[I]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." *In re Jane Doe,* 95 Hawai'i at 190, 20 P.3d at 623 (citations, quotation signals, and ellipsis points omitted).

## III. *DISCUSSION*

As an initial matter, we emphasize that, on appeal, the parties do not dispute that Norton molested Melony and Nicole. Nor do the parties disagree regarding the nature and extent of the plaintiffs' injuries, to wit, that each of the plaintiffs suffer from various psychological disorders that are likely permanent. Moreover, the DOE does not dispute the circuit court's findings of fact vis-a-vis the actions taken and not taken by its employees in the course of investigating T.Y.'s, A.C.'s, Melony's, and Nicole's reports of Norton's sexual improprieties; rather, the DOE disputes the legal import of these acts and omissions. Finally, none of the parties challenge any of the circuit court's pretrial rulings or its rulings concerning the admissibility of exhibits.

Because the issues raised in the DOE's cross-appeal are potentially outcome-dispositive of those raised in the plaintiffs' appeal, we address the points of error that the DOE advances in its cross-appeal before addressing those that the plaintiffs raise in their appeal.

### A. *The DOE's Cross–Appeal*

The DOE argues that the circuit court: (1) wrongly concluded that the STLA did not cloak the DOE with immunity from liability for its alleged negligence and NIED; (2) wrongly concluded that the plaintiffs' NIED claim was compensable in the absence of physical injury; (3) wrongly imposed "new duties" upon the DOE in concluding that the DOE owed the plaintiffs "a duty not only to supervise students, but to take such reasonable measures as would be taken by reasonable parents to avoid injury to students"; (4) clearly erred in finding that its employees had breached the "new duties"; and (5) clearly erred in finding that the breaches were each a substantial factor in causing the plaintiffs' psychological injuries. We address the DOE's arguments *seriatim.*

### 1. *Sovereign Immunity*

Pursuant to HRS § 662–2 (1993), "the State ... waives its immunity for liability for the torts of its employees and shall be liable

in the same manner and to the same extent as a private individual under like circumstances[.]" This court has held that, in so providing, the legislature "definitely expressed the intent ... that, for purposes of determining [the] liability of the State in tort cases, all the accepted tort law relating to private parties is applicable." *Upchurch v. State*, 51 Haw. 150, 151, 454 P.2d 112, 114 (1969). However, several "exceptions" to the general waiver of immunity from tort claims are set forth in HRS § 662–15 (1993 & Supp. 2001). Consequently, we have held that, "if a private party would be liable under the circumstances[, then] the State would also be liable, except for [those] claims enumerated in [HRS § 662–15]." *Id.* at 152, 454 P.2d at 114.

The DOE invokes "the intentional tort" exception, set forth in HRS § 662–15(4), to argue that it is immune from the plaintiffs' negligence and NIED claims. The intentional tort exception provides in relevant part that the STLA's general waiver of sovereign immunity, *see* HRS § 662–2, does not apply to "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." HRS § 662–15(4). Citing *United States v. Shearer,* 473 U.S. 52,

105 S.Ct. 3039, 87 L.Ed.2d 38 (1985), the DOE posits that, inasmuch as the plaintiffs' negligence and NIED claims "arise out of" Norton's assault and battery of Melony and Nicole or Sosa's misrepresentation to the military, it retains its sovereign immunity from liability for those claims, pursuant to HRS § 662–15(4).

■ In response, the plaintiffs contend that their negligence and NIED claims against the DOE do not directly "arise out of" Norton's molestation of the girls.[32] The plaintiffs observe that their negligence and NIED claims are predicated upon breaches of the DOE's duty of care that were committed by employees other than Norton. According to the plaintiffs, simply because Norton's molestation of the girls was a foreseeable result of the unreasonable conduct of other DOE employees does not transform their negligence and NIED claims into claims that "arise out of" Norton's conduct.

■ The STLA is modeled after the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b) and 2671 et seq. *See, e.g., Figueroa v. State*, 61 Haw. 369, 383–84, 604 P.2d 1198, 1206 (1979); *Rodrigues v. State*, 52 Haw. 156, 167, 472 P.2d 509, 517 (1970). Accordingly, this court may, in the absence of other authority,[33] turn to federal case law

---

32. The plaintiffs also argue that the terms "assault" and "battery," as employed in HRS § 662–15(4), should be construed *in pari materia* with penal statutes proscribing assault, battery, and sexual offenses; thus, because Norton's conduct would not have constituted a criminal "assault" or "battery" in 1957 at the time the STLA originally was enacted, the plaintiffs posit that his molestation of Melony and Nicole does not fall within the ambit of HRS § 662–15(4), and, therefore, that the DOE is not shielded by sovereign immunity against their claims, even if their claims do, in fact, "arise out of" Norton's conduct. Contrary to the plaintiffs' view, the legislature's express enumeration of "assault [and] battery" within the intentional tort exception—as well as, more generally, within the State *Tort Liability Act* as a whole—clearly evinces an intent that "assault" and "battery," as well as the remainder of the list, be construed in the context of tort (rather than criminal) law. Thus, the context of HRS § 662–15(4)'s plain and unambiguous language reflects the legislature's intent to retain the state's sovereign immunity from liability for any tort claim "arising out of" an employee's tortious, rather than criminal, assault and battery of another person. *See Department*

of Human Resources v. Coley, 247 Ga.App. 392, 544 S.E.2d 165, 170–71 (2000). To the extent that Norton's conduct—touching Melony and Nicole in an "uncomfortable" (and, therefore, "offensive" in the tort context) manner—constituted *tortious*, but not necessarily criminal, assault and battery, his conduct clearly falls within the ambit of the STLA's intentional tort exception.

33. The parties do not cite, and our own research has not unearthed, any Hawai'i decision that has construed the phrase "arising out of" as it is employed in HRS § 662–15(4). Indeed, the Hawai'i appellate courts have cited to HRS § 662–15(4) infrequently and, for the most part, in passing. *See Towse v. State*, 64 Haw. 624, 637 n. 1, 647 P.2d 696, 698 n. 1 (1982) (agreeing that circuit court properly dismissed state as party because plaintiffs' defamation and false imprisonment claims against state were precluded under HRS § 662–15(4)); *Orso v. City and County of Honolulu*, 56 Haw. 241, 242, 246–47, 534 P.2d 489, 490, 492–93 (1975) (in action for damages for defamation, false arrest, false imprisonment, and malicious prosecution, holding, *inter alia*, that the immunity retained in HRS § 662–15(4)

construing parallel provisions of the FTCA for guidance in construing the STLA. *Cf. Schefke v. Reliable Collection Agency, Ltd.*, 96 Hawai'i 408, 425, 32 P.3d 52, 69 (2001) (noting that, "[n]ot having previously dealt with a retaliation claim under HRS § 378-2 ..., we may look in construing HRS § 378-2, 'to interpretations of analogous federal laws by the federal courts for guidance' " (quoting *Shoppe v. Gucci Am., Inc.*, 94 Hawai'i 368, 377, 14 P.3d 1049, 1058 (2000)) (additional citations omitted)); *State v. Crisostomo*, 94 Hawai'i 282, 287–88, 12 P.3d 873, 878–79 (2000) (noting that, "[b]ecause [Hawai'i Rule of Penal Procedure] Rule 24(c) [ (1996) ] is nearly identical to its federal counterpart, *i.e.*, Federal Rules of Criminal Procedure [ ] Rule 24(c) (1999),[ ] this court may look to parallel federal law for guidance" (citations omitted)).

Pursuant to 28 United States Code (USC) § 1346(b), the district courts of the United States are vested with "exclusive jurisdiction of civil actions on claims against the United States, for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee" of the federal government "while acting within the scope of his [or her] office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." (Quoted in *Sheridan v. United States*, 487 U.S. 392, 394 n. 1, 108 S.Ct. 2449, 101 L.Ed.2d 352 (1988).) This provision is substantially similar to HRS §§ 662–2 and 662–3. Like the STLA, the FTCA does not apply to "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights[.]" [34] 28 USC § 2680(h) (quoted in *Sheridan*, 487 U.S. at 394 n. 1, 108 S.Ct. 2449).

The DOE urges that we adopt the reasoning of a plurality of the United States Supreme Court, which, in *Shearer*, held that the FTCA's intentional tort exception "encompass[es] claims sounding in negligence." 473 U.S. at 57, 105 S.Ct. 3039. Vernon Shearer was a private in the United States Army. *Id.*

was not applicable to the City and County of Honolulu); *Salavea v. City and County of Honolulu*, 55 Haw. 216, 222 n. 2, 517 P.2d 51, 55 n. 2 (1973) (Levinson, J., concurring and dissenting) (noting that "under HRS § 662–15(4), the 'State' is not liable for the intentional torts of its agents"); *Littleton v. State*, 6 Haw.App. 70, 74, 708 P.2d 829, 832–33 (in general discussion of the STLA, observing that, "under [HRS] § 662–15(4)[, the state] is exempt from liability in situations where a private person might be liable"), *affirmed*, 68 Haw. 220, 708 P.2d 824 (1985); *Fogarty v. State*, 5 Haw.App. 616, 620–23, 705 P.2d 72, 76–77 (1985) (observing that state employee's misrepresentations could support claim for relief either in tort or in assumpsit and holding that, while HRS § 662–15(4) barred tort claim of misrepresentation, claim for breach of implied warranty sounding in assumpsit could, nonetheless, be maintained against state under HRS § 661–1(1) (Supp.1984), even though such an assumpsit claim would be based on employee's misrepresentations); *Mitsuba Publ'g Co. v. State*, 1 Haw.App. 517, 517, 620 P.2d 771, 772 (1980) (holding, *inter alia*, that circuit court did not abuse its discretion in dismissing defamation claim against state and Office of Consumer Protection because neither was a "proper part[y]," citing HRS § 662–15(4)).

Moreover, the STLA's legislative history is scant. The legislature first codified the STLA in 1957 and has amended it several times. However, other than minor non-substantive changes, the language of HRS § 662–15(4) has not been altered since it was originally enacted. Two standing committee reports note that the purpose of the STLA is "to permit tort claims against the [state] arising from negligent acts of its employees." Sen. Stand. Comm. Rep. No. 255, in 1957 Senate Journal, at 526; *see also* Hse. Stand. Comm. Rep. No. 1030, in 1957 House Journal, at 926. To "effectuate this purpose," HRS § 662–15(4) deems "[c]ertain claims to be outside [the] scope" of the STLA. Sen. Stand. Comm. Rep. No. 255, in 1957 Senate Journal, at 526; *see also* Hse. Stand. Comm. Rep. No. 1030, in 1957 House Journal, at 926. Thus, other than reflecting, as the STLA's language itself makes plain, that the STLA waives the state's immunity for claims "arising out of" the negligent acts of a state employee but not "arising out of" his or her intentional torts, the STLA's legislative history is of little assistance.

**34.** Unlike the STLA, however, the FTCA contains an "exception" to the intentional tort "exception," which provides in relevant part that the FTCA shall apply to "any claim arising ... out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" as a result of the "acts or omissions of investigative or law enforcement officers of the United States Government[.]" 28 USC § 2680(h) (quoted in *Sheridan*, 487 U.S. at 394 n. 1, 108 S.Ct. 2449).

at 53, 105 S.Ct. 3039. While off duty and away from the Army base at which he was stationed, another serviceman, Private Andrew Heard, kidnapped and murdered him. *Id.* Shearer's mother, as his administratrix, attempted to sue the United States under the FTCA, claiming that the Army's negligence caused her son's death. *Id.* at 54, 105 S.Ct. 3039. More specifically, she claimed that the Army, which knew that Private Heard was dangerous because he had been convicted of manslaughter by a German court while assigned to an Army base in Germany in 1977, "negligently and carelessly failed [ (1) ] to exert a reasonably sufficient control over" him, (2) "to warn other persons that he was at large," and (3) "to ... remove [him] from active military duty." *Id.* at 54, 58, 105 S.Ct. 3039.

In a decision in which Justice Powell took no part, four justices of the United States Supreme Court believed it "clear that respondent's claim arises out of the battery committed by Private Heard." *Id.* at 54–55, 105 S.Ct. 3039. According to the *Shearer* plurality, "[n]o semantical recasting of events can alter the fact that the battery was the immediate cause of Private Shearer's death and, consequently, the basis of respondent's claim." *Id.* at 55, 105 S.Ct. 3039. The plurality noted that Shearer's mother could not "avoid the reach of [28 USC] § 2580(h) by framing her complaint in terms of negligent failure to prevent the assault and battery," reasoning that 28 USC § 2580 "does not merely bar claims *for* assault or battery; in sweeping language it excludes any claim *arising out of* assault or battery." *Id.* (emphases in original). Accordingly, the *Shearer* plurality held that "this provision ... cover[s] claims ... that sound in negligence but stem from a battery committed by a [federal g]overnment employee." *Id.* Thus, in the *Shearer* plurality's view, "the express words of the statute bar respondent's claim against the [federal g]overnment," *id.* (citation and internal quotation signals omitted), because

"it is inescapable that the phrase 'arising out of assault [or] battery' is broad enough to encompass claims sounding in negligence," *id.* at 57, 105 S.Ct. 3039.[35]

The plaintiffs, however, observe that a majority of the United States Supreme Court apparently has retreated from the *Shearer* plurality's draconian view of the FTCA's intentional tort exception, noting that, subsequently in *Sheridan*, the Court acknowledged that, "in at least some situations[,] the fact that an injury was directly caused by an assault or battery will not preclude liability against the [federal g]overnment for negligently allowing the assault to occur." 487 U.S. at 398–99, 108 S.Ct. 2449. The salient facts before the *Sheridan* Court were as follows:

> After finishing his shift as a naval medical aide at the hospital, Carr consumed a large quantity of wine, rum, and other alcoholic beverages. He then packed some of his belongings, including a rifle and ammunition, into a uniform bag and left his quarters. Some time later, three naval corpsmen found him lying face down in a drunken stupor on the concrete floor of a hospital building. They attempted to take him to the emergency room, but he broke away, grabbing the bag and revealing the barrel of the rifle. At the sight of the rifle, the corpsmen fled. They neither took further action to subdue Carr, nor alerted the appropriate authorities that he was heavily intoxicated and brandishing a weapon. Later that evening, Carr fired the shots that caused physical injury to one of the petitioners and property damage to their car.

487 U.S. at 395, 108 S.Ct. 2449. In suing the federal government under the FTCA, the plaintiffs contended that "the general rule"— *i.e.*, that the federal "[g]overnment is not liable for the intentional torts of its employees"—"was inapplicable because they were relying, not on the fact that Carr was a [federal g]overnment employee when he as-

---

**35.** The *Shearer* plurality observed that its interpretation of the assault and battery exception was not inconsistent with the "line of cases holding that the [federal g]overnment may be held liable for negligently failing to prevent the intentional torts of a non-employee under its supervision," because the FTCA focuses upon "the actions of *employees.*" *Id.* at 56–57, 105 S.Ct. 3039 (emphasis in original). As such, the FTCA's intentional tort exception does not apply to cases in which the intentional tortfeasor is not an employee of the federal government. *Id.*

saulted them, but rather on the negligence of other [federal g]overnment employees who failed to prevent his use of the rifle." *Id.*

Upon the foregoing facts, a majority of the United States Court of Appeals for the Fourth Circuit had held that the plaintiffs' claim was foreclosed by its precedents, specifically *Hughes v. United States,* 662 F.2d 219 (4th Cir.1981) (*per curiam*) (affirming district court's dismissal of plaintiffs' negligence claim because it arose out of postal employee's sexual indecencies with two minor girls while on his mail route and not as result of supervisor's purported negligence in allowing him to remain in position where he came into contact with children after he had pled guilty to similar sexual offense), and *Thigpen v. United States,* 800 F.2d 393 (4th Cir.1986) (affirming district court's dismissal of plaintiffs' negligence claim because it arose out of naval corpsman's sexual indecencies with two minor girls while they were hospitalized at naval hospital and not as result of Navy's negligent supervision of offending corpsman). *Sheridan,* 487 U.S. at 395–97 & n. 1, 108 S.Ct. 2449. Chief Judge Winter, however, dissented. *Id.* at 397–98, 108 S.Ct. 2449.

In Chief Judge Winter's view, cases such as *Hughes* and *Thigpen,* which involved negligent hiring or retention and negligent supervision claims, were inapposite to situations in which "the basis for the [federal g]overnment's alleged liability has nothing to do with the assailant's employment status." *Id.* at 397. As quoted by Justice Stevens, writing for the *Sheridan* majority, Chief Judge Winter had believed that "claims of negligent hiring and/or supervision"

> are essentially grounded in the doctrine of respondeat superior. In these cases, the government's liability arises, if at all, *only* because of the employment relationship. If the assailant were not a federal employee, there would be no independent basis for a suit against the government. It is in this situation that an allegation of government negligence can legitimately be seen as an effort to 'circumvent' the [28 USC] § 2680(h) bar; it is just this situation— where government liability is possible only because of the federal paychecks—that [28

USC] § 2680(h) was designed to preclude. . . .

> On the other hand, where governmental liability is independent of the assailant's employment status, it is possible to discern two distinct torts: the intentional tort (assault and battery) and the government negligence that precipitated it. Where no reliance is placed on negligent supervision or respondeat superior principles, the cause of action against the government cannot really be said to "arise out of" the assault and battery; rather it is based on the government's breach of a separate legal duty.

*Id.* at 397–98, 108 S.Ct. 2449 (quoting 823 F.2d 820, 824) (internal citations omitted) (some internal quotation signals omitted) (emphasis in original). Recognizing a split among the federal appellate circuits that mimicked the split between the majority and dissenting opinions in the Fourth Circuit's *Sheridan* opinion, the United States Supreme Court granted certiorari "to decide . . . whether" the plaintiffs' "claim is one 'arising out of' an assault or battery within the meaning of" 28 USC § 2680(h); a majority of the Court reversed the Fourth Circuit's opinion. *Id.* at 394, 398, 108 S.Ct. 2449.

The *Sheridan* Court initially observed that the intentional tort exception to the FTCA was "unquestionably broad enough to bar all claims based *entirely* on an assault and battery." *Id.* at 398, 108 S.Ct. 2449 (emphasis in original). However, citing *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963) (holding that a federal prisoner, who was assaulted by other inmates, could recover damages against the United States because prison officials negligently failed to prevent the assault), the *Sheridan* Court, as we have noted, acknowledged "that in at least some situations[,] the fact that an injury was directly caused by an assault or battery will not preclude liability against the [federal g]overnment for negligently allowing the assault to occur." *Id.* at 398–99, 108 S.Ct. 2449.

In the *Sheridan* Court's view, "two quite different theories might explain why Muniz's claim did not 'arise out of' the assault" perpe-

trated by the other inmates.[36] *Id.* at 399, 108 S.Ct. 2449. The first theory was that, insofar as Muniz alleged that the prison officials were negligent, his "claim did not arise solely, or even predominately, out of the assault." *Id.* Under this theory, the focus is upon the negligent acts or omissions of a federal employee rather than upon the assault, which is "simply considered as part of the causal link to the injury." *Id.* Thus, it was not the "assailant's individual involvement," but, rather, the "antecedent negligence of [federal employees]" from which Muniz's claim would arise under the first theory. *Id.* However, the *Sheridan* majority relied "exclusively on the second theory, which makes clear that the intentional tort exception is simply inapplicable to torts that fall outside the scope of [28 USC] § 1346(b)'s general waiver" of sovereign immunity for the conduct of federal employees. *Id.* at 400, 108 S.Ct. 2449.

Under the second theory, espoused by the *Sheridan* Court, the intentional tort exception is "read against the rest of the [FTCA]," and, therefore, "appl[ied] only to claims that would otherwise be authorized by the basic waiver of sovereign immunity." *Id.* Since the FTCA only waives sovereign immunity "for personal injuries 'caused by the negligent or wrongful act or omission *of any employee of the Government while acting within the scope of his [or her] office or employment,*" *id.* at 400–401, 108 S.Ct. 2449 (citation omitted) (some emphasis added and some in original), the intentional tort exception "only applies in cases arising out of assaults by federal employees," *id.* at 400, 108 S.Ct. 2449. As such, the *Sheridan* Court believed that the better reading of *Muniz* was that the FTCA's intentional tort exception did not apply because the prison inmates who actually assaulted Muniz were not federal employees. *Id.* at 400–401, 83 S.Ct. 1850.

Accordingly, as to the facts before it, the *Sheridan* Court observed that, "[i]f nothing more was involved here than the conduct of

Carr at the time he shot at [the plaintiffs], there would be no basis for imposing liability on the [federal g]overnment," insofar as he was not on duty at the time he shot at the plaintiffs and, therefore, was not acting within the scope of his federal employment. *Id.* at 401, 108 S.Ct. 2449. Thus, in the *Sheridan* Court's view, the FTCA did not waive sovereign immunity for any alleged liability arising from Carr's conduct in the first instance, even had his conduct been merely negligent. *Id.* Yet, the *Sheridan* Court noted that the case before it did not simply arise from Carr's conduct; rather, the plaintiffs attempted to hold the federal government liable for "the negligence of other [federal g]overnment employees who allowed a foreseeable assault and battery to occur."

Consequently, the *Sheridan* Court construed the plaintiffs' negligence claim as one that did not seek to hold the federal government liable on the sole basis that Carr was a federal employee acting within the scope of his employment; rather, the court construed the claim as one in which "the negligence of other Government employees who allowed a foreseeable assault and battery to occur may furnish a basis for Government liability that is entirely independent of [the intentional tortfeasor's] employment status." *Id.* However, the *Sheridan* Court did not expressly answer the question on the basis of which it had granted certiorari, *see* 487 U.S. at 394, 108 S.Ct. 2449, insofar as it ultimately held that the intentional tort exception did not apply to the plaintiffs' claim. Rather, the Court held that the federal government, "by voluntarily adopting regulations that prohibit[ed] the possession of firearms on the naval base and that require[d] all personnel to report the presence of any such firearm," as well as "by further voluntarily undertaking to provide care to a person who was visibly drunk and visibly armed," had, under Maryland law, "assumed . . . [a] responsibility to 'perform [its] "good Samaritan" task in a

---

**36.** The other inmates pursued Muniz into one of the prison's dormitories. *Sheridan,* 487 U.S. at 399 n. 4, 108 S.Ct. 2449. A prison guard opted not to intercede and, instead, locked the dormitory, "apparently choosing to confine the altercation[.]" *Id.* The other inmates then beat Muniz to unconsciousness, fracturing his skull; as a

result, Muniz eventually lost his vision in his right eye. *Id.* Muniz "alleged that the prison officials were negligent in failing to provide enough guards to prevent the assaults . . . and in letting prisoners, some of whom were mentally abnormal, intermingle without adequate supervision." *Id.*

careful manner.' " *Id.* at 401, 108 S.Ct. 2449 (citations omitted) (some brackets added and some in original). In light of the federal government's voluntary assumption of a "good Samaritan" duty, which was wholly distinct from and did not "arise out of" Carr's federal employment, the fact that Carr happened to be a federal employee was irrelevant; the *Sheridan* Court expressly noted that "it [was] not appropriate in this case to consider whether negligent hiring, negligent supervision, or negligent training may ever provide the basis for liability under the FTCA for a foreseeable assault or battery by a [federal g]overment employee." *Id.* at 402–03 & n. 8, 108 S.Ct. 2449.

In the wake of *Sheridan,* the federal circuits have generally agreed, with the notable exception of the United States Court of Appeals for the Ninth Circuit, that a plaintiff's negligence claim against the federal government that is predicated upon the federal government's hiring, training, or supervision of an employee who commits a foreseeable intentional tort against the plaintiff is subsumed within, and therefore barred by, the FTCA's intentional tort exception because such a claim stems from the intentional tortfeasor's employment relationship with the federal government and, therefore, is said to "arise out of" a federal employee's intentionally tortious conduct. *See, e.g., Leleux v. United States,* 178 F.3d 750, 756 (5th Cir. 1999) (holding that "causes of action distinct from those excepted under [the intentional tort exception] are nevertheless deemed to be barred when the underlying governmental conduct 'essential' to the plaintiff's claim can fairly be read to 'arise out of' conduct that would establish an excepted cause of action," *i.e.,* an intentional tort (citation omitted)); *McNeily v. United States,* 6 F.3d 343 (5th Cir.1993) (holding that a "plaintiff cannot avoid the reach" of the intentional tort exception "by framing his [or her] complaint in terms of negligent failure to prevent the excepted harm"); *see also Ryan v. United States,* 156 F.Supp.2d 900, 904 (N.D.Ill.2001) (citing, *inter alia, Franklin v. United States,* 992 F.2d 1492, 1499 (10th Cir.1993); *Westcott v. Omaha City,* 901 F.2d 1486, 1490 (8th Cir.1990); and *Guccione v. United States,* 847 F.2d 1031, 1035–37 (2d Cir.1988), *reh'g*

*denied,* 878 F.2d 32, 33 (2d Cir.1989), as having "interpreted 'arising out of' broadly," and, consequently, as holding "that a negligent hiring or supervision claim necessarily arises out of an underlying assault or battery").

The Ninth Circuit, however, has adopted a narrow view of the FTCA's intentional tort exception. *Senger v. United States,* 103 F.3d 1437 (9th Cir.1996), is exemplary in this regard. The *Senger* court viewed its sister circuits' reasoning as flawed on the basis that granting broad immunity to the federal government for the negligence of one employee simply because a foreseeable result of that employee's negligence was that another federal employee would commit an intentional tort was inconsistent with the FTCA's avowed purpose "to 'provide a forum for the resolution of claims against the federal government for injury caused by the government's negligence.' " *Id.* at 1441 (quoting *Bennett v. United States,* 803 F.2d 1502, 1504 (9th Cir.1986)). Rather than demarcating the boundaries of the intentional tort exception solely upon whether the intentional tortfeasor was or was not a federal employee, the *Senger* court drew a line between negligence claims "based entirely on a theory of *respondeat superior,*" which, in its view, were foreclosed by the intentional tort exception, and claims predicated upon "independent negligent acts or omissions by the [federal g]overnment that are legal causes of the [plaintiff's] harm," which fell outside the scope of the intentional tort exception, even if the plaintiff's harm was directly caused by a federal employee's intentionally tort. *Id.* (citing *Bennett,* 803 F.2d at 1504). *See also Brock v. United States,* 64 F.3d 1421 (9th Cir.1995) (holding that an employee's negligent supervision claim predicated on Forest Service's failure to supervise plaintiff's supervisor, who had raped her and subjected her to continuing sexual harassment, and to supervise her coworkers, who had retaliated against her for filing a claim with the Equal Employment Opportunity Commission against the supervisor, was not barred by the FTCA's intentional tort exception); *Morrill v. United States,* 821 F.2d 1426 (9th Cir.1987) (holding that negligent supervision claim ad-

vanced by "go-go dancer," who the Navy hired to perform in club for enlisted men and who was assaulted and raped by enlisted man, was not barred by FTCA's intentional tort exception); *Kearney v. United States,* 815 F.2d 535 (9th Cir.1987) (holding that negligent supervision claim predicated upon federal employee's release of an Army officer, initially detained for rape, who subsequently murdered plaintiff's wife, was not barred by FTCA's intentional tort exception).

In *Bennett,* a pre-*Sheridan* decision upon which the *Senger* court relied, the Ninth Circuit observed that the policy underlying the FTCA's intentional tort exception "was to insulate the government from liability for acts it was powerless to prevent or which would make defense of a lawsuit unusually difficult." 803 F.2d at 1503 (citation omitted). In the *Bennett* court's view, a third person's assault or battery is "especially difficult to prevent where there is no known history of similar behavior," which was why, at common law, a third person's crime or intentional tort constituted an " 'independent, intervening cause' " that would, generally speaking, preclude a defendant's antecedent negligence from being a legal cause of the assaulted or battered person's injuries. *Id.* (citation omitted). The *Bennett* court emphasized, however, that, in the case before it, the plaintiffs had not based their claim upon the doctrine of *respondeat superior,* under which they would have asserted that, as the employer of an intentional tortfeasor, the federal government was liable for the intentional tortfeasor's acts and omissions committed within the scope of his or her employment. *Id.* at 1503–04. Rather, the plaintiffs had predicated their claim upon the federal government's negligent supervision, hiring, and investigation of the intentional tortfeasor, *i.e.,* upon the negligent acts and omissions of employees other than the assailant. *Id.*

Expressing its disagreement with the *Shearer* plurality's apparent distinction between assailants who are federal employees and those who are not, *see id.* at 1504–05, the *Bennett* court regarded the "historical evidence" for drawing such a distinction as "far from clear." *Id.* at 1504. The *Bennett* court

noted that its review of the FTCA's plain language and legislative history unearthed no explanation as to why Congress would waive sovereign immunity from liability for claims arising out of negligent supervision of federal wards—such as inmates and patients—but retain immunity with respect to claims arising out of intentional acts committed by negligently supervised federal employees. *Id.* In the *Bennett* court's view, the intentional tort exception's "arising out of" language appeared to "appl[y] equally to batteries by federal employees and by nonemployees." *Id.* Thus, the *Bennett* court concluded that predicating the application of the FTCA's intentional tort exception solely upon whether the intentional tortfeasor (as opposed to the employee who was negligent in some manner) was a federal employee was "irrational." *Id.*

Consequently, the *Bennett* court held that the FTCA's intentional tort exception did not insulate the federal government from a negligence claim predicated upon its failure to investigate a teacher before hiring him, where he had admitted in his application for employment that a valid bench warrant remained outstanding with regard to an Oklahoma criminal charge of "[o]utrage to [p]ublic [d]ecency," as well as upon its retention and failure to supervise the teacher after his conduct put his supervisors on notice that he was molesting children. *Id.* at 1502–03. The *Bennett* court, therefore, deemed the federal government's "own negligence"—rather than the teacher's kidnapping, assault, and rape of several students—to be "the legal cause of the injury sued on" and, thus, held that the FTCA's intentional tort exception did not preclude the plaintiffs from obtaining relief for the federal government's negligence. *Id.*

Although the Ninth Circuit appears to be the lone federal circuit court to embrace the "narrow" view of the FTCA's intentional tort exception, a few state supreme courts have adopted similar constructions with respect to their respective state tort liability acts. The Idaho Supreme Court, for example, has held, in the context of a negligent retention claim, that the Idaho Tort Claims Act (ITCA)— which contains an intentional tort exception (similar to HRS § 662–15(4)), which provides

in relevant part that "a governmental entity is not liable for any claim which '[a]rises out of assault [or] battery,' " *Doe v. Durtschi*, 110 Idaho 466, 716 P.2d 1238, 1243 (1986); *see also Kessler v. Barowsky*, 129 Idaho 647, 931 P.2d 641, 648 (1997)—does not immunize a school district from liability under the ITCA's intentional tort exception where students were molested by a teacher whom the school district "should have reasonably anticipated ... would commit an intentional tort." *Durtschi*, 716 P.2d at 1245. Eschewing the construction of the FTCA's intentional tort exception that most of the federal courts had adopted and under which the plaintiffs' negligence claims would have been barred, the *Durtschi* court reasoned that "[i]t is clearly unsound to afford immunity to a negligent defendant because the intervening force, the very anticipation of which made his [or her] conduct negligent, has brought about the expected harm." *Durtschi*, 716 P.2d at 1244 (citation omitted). As such, the *Durtschi* court ruled that "the children's injuries arose out of the basic negligence of the school district" and that their injuries "were the foreseeable consequence of the school district's negligence in retaining [the teacher] despite full knowledge of his proclivities." *Id.* at 1243.

On the other hand, the *Durtschi* court recognized that, "of course, a plaintiff cannot merely point to an assault and battery and then claim, based simply on its occurrence, that the state was negligent in not preventing it." *Id.* at 1245. We agree, insofar as such a claim is, in essence, little else than a "semantical recasting," *Shearer*, 473 U.S. at 55, 105 S.Ct. 3039, which attempts to cloak a *respondeat superior* claim in negligence clothing so as to circumvent the intentional tort exception. However, we also agree, where "the government entity should have reasonably anticipated that one of [its] employees would commit an intentional tort," *Durtschi*, 716 P.2d at 1245, that the STLA's intentional tort exception does not insulate the governmental entity from liability. As the *Durtschi* court opined:

> The fact that the foreseeable danger was from intentional or criminal misconduct is irrelevant; the school district had a ...

duty to make reasonable efforts to protect its students from such a danger. A breach of that duty constitutes negligence.... [Thus, the teacher's] actions [do not necessarily] constitute a supervening cause, and the school district's tortious conduct [does] not arise out of the assault and battery. Rather, the roots of the assault and battery [lie] in the district's own negligence.

*Id.* at 1244. In the context of a negligent supervision claim, the Idaho Supreme Court has subsequently held that the ITCA's intentional tort exception would not, therefore, constitute a bar so long as "those who had the duty to supervise should have reasonably anticipated that those subject to their supervision would commit a battery." *Kessler*, 931 P.2d at 648.

Finally, we note that the Massachusetts Supreme Judicial Court has similarly rejected a "broad" construction of the intentional tort exception contained in the Massachusetts Tort Claims Act. *See, e.g., Dobos v. Driscoll*, 404 Mass. 634, 537 N.E.2d 558, 569 (1989) (holding that "where the supervisory officials allegedly had, or should have had, knowledge of a public employee's assaultive behavior, it is the supervisor's conduct, rather than the employee's intentional conduct, that is the true focus" of the plaintiff's negligence claim).

We have repeatedly held that the STLA "should be liberally construed to effectuate its purpose to compensate the victims of negligent conduct of state officials and employees in the same manner and to the same extent as a private person in like circumstances." *Breed v. Shaner*, 57 Haw. 656, 665, 562 P.2d 436, 442 (1977) (citing *Rogers v. State*, 51 Haw. 293, 296–98, 459 P.2d 378, 381–82 (1969) (refusing to "emasculate" the STLA by broadly construing the "discretionary function" exception to include "operational level acts" of state employees)); *cf. Hawaii Community Federal Credit Union v. Keka*, 94 Hawai'i 213, 229, 11 P.3d 1, 17 (2000) (" 'Remedial statutes are liberally construed to suppress the perceived evil and advance the enacted remedy.' " (Quoting *Cieri v. Leticia Query Realty, Inc.*, 80 Hawai'i 54, 68, 905 P.2d 29, 43 (1995) (brackets omitted).)). That being the case, we believe that

the Ninth Circuit and the Idaho and Massachusetts high courts have articulated the better view of the intentional tort exception, as opposed the "broad" view espoused by the majority of the federal appellate courts. Adoption of the latter, grudging construction would irrationally restrict the remedial purpose of the STLA to compensate victims of the negligent conduct of state employees.[37]

In the present matter, the plaintiffs' negligence and NIED claims are not duplicitous of their *respondeat superior* claim. Under the latter, the plaintiffs posit that the DOE, as Norton's employer, is vicariously liable for his molestation of the girls because Norton's acts of molestation occurred within the scope of his employment with the DOE; the conduct of other DOE employees, such as Norton's supervisors, is irrelevant to the DOE's potential liability, because the only material question is whether Norton's molestation of the girls constituted a negligent act that was within the scope of his employment. *See, e.g., Wong–Leong v. Hawaiian Independent Refinery, Inc.*, 76 Hawaiʻi 433, 438, 879 P.2d 538, 539 (1994) ("to recover under [a] *respondeat superior* theory, a plaintiff must establish: 1) a negligent act of the employee, in other words, a breach of a duty that is the legal cause of plaintiff's injury; and 2) that the negligent act was within the employee's scope of employment" (citations omitted)).

It is precisely such a theory of liability that the STLA's intentional tort exception precludes, where the allegedly negligent act of the employee is asserted to be "assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."[38] HRS § 662–15(4). In other words, the plaintiffs' *respondeat superior* claim must "aris[e] out of" Norton's assault and battery of the girls because his molestation of them is the sole basis of the plaintiffs' claim against his employer, the DOE.

On the other hand, the plaintiffs' negligence and NIED claims are not predicated upon Norton's molestation of the girls *per se.* Rather, the plaintiffs posit that *other* DOE employees—specifically, Estomago, Schlosser, and Sosa—breached a duty that legally caused the plaintiffs' injuries.[39] The plaintiffs' theory of negligence—predicated, as it is, upon the acts and omissions of Norton's supervisors—does not, therefore, "arise out of" Norton's molestation of Melony and Nicole. To the contrary, Norton's molestation of Melony and Nicole arises out of Estomago's, Schlosser's, and Sosa's antecedent negligent acts and omissions in reinstating and in failing to supervise him. We agree with the Idaho Supreme Court's disbelief

37. We note, in our view, that the federal courts that have adopted the "broad" view of the FTCA's intentional tort exception undermine the remedial purpose of the FTCA. The "broad" view essentially posits the innocuous premise that the FTCA affords a remedy for the negligent conduct of federal employees, and, therefore, that the intentional tort exception impliedly retains immunity from liability for all claims arising out of a federal employee's intentional torts. The courts adopting the "broad" view, however, have reasoned that a negligent hiring, training, or supervision claim arises against the federal government only because the assailant who directly caused the plaintiff's damages by committing an intentional tort is a *federal* employee. Although most of the cases adopting the "broad" view do not say so expressly, they all impliedly shift the focus of the intentional tort exception from the employee's *intentional tort* to the intentional tortfeasor's *federal employment.* Such a shift of focus, once accepted, sweeps within its ambit negligent hiring, training, and supervision claims. As the Ninth Circuit has observed, however, the "broad" construction of the intentional tort exception departs from its plain meaning, has no support in the legislative history of the FTCA, and, in the end, is "irrational"—waiving immunity for claims alleging that a governmental employee has negligently supervised a ward, patient, inmate, or some other nonemployee under the government's control, but preserving immunity from liability for claims alleging that a government employee negligently supervised another government employee. *Bennett,* 803 F.2d at 1504–505; *see also Senger,* 103 F.3d at 1441–43.

38. As such, to the extent that the plaintiffs' base their negligence and NIED claims on Sosa's *misrepresentation* to the military that the DOE's internal investigation of Norton had "absolved" him, the claim is barred by HRS § 662–15(4).

39. Indeed, to the extent that the plaintiffs claim that Schlosser's interrogation of the girls and his failure to inform their respective parents of their revelations to him legally caused some of their injuries, Norton's conduct is not directly implicated at all.

that the ... legislature, by creating an exception to governmental liability for actions arising out of assault and battery, thereby intended to relieve state agencies from any duty to safeguard the public from employees whom they know to be [or reasonably should anticipate will become] dangerous.... Surely the ... legislature could not have intended that school districts could ignore their ... duty [to students and parents] and retain known child molesters in the classroom with total impunity[.]

*Durtschi,* 716 P.2d at 1245.

▬ Based on the foregoing discussion, we hold that, where a plaintiff's negligence claim against the State seeks to hold the State vicariously liable for a state employee's "assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights" under the doctrine of *respondeat superior,* the State is, pursuant to HRS § 662–15(4), immune from the plaintiff's claim. However, where the plaintiff's negligence claim seeks to hold the State liable for the conduct of state employees other than the alleged intentional tortfeasor, pursuant to theories of negligent hiring, retention, supervision, or the like, the plaintiff's claim does not necessarily "arise out of" the hired, retained, or supervised employee's intentional tort. Rather, if the State knew, or reasonably should have anticipated, that one of its employees would commit an intentional tort against a person to whom the State owed a duty of care, the State is liable for the negligence of those employees who were in a position to take reasonable precautions against the anticipated harm.

▬ In light of the foregoing, we further hold, to the extent that the plaintiffs predicate their negligence and NIED claims upon the DOE's negligent retention and supervision of Norton, that the STLA's intentional tort exception does not insulate the DOE from liability; given that the plaintiffs have alleged that the DOE reasonably should have anticipated that Norton would molest the girls, their negligent retention and supervision claims do not "arise out of" Norton's

acts of molestation. Moreover, to the extent that the plaintiffs' negligence and NIED claims are predicated upon the allegation that Schlosser's interrogation of the girls and his failure to notify the girls' parents of their accusations legally caused some of their injuries, HRS § 662–15(4) is not implicated at all, *see supra* note 39. However, HRS § 662–15(4) expressly precludes the plaintiffs from holding the DOE liable for Sosa's misrepresentation to the military that the DOE's internal investigation "absolved" Norton, *see supra* note 38 and accompanying text.

### 2. *The plaintiffs' negligence and NIED claims*

▬ To prevail on their negligence claim, the plaintiffs had to establish, by a preponderance of the evidence, that (1) the DOE owed them a duty of care, which (2) the DOE breached, thereby (3) legally causing (4) actual injury to them. In other words, there are four primary elements to a negligence claim:

1. A duty or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks;

2. A failure on the defendant's part to conform to the standard required: a breach of the duty;

3. A reasonably close causal connection between the conduct and the resulting injury; and

4. Actual loss or damage resulting to the interests of another.

*Dairy Road Partners v. Island Ins. Co., Ltd.,* 92 Hawai'i 398, 419, 992 P.2d 93, 114 (2000) (citations omitted).

▬ However, where the alleged actual injury is for psychological distress *alone,* there is a need to strike a balance between "avoiding the trivial or fraudulent claims that have been thought to be inevitable due to the subjective nature of [such] injur[y]," on the one hand, and "promoting the underlying purpose of negligence law," *i.e.,* "compensating persons who have sustained emotional injuries attributable to the wrongful conduct of others," on the other. *Camper v. Minor,*

915 S.W.2d 437, 440 (Tenn.1996); *see also Guth v. Freeland*, 96 Hawai'i 147, 152, 28 P.3d 982, 987 (2001) (noting that, in general, courts are prompted to limit recovery for emotional distress because (1) it "is temporary and often trivial," (2) it "may be imagined and is easily feigned," and (3) it "may seem unfair to hold defendants, whose actions were merely negligent, financially responsible for harm that appears remote from the actual conduct"); *Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1, 40, 837 P.2d 1273, 1292, *reconsideration granted in part and denied in part*, 74 Haw. 650, 843 P.2d 144 (1992) (noting that recovery for NIED is generally restricted because "the difficulty of distinguishing between fraudulent, trivial, and serious injuries will result in unlimited liability" and because of "the fear that mental distress recoveries will impose burdens on defendants disproportionate to their culpability"); *Rodrigues*, 52 Haw. at 172–73, 472 P.2d at 520. Different jurisdictions have developed sundry variants of what is known as the "physical injury rule," under which, generally speaking, the plaintiff's emotional distress must be accompanied by a physical injury or symptom, *see, e.g., Camper*, 915 S.W.2d at 440–43 (surveying cases); *John & Jane Roes, 1–100 v. FHP, Inc.*, 91 Hawai'i 470, 473 & n. 5, 985 P.2d 661, 664 & n. 5 (1999) (noting variations of the physical injury rule, *e.g.*, the rules that the plaintiff must experience a "physical impact," or exhibit physical symptoms attributable to his or her emotional distress, or be in the "zone of danger" created by the defendant's negligent conduct), to separate the wheat of genuine psychological distress claims from the chaff of trivial or fraudulent claims.

■ This court was the first to eschew such "physical injury" rules when we held in *Rodrigues* that a plaintiff may recover for negligent infliction of emotional distress, absent any physical manifestation of his or her psychological injury or actual physical presence within a zone of danger, "where a reasonable [person], normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Rodrigues*, 52 Haw. at 173, 472 P.2d at 520; *John & Jane Roes*, 91 Hawai'i at 473, 985 P.2d at 664 (noting that, due to

*Rodrigues*, "Hawai'i 'became the first jurisdiction to allow recovery [for NIED] without a showing of physically manifested harm' to the plaintiff" (quoting *Campbell v. Animal Quarantine Station*, 63 Haw. 557, 560, 632 P.2d 1066, 1068 (1981))). Thus, an NIED claim is nothing more than a negligence claim in which the alleged actual injury is wholly psychic and is analyzed "utilizing ordinary negligence principles." *Larsen*, 74 Haw. at 41, 837 P.2d at 1293 (citing *Rodrigues*, 52 Haw. at 174, 472 P.2d at 520–21).

■ Although *Rodrigues* established that an NIED claimant did not need to establish that he or she was *himself or herself* physically injured by the defendant's conduct in order to recover for a purely psychological injury, we have consistently held, as a general matter, that the plaintiff must establish some predicate injury either to property or to another person in order himself or herself to recover for negligently inflicted emotional distress. *See Guth*, 96 Hawai'i at 150, 28 P.3d at 984; *John & Jane Roes*, 91 Hawai'i at 474, 985 P.2d at 665 (collecting cases in which this court has "subscribed to the principle that 'recovery for negligent infliction of emotional distress by one not physically injured is *generally* permitted only when there is 'some physical injury to property or [to] another person' resulting from the defendant's conduct' " (quoting *Ross v. Stouffer Hotel Co. (Hawai'i) Ltd.*, 76 Hawai'i 454, 465–66, 879 P.2d 1037, 1048–49 (1994) (brackets and some citations omitted) (emphasis in original))). The foregoing principle, however, has been "modified somewhat" by HRS § 663–8.9 (1993), which requires a predicate physical injury to the NIED claimant before he or she may recover damages for negligent infliction of emotional distress, where he or she claims that the psychological distress arises solely out of damage to property or to material objects. *John & Jane Roes*, 91 Hawai'i at 474 & n. 6, 985 P.2d at 665 & n. 6. As such, the law as it currently stands in Hawai'i is that an NIED claimant must establish, incident to his or her burden of proving actual injury (*i.e.*, the fourth element of a generic negligence claim, *see Dairy Road Partners*, 92 Hawai'i at 419, 992 P.2d at 114), that *someone* was physically injured by the

defendant's conduct, be it the plaintiff himself or herself or someone else. *See John & Jane Roes,* 91 Hawai'i at 474 & n. 6, 985 P.2d at 665 & n. 6.

However, in cases that present unique circumstances, which provide the requisite assurance that the plaintiff's psychological distress is trustworthy and genuine, we have not hesitated to "carve out [ ] exception[s] to our general rule that recovery [for psychic injury standing alone] is permitted only where there is a predicate physical injury to *someone,* be it a plaintiff or a third person." *Id.* (emphasis in original). In *John & Jane Roes,* for example, we held that "exposure to HIV-positive blood 'involve[s] circumstances which guarantee the genuineness and seriousness of the claim' " (quoting *Rodrigues,* 52 Haw. at 171, 472 P.2d at 519), and, therefore, we carved out an exception that permitted "relief ... where [the plaintiff] alleges, *inter alia,* actual exposure to HIV-positive blood, whether or not there is a predicate physical harm." 91 Hawai'i at 476–77, 985 P.2d at 667–68 (some brackets added and some in original). Similarly, in *Guth,* we recognized another exception in cases involving the mishandling of corpses, because we believed that "those who are entrusted with the care and preparation for burial of a decedent's body have a duty to exercise reasonable care" encompassing the obligation to avoid negligently causing emotional distress to the decedent's immediate family members who were aware that the defendant was preparing the decedent's body for funerary purposes. 96 Hawai'i at 154–55, 28 P.3d at 989–90 (adopting the "minority view," under which the plaintiff claiming that the defendant was negligent in the course of preparing the body of an immediate family member for funeral, burial, or crematory purposes, could recover for emotional distress standing alone, without establishing that his or her "emotional distress [had] manifest[ed] itself in a physical injury").

■ To the extent that the plaintiffs in the present matter attempted to establish the "actual loss or damage" element of their negligence claim solely by proving that the DOE's negligence resulted in *psychological* injury, their "negligence" claim is consub-

stantial with their "NIED" claim. Consequently, in order to recover for their purely psychic injuries, the plaintiffs would be compelled by our precedent to establish a predicate physical injury to a person as a guarantee of the trustworthiness of their claim. *See, e.g., Guth,* 96 Hawai'i at 150, 28 P.3d at 984; *John & Jane Roes,* 91 Hawai'i at 474, 985 P.2d at 665. The DOE asserts as much, noting that none of the plaintiffs had been physically injured by Norton's conduct. Assuming *arguendo,* that Norton's molestation of Melony and Nicole would not constitute the requisite physical injury, we believe nonetheless that the circumstances of the present matter, like those present in *John & Jane Roes* and in *Guth,* warrant the recognition of yet another exception to the general requirement that the plaintiff seeking redress solely for emotional distress must establish a predicate physical injury to a person.

■ Reinstating a teacher accused of child molestation to a position of trust that puts him or her in close (and generally unsupervised) proximity with children, without first ascertaining that it is, at the very least, more likely than *not* that he or she is actually innocent of the accusation, certainly, as we explain more fully *infra* in sections III.A.2.a and b, renders it "particularly foreseeable," *see John & Jane Roes,* 91 Hawai'i at 474, 985 P.2d at 665 (citation omitted), that the teacher may molest one of his or her students. Put simply, where such circumstances are present, and the teacher in fact molests a student while the child is in attendance at school, we believe it self-evident that the child's resulting psychological trauma, as well as that of the child's parents, "involve[s] circumstances [that] guarantee [its] genuineness and seriousness[.]" *See Rodrigues,* 52 Haw. at 171, 472 P.2d at 519. Like negligently exposing a person to HIV, negligently placing a child in an environment where he or she is left unsupervised with an accused child molester, without undertaking any reasonable effort to ascertain whether it can be anticipated that the accused will molest again, "makes the threat of [molestation] much more of a real possibility to be feared and far more than a speculative worry." *See*

*John & Jane Roes*, 91 Hawai'i at 476, 985 P.2d at 667. In the words of Dr. Annon, whose testimony was uncontradicted, reinstating Norton after his acquittal without requiring that he undergo a psychological evaluation and without imposing any restrictions upon his conduct or subjecting him to heightened supervision constituted "a real risk" to the children. *See supra* note 20.

That being the case, the DOE urges us in vain to preclude the plaintiffs from recovering any of their damages at all, simply because they did not prove a predicate physical injury to a person. We turn, then, to the DOE's challenges to the circuit court's determinations as to the remainder of the elements that the plaintiffs were required to establish in order to recover for their psychic injuries—*i.e.*, duty of care, breach of duty, and legal causation.

### a. *Duty of care*

As a general matter, "a person does not have a duty to act affirmatively to protect another person from harm" by a third person. *Lee v. Corregedore*, 83 Hawai'i 154, 159, 925 P.2d 324, 329 (1996). Thus, " '[a] prerequisite to any negligence action is the existence of a duty owed by the defendant to the plaintiffs[ ]' " that " 'require[s] the [defendant] to conform to a certain standard of conduct for the protection of [the plaintiff] against unreasonable risks.' " *Id.* at 158–59, 925 P.2d at 328–29 (quoting *Maguire v. Hilton Hotels Corp.*, 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995), and *Birmingham v. Fodor's Travel Publications*, 73 Haw. 359, 366, 833 P.2d 70, 74 (1992)); *see also Touchette v. Ganal*, 82 Hawai'i 293, 299, 922 P.2d 347, 352 (1996) (citing, as the "general rule," Restatement (Second) of Torts § 314, at 116 (1965): "[t]he fact that the actor realizes or

should realize that action on his or her part is necessary for another's . . . protection does not of itself impose upon him or her a duty to take such action" (brackets omitted)). Whether a person owes another a duty reasonably to protect the other from foreseeable harm by a third person depends upon whether the circumstances warrant the imposition of such a duty.

If, for example, there is a "special relationship" between the defendant and the plaintiff, or between the defendant and a third person, then the defendant owes the plaintiff a "duty to control the conduct of [the] third person so as to prevent him or her from causing physical harm to the plaintiff." *Touchette*, 82 Hawai'i at 298–99, 922 P.2d at 352–53 (quoting *Cuba v. Fernandez*, 71 Haw. 627, 631–32, 801 P.2d 1208, 1211 (1990) (quoting Restatement (Second) of Torts § 315, at 122 (1965))). Accordingly, because of the "special relationship" shared between a common carrier and its passengers, an innkeeper and his or her guests, a possessor of land (who holds his or her land open to the public) and his or her invitees, and a custodian and his or her ward, the law imposes upon the former the duty to take reasonable steps to protect the latter from foreseeable harms. *Id.* at 299, 922 P.2d at 353 (quoting *Cuba*, 71 Haw. at 631–32, 801 P.2d at 1211 (quoting Restatement (Second) of Torts § 314A, at 118 (1965))). The "section 314A list" is not, however, exhaustive, and other circumstances may engender a "special relationship," such that the defendant will owe the plaintiff a duty to take reasonable precautions to protect the plaintiff from the conduct of a third person. *Id.* at 299, 922 P.2d at 353.

Thus, we have expressly held that, if the State has entered into a custodial relationship [40] with a particular person, then the

---

40. The Restatement (Second) of Torts § 314A provides in relevant part that "[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his [or her] normal opportunities for protection is under a . . . duty to the other" "to take reasonable action . . . to protect them against unreasonable risk of physical harm[.]" The commentary to this section remarks that the duty that a "special relationship" imposes upon a defendant "is only one to exercise reasonable care under the circum-

stances. The defendant is not liable where he [or she] neither knows nor should know of the unreasonable risk[.]" Restatement (Second) of Torts § 314A Comment e, at 120 (1965). Correlatively, this court has noted that even if the defendant and the plaintiff share a "special relationship," the defendant will not become liable to the plaintiff for an injury that a third person inflicts upon the plaintiff unless the harm was reasonably foreseeable. *See, e.g., Lee*, 83 Hawai'i at 160, 925 P.2d at 330.

State owes that person an affirmative duty to take reasonable steps to prevent any harm—which the State foresees or should reasonably anticipate—befalling its ward, either by his or her own hand or by that of another. *See, e.g., Lee,* 83 Hawai'i at 161, 925 P.2d at 331 ("[w]hen one party is in the custodial care of another, as in the case of a jailed prisoner, the custodian has the duty to exercise reasonable and ordinary care for the protection of the life and health of the person in custody" (quoting *City of Belen v. Harrell,* 93 N.M. 601, 603 P.2d 711, 713 (1979))); *id.* at 174, 925 P.2d at 344 (Levinson, J., dissenting) (agreeing with the proposition quoted from *Belen* ); *Figueroa v. State,* 61 Haw. 369, 376–80, 604 P.2d 1198, 1202–04 (1979) (judicial commitment of juvenile to Hawai'i Youth Correctional Facility placed the State under the duty to exercise reasonable care to prevent the juvenile's suicide).

▆▆ Absent a duty to adhere to a particular standard of care by virtue of the State and either the plaintiff or the third person sharing a "special relationship" (or, alternatively, because a statute or administrative rule or regulation mandates that the defendant adhere to a particular standard of care, *see, e.g., Tseu ex rel. Hobbs v. Jeyte,* 88 Hawai'i 85, 90–92, 962 P.2d 344, 350–51 (1998); *Upchurch,* 51 Haw. at 154, 454 P.2d at 115), the State is, as is any person, generally required to exercise only "ordinary care" in the activities it affirmatively undertakes to prevent foreseeable harm to others. *Upchurch,* 51 Haw. at 152, 454 P.2d at 114; *see also, e.g., Lee,* 83 Hawai'i at 162, 925 P.2d at 332 ("[i]n general, anyone who does an affirmative act is under a duty to others to exercise the care of [a] reasonable [person] to protect [others] against an unreasonable risk of harm to them arising out of the act" (quoting *Touchette,* 82 Hawai'i at 301–02, 922 P.2d at 355–56 (quoting Restatement (Second) of Torts § 302 Comment a, at 82 (1965)))) (emphasis omitted) (brackets in original).

▆▆ Regardless of the source of a particular duty, a defendant's liability for failing to adhere to the requisite standard of care is limited by the preposition that "the defendant's obligation to refrain from partic-

ular conduct [or, as the circumstances may warrant, to take whatever affirmative steps are reasonable to protect another] is owed only to those who are foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the conduct [or omission] unreasonably dangerous." *John & Jane Roes,* 91 Hawai'i at 473, 985 P.2d at 664 (quoting *Rodrigues,* 52 Haw. at 174, 472 P.2d at 521). Thus, if it is not reasonably foreseeable that the particular plaintiff will be injured if the expected harm in fact occurs, the defendant does not owe that plaintiff a duty reasonably to prevent the expected harm. *See, e.g., Acoba v. General Tire, Inc.,* 92 Hawai'i 1, 18, 986 P.2d 288, 305 (1999) ("[a]n actionable duty is generally owed to foreseeable plaintiffs subjected to an unreasonable risk of harm created by the actor's negligent conduct" (quoting *Seibel v. City and County of Honolulu,* 61 Haw. 253, 257, 602 P.2d 532, 536 (1979))). Similarly, but not synonymously, if the harm is not reasonably foreseeable, the defendant will not be deemed to have breached the duty of care that he or she owes to a foreseeable plaintiff. *See, e.g., Knodle,* 69 Haw. at 385, 388, 742 P.2d at 383, 385 (noting that what is reasonable under the circumstances of any given negligence case for purposes of determining whether the defendant's conduct breached his or her duty of care "is marked out by the foreseeable range of danger" and, thus, there must be "some probability of harm sufficiently serious that [a reasonable and prudent person] would take precautions to avoid it" (citations omitted)).

▆▆ With the foregoing general principles in mind, we address the DOE's arguments challenging the circuit court's determination that the DOE owed each of the plaintiffs a duty to refrain from negligently inflicting emotional distress upon them, or, in other words, to take reasonable precautions to avoid the foreseeable risk that Norton would molest Melony and Nicole.

Quoting *Miller v. Yoshimoto,* 56 Haw. 333, 340, 536 P.2d 1195, 1199 (1975), the circuit court noted that the DOE is under the duty to "reasonably supervis[e] public school students during their required attendance and presence at school." Moreover, relying on

our citation in *Lee* of *Eisel v. Board of Education*, 324 Md. 376, 597 A.2d 447 (1991) (holding that school counselor owes a duty to use reasonable means to attempt to prevent student's suicide if he or she is on notice of student's suicidal ideation), and *Brooks v. Logan*, 127 Idaho 484, 903 P.2d 73 (1995) (holding that school district and teacher were subject to statutory duty to exercise reasonable care in supervising students and preventing foreseeable harm to them), the circuit court concluded that, because the DOE stood "in the position of a parent" with regard to its students, the DOE was specifically subject to "a duty not only to supervise students, but [also] to take such reasonable measures as would be taken by reasonable parents to avoid injury to students." *See Lee*, 83 Hawai'i at 171, 925 P.2d at 341 (distinguishing *Eisel* and *Brooks* from the record before it on the basis that, in those cases, "children [were] under the care, protection, control and supervision of their respective schools, a role which the *Brooks* court 'described as one *in loco parentis*' " (quoting *Brooks*, 903 P.2d at 79)); *see also Eisel*, 597 A.2d at 451–52 ("the relation of a school vis[-]a[-]vis a pupil is analogous to one who stands *in loco parentis*, with the result that a school is under a special duty to exercise reasonable care to protect a pupil from harm" (as quoted in *Lee*, 83 Hawai'i at 171, 925 P.2d at 341)).

The DOE takes particular exception to the circuit court's Conclusion of Law (COL) No. 35 to the effect that, on the facts of this case, the requisite standard of care "included" the following specific "duties":

 a. to conduct a reasonably thorough administrative investigation of T.Y.'s allegations against Norton, so as to avoid the possibility of similar actions against other students . . .;

 b. to adequately supervise its employees, including teachers, who are in a position to cause injury to students;

 c. to provide adequate training to its administrators in appropriate issues, such as the proper methodology for conducting administrative investigations, pedophilia, and the procedures for conducting interviews of [ ] students who may

be victims of sexual molestation by a teacher;

 d. to not make misrepresentations of fact to others who rely on representations made by DOE administrators regarding issues that concern and directly impact the safety of students; and

 e. to properly conduct interviews of students who may be victims of sexual molestation by a teacher, and to immediately contact the parents of such students, unless good cause exists not to contact the parents.

The DOE also challenges the circuit court's COL No. 36, which concluded that "these duties extend not only to the students themselves, but to the parents of the students, because it is reasonably foreseeable that the parents of students would also be foreseeably endangered by breaches of these duties." The DOE maintains that it merely owes students a duty of reasonable supervision during their required attendance at school; in support of its position, the DOE cites *Kim v. State*, 62 Haw. 483, 491–92, 616 P.2d 1376, 1381–82 (1980). Thus, the DOE perceives the circuit court's ruling as "greatly expand[ing]" the standard of care to which it must conform its conduct in superintending Hawai'i's public schools. Indeed, in the DOE's view, the circuit court imposed "new duties" upon it that, "in essence," hold it "to the standard of care of detectives, attorneys, and mental health counselors."

The DOE argues that the circuit court erroneously predicated its conclusions with respect to the duty that the DOE owed to the plaintiffs on its findings with regard to the foreseeability of the injuries suffered by the plaintiffs. In this vein, the DOE contends that,

[a]ccording to the circuit court, the DOE could foresee that:

(1) [Schlosser's] interview of [Melony and Nicole] as potential witnesses to the assault on A.C. would result in statements by the girls that they too were molested;

(2) [n]either the girls nor the military police, in the course of their investigation, would directly inform the parents of the sexual assaults;

(3) [Schlosser's] specific inquiry into the nature of Norton's assaults upon Melony and Nichole would exacerbate their emotional distress to such an extent that the girls could never be effective witnesses against Norton in a subsequent criminal trial;

(4) [a]s a result, two juries would not find [Melony's and Nicole's] allegations credible; and

(5) Norton would be acquitted, for a second time, of sexual assault charges.

The DOE urges us to hold that such harms were not reasonably foreseeable and, therefore, should not predicate the imposition of any "new duties" upon it. Finally, the DOE asserts that, in any event, mere foreseeability of the harm, standing alone, is not a sufficient basis upon which to predicate the imposition of a duty of care.

In our view, the circuit court was correct in concluding that the DOE's duty ran, not only to Melony and Nicole, but to their respective parents, because it was reasonably foreseeable that both the students and their parents would suffer emotional distress in the event that Norton molested the students. Nor do we construe the circuit court's conclusions regarding the duty of care that the DOE owed to the plaintiffs as imposing anything "new" upon the DOE. Rather, as we explain below, our case law supports the circuit court's determination that the DOE, standing *in loco parentis*, owes students and their parents a duty to take reasonable steps to prevent reasonably foreseeable harms to its students.

In *Miller*, this court held that the State "has a duty of reasonably supervising the public school students of Hawai'i during their required attendance and presence at school and while the students are leaving school immediately after the school day is over." 56 Haw. at 340, 536 P.2d at 1199 (citing *Titus v. Lindberg*, 49 N.J. 66, 228 A.2d 65, 68 (1967)). The duty of "reasonable supervision entails general supervision of students, unless specific needs, or a dangerous or likely to be dangerous situation calls for specific supervision." *Id.* Miller, a student at a public intermediate school, was struck in her left eye with a rock thrown by Yoshimoto, one of her fellow students, while walking across the school campus on her way home shortly after classes had been dismissed for the day. *Id.* at 333–37, 536 P.2d at 1196–98. As a result, Miller's left eye had to be replaced with an artificial eye. *Id.* at 337, 536 P.2d at 1198. Miller sued, *inter alia*, the State, claiming that the school's administrators and teachers had been negligent in supervising students at the time of the incident. *Id.* at 333, 536 P.2d at 1196. The trial court entered judgment in favor of the State, and Miller appealed. *Id.*

On appeal, this court held that rules and regulations that the DOE had adopted "provid[ed] the necessary guidelines and requirements for the personnel of the State educational system to perform its supervisory duties." [41] *Id.* at 340, 536 P.2d at 1199. We noted that numerous school administrators and teachers had been stationed around the

---

**41.** This court set out the relevant rules, regulations, and policies that the Board of Education had adopted pursuant to statutory authority (*see* HRS § 292–12) at some length in *Miller*. *See Miller*, 56 Haw. at 337–40, 536 P.2d at 1198–99. In essence, these rules, regulations, and policies repeatedly recognized that "[t]he public schools have a concern for the safety and welfare of their students in the immediate vicinity of the school as they come and go before and after the regular school day." *Id.* at 339, 536 P.2d at 1199 (quoting Official Policies and Regulations of the Department of Education, State of Hawai'i 1970 (adopted Oct. 1970) [hereinafter, "DOE OPR"] at 4230). Thus, the principal was obligated to "deploy his [or her] staff members in such a manner that their supervisory responsibilities shall include the personal safety of all students" and to "seek additional resources, outside his [or her]

immediate staff, to prevent physical harm to the students under his [or her] supervision." *Id.* (quoting DOE OPR at 4210.1). Teachers, generally, were obligated to "[a]ssist the supervision of pupils before school, during intermission[,] and after school." *Id.* at 338, 536 P.2d at 1198 (quoting DOE OPR at 1900–01.1). Moreover, the DOE's official policies and regulations mandated that the DOE "shall give" "[a]ttention ... to the personal safety of each student while on campus or engaged in school-connected activities off-campus." *Id.* (quoting DOE OPR at 4210). This "attention" included, *inter alia*, the "provision of services to safeguard students from the deviate behavior of those who fail to conform to standards of conduct compatible with the best interests of all." *Id.* at 338, 536 P.2d at 1199 (quoting DOE OPR at 4210).

school at the time of Miller's injury for the purpose of supervising the students' departure for the day, but that no one had been specifically assigned to supervise the area of the school grounds where Miller was injured. *Id.* at 340–41, 536 P.2d at 1200. Absent evidence that the area in which Miller was injured "was dangerous in character or likely to be dangerous because of known deviant conduct of students or of others," thereby "requiring specific supervision," this court held that the school was not subject to a duty to single out either the area or Yoshimoto. *Id.* at 341, 536 P.2d at 1200. We explained that

> [t]he duty of reasonable supervision does not require the [DOE] to provide personnel to supervise every portion of the school buildings and campus area. However, if certain specific areas are known to the [DOE] as dangerous, or the [DOE] should have known that a specific area is dangerous, or the [DOE] knew or should have known that certain students would or may conduct themselves in a manner dangerous to the welfare of others, [the DOE's] duty of reasonable supervision would require specific supervision of those situations.

*Id.* However, because Miller had failed to establish that the DOE had breached the duty of care that it owed her, this court affirmed the trial court's judgment in favor of the State. *Id.* at 341–42, 536 P.2d at 1200–201. Because the *Miller* court grounded the duty of care that the DOE owed to Miller in the DOE's policies and regulations, it did not discuss whether the DOE shared a "special relationship" with students and their parents.

In *Kim,* we held the DOE to the duty of care that we had articulated in *Miller,* without further elaboration as to its source. Several high school students were engaging in "disruptive behavior," *i.e.,* "giggling, scooting of chairs, whispering, and some gestur[ing]" that "apparently [was] directed" at Kim—a new student at the school—during class. 62 Haw. at 485, 492, 616 P.2d at 1378, 1383. The classroom teacher rebuked the disruptive students. *Id.* at 485, 616 P.2d at 1378. The following day, the teacher overheard several students conversing in an unruly manner in the hallway outside her classroom; Kim was inside the teacher's classroom at the time. *Id.* "Minutes later, a large male student, a newly-enrolled tenth grader the teacher did not know at that time, entered the room and advanced determinedly and aggressively towards" Kim. *Id.* at 486, 616 P.2d at 1378. The teacher fled the classroom, seeking the principal's and vice-principal's assistance, both of whom occupied offices adjacent to the classroom. *Id.* at 486, 616 P.2d at 1379. Meanwhile, the intruding student pummeled Kim, who sustained "serious injuries" as a result. *Id.* Arriving quickly on the scene, the principal and the vice-principal, apparently with some difficulty, overcame Kim's assailant and "restore[d] order." *Id.* Kim sued the State, claiming that his injuries were legally caused by the DOE's negligence in failing adequately to police, control, and supervise the classroom where he had been attacked, as well as in "otherwise neglecting to adopt measures to ensure his safety." *Id.* The trial court entered judgment in favor of the State and Kim appealed. *Id.* at 484, 616 P.2d at 1378.

On appeal, we reiterated that the DOE's duty reasonably to supervise students "entails 'general supervision of students, unless specific needs, or a dangerous or likely to be dangerous situation calls for specific supervision.' " *Id.* at 491–92, 616 P.2d at 1381–82 (quoting *Miller,* 56 Haw. at 340, 536 P.2d at 1199). With respect to whether the school's administrators and teachers "should have been aware of the imminent danger of an intrusion by a student with a propensity for violence," this court determined that the students' disruptive behavior the previous day "was not such [conduct] that would give rise to a probability of an invasion of the classroom by another student with a proclivity for harm." *Id.* at 492, 616 P.2d at 1382. This court therefore held that, "[a]s the peril was neither known nor reasonably foreseeable, there was no basis" for the imposition of a duty of "specific supervision" upon the DOE "to cope with the danger." *Id.*

Although neither *Miller* nor *Kim* expressly determined that there was a "special relationship" between the DOE and either its students or its students' parents, in *Lee,* as

we have noted, we cited with approval to two other jurisdictions that *have* held that a school or school district stands in the shoes of a student's parents when the student is in the school's custody. The issue *sub judice* in *Lee* was whether the State and its employee, Manuel Corregedore, owed a duty to Anthony Perreira to prevent his suicide. 83 Hawai'i at 156, 925 P.2d at 326. At the State of Hawai'i's Office of Veterans' Services, the State employed Corregedore as a Veterans' Services Counselor IV; at the time he committed suicide, Perreira, a disabled Vietnam veteran, "regularly" met with and "received help from" Corregedore.[42] *Id.* In a wrongful death claim maintained by Perreira's estate, the plaintiffs asserted that Corregedore was subject to an affirmative duty, arising from his professional relationship with Perreira, to "prevent Perreira's suicide." *Id.* at 156, 158, 925 P.2d at 326, 328; *accord id.* at 177 n. 3, 925 P.2d at 348 n. 3 (Levinson, J., dissenting) (noting that the plaintiffs "assert only that Corregedore owed Perreira a duty to take reasonable action to prevent his suicide" (emphasis omitted)). On appeal, a majority of this court held that Corregedore did not owe Perreira such a duty. *Id.* at 172–73, 925 P.2d at 342–43 (declining to impose such a duty upon Corregedore as a matter of common law and holding that HRS ch. 363, relating to veterans' rights and benefits, did not impose a statutory duty of care upon Corregedore to prevent Perreira's suicide).

In a lengthy discussion of the policy considerations that, in the *Lee* majority's view, ultimately militated against imposing a duty upon Corregedore "to prevent Perriera's suicide," *see Lee*, 83 Hawai'i at 166–72, 925 P.2d at 336–42, the *Lee* majority distinguished *Eisel* and *Brooks* as follows:

> We are aware of one instance in which a court held that "school counselors [at a middle school] have a duty to use reasonable means to attempt to prevent a [student's] suicide when they are on notice of a child or adolescent student's suicidal intent." *Eisel* [,] ... 597 A.2d [at] 456[ ]. In addition, another court held that a high school teacher had a duty to exercise reasonable care in preventing a high school student's suicide. *Brooks* [,] ... 903 P.2d [at] 79[ ]. However, both *Eisel* and *Brooks* are clearly distinguishable from the instant case. While the suicide victim in the instant case, Perreira, was an independent, forty-two year old adult man, "Eisel's claim involve[d] suicide by an adolescent[,]" *Eisel*, 597 A.2d at 451, and *Brooks* involved "the suicide of fourteen-year-old Jeffrey Brooks." *Brooks*, 903 P.2d at 75. Thus, while Perreira had the freedom, as an adult, to enter or leave the Veterans Administration Clinic and the Office of Veterans' Services, accepting or refusing medical treatment as he pleased, the suicide victims in *Eisel* and *Brooks* were children under the care, protection, control[,] and supervision of their respective schools, a role which the *Brooks* court "described as one *in loco parentis*." *Brooks*, 903 P.2d at 79 (emphases in original). Likewise, the *Eisel* court recognized "the doctrine that the relation of a school vis a vis a pupil is analogous to one who stands *in loco parentis*, with the result that a school is under a special duty to exercise reasonable care to protect a pupil from harm." *Eisel*, 597 A.2d at 451–52 (emphases added; quotation marks and citations omitted).

> The *Eisel* and *Brooks* courts also based their holdings on statutes that imposed a duty on schools to protect children from suicides. In *Eisel*, the Maryland "General Assembly ha[d] made it quite clear [through the Youth Suicide Prevention

---

**42.** Corregedore was not a "counselor" in the sense of being a psychiatrist, psychologist, or mental health professional, although he had received some training "in mental health and suicide prevention while in the military." *Lee*, 83 Hawai'i at 156, 925 P.2d at 326. In essence, Corregedore assisted veterans in "identifying their concerns or problems, and explaining the options available to them to deal with the problem." *Id.* at 156–57, 925 P.2d at 326–27. He did not provide psychiatric or psychological services to them, but, rather, referred the veterans whom he counseled to appropriate professionals who could directly address the veterans' problems. *Id.* at 157, 925 P.2d at 327. Corregedore's job description expressly required him to refer veterans for services related to their needs and problems. *Id.* at 156 & n. 1, 925 P.2d at 326 & n. 1; *see also id.* at 179–80, 925 P.2d at 349–50 (Levinson, J., dissenting) (discussing the duties requisite to Corregedore's employment).

School Programs Act] that prevention of youth suicide is an important public policy, and that local schools should be at the forefront of the prevention effort." *Eisel,* 597 A.2d at 453. In a clear reference to the distinction between adults and children, the *Eisel* court noted that "[t]he Act d[id] not view ... troubled children as standing independently, to live or die on their own." *Id.* at 454. Likewise, in *Brooks,* the Idaho "legislature [had] enacted I.C. § 33–512(4)," which "created a statutory duty ... requir[ing] a school district to act reasonably in the face of foreseeable risks of harm" and "to act affirmatively to prevent foreseeable harm to its students." *Brooks,* 903 P.2d at 79. In contrast to school children, adults such as Perreira have much greater personal autonomy and decision-making freedom with respect to their own health care.

*Lee,* 83 Hawai'i at 171, 925 P.2d at 341 (some brackets and ellipsis points added and some in original).

In *Eisel,* the plaintiff (thirteen-year-old Nicole Eisel's father) brought a wrongful death action against the Maryland Board of Education, in which he argued that "school counselors have a duty to intervene to attempt to prevent a student's threatened suicide." 597 A.2d at 448. During the week preceding her suicide, Nicole informed several friends that she intended to commit suicide; these friends related Nicole's intention to their school counselor, who, in turn, related it to Nicole's school counselor. *Id.* at 449. Both counselors confronted Nicole with their knowledge of her statements to her friends, but Nicole denied making those statements. *Id.* Neither counselor, however, informed Nicole's parents or school administrators about Nicole's intent to commit suicide. *Id.* at 450.

The specific issue on appeal was whether the school had breached its duty of care by failing to inform Nicole's parents of her reported suicidal ideation. *Id.* at 448. With respect to the duty of care that the school owed to Nicole, the *Eisel* court acknowledged that a "special relationship between a defendant and the suicidal person creates a duty to prevent a foreseeable suicide," but noted that "[r]ecent attempts to extend the duty to prevent suicide beyond custodial or therapist-patient relationships have failed." *Id.* Nevertheless, the *Eisel* court believed that a number of factors distinguished the case before it from "those cases finding an absence of any duty" on the basis that "the custodial relationship between the suicide victim and the defendant was other than that of hospital and patient or jailer and prisoner." *Id.* at 451. Those factors were: (1) that the suicide in *Eisel* was that of an adolescent; (2) that the school's conduct at issue in *Eisel* was its failure to communicate the child's reported suicidal ideation to her father, rather than a failure to physically prevent the child's suicide; (3) that the relationship between school counselor and students was "not devoid of therapeutic overtones," as reflected in the official job description of school counselors and in Nicole's counselor's specific qualifications; and (4) that the Maryland Court of Appeals (the state's court of last resort) had previously recognized that "the relation of a school vis[-]a[-]vis a pupil is analogous to one who stands *in loco parentis,* with the result that a school is under a special duty to exercise reasonable care to protect a pupil from harm[.]" *Id.* at 451–52. For the last proposition, the Maryland Court of Appeals cited, *inter alia,* the Restatement (Second) of Torts § 320, at 130 (1965), which we discuss *infra. Id.* at 452.

In the *Eisel* court's view, the foregoing factors reflected that "it is an open question whether there is a duty to attempt to prevent an adolescent's suicide, by reasonable means, including, in this case, by warning the parent." *Id.* The *Eisel* court resolved this open question by considering six "variables," [43]

---

43. Specifically, the *Eisel* court, in considering whether to recognize a duty in tort, addressed:

The foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

which led it to hold that "school counselors have a duty to use reasonable means to attempt to prevent a suicide when they are on notice of a child or adolescent student's suicidal intent." *Id.* at 452–56.

In *Brooks,* the plaintiffs (Jeffrey Brooks's family and estate) alleged that Jeffrey's high school English teacher and the school district owed a duty to "take affirmative action to detect and assist students who suffer from depression or suicidal ideation." 903 P.2d at 75–76. More specifically, the plaintiffs claimed that the school district owed a duty to warn Jeffrey's parents of his suicidal tendencies, which, they alleged, he had, albeit elliptically, conveyed in a journal, which he kept as part of an English assignment and which his teacher had read. *Id.* at 75, 79. In this regard, the *Brooks* court held: (1) that the school had not voluntarily assumed a duty to help Jeffrey because his teacher had, in the past, helped other troubled students, *id.* at 78; (2) that a custodial relationship did not give rise to a duty a warn, *id.* at 78–79; but (3) that, under the Idaho Code (I.C.), the school owed a duty to "protect the health and morals of students," *id.* (citing I.C. § 33–512(4)), which, as Idaho Supreme Court precedent established, "created a statutory duty [that] requires a school district to act reason-ably in the face of foreseeable risks of harm," *id.* at 79 (citations omitted). Thus, the *Brooks* court construed and applied its own precedent as follows:

> Previously, we have ruled that when the legislature enacted I.C. § 33–512(4), it created a statutory duty [that] requires a school district to act reasonably in the face of foreseeable risks of harm. *Czaplicki v. Gooding Joint School Dist.,* 116 Idaho 326, 331, 775 P.2d 640, 645 (1989); *Doe v. Durtschi,* 110 Idaho 466, 716 P.2d 1238 (1986). We again discussed this statutory duty in *Bauer v. Minidoka Sch. Dist. No. 331,* 116 Idaho 586, 778 P.2d 336 (1989). In that opinion we noted that this statutory duty exemplifies the role of the state to the children in school, which is a role described as one *in loco parentis. Id.* at 588, 778 P.2d at 338. We quoted favorably from a Washington opinion[,] which pointed out that "the duty a school district owes to its pupils is '[t]o anticipate reasonably foreseeable dangers and to take precautions protecting the children in its custody from such dangers.' " *Id.* at 590, 778 P.2d at 340 (quoting *Carabba v. Anacortes Sch. Dist. No. 103,* 72 Wash.2d 939, 435 P.2d 936, 946 (1967)).[44]

597 A.2d at 452 (citations, internal quotation signals, and original brackets omitted). As to these factors, the *Eisel* court believed: (1) that Nicole's suicide was foreseeable, given that the defendants had knowledge of her intent, and that the degree of certainty that she suffered the foreseeable harm was one hundred percent; (2) that, in Maryland, the prevention of youth suicide was an important public policy, as reflected by the enactment of the Youth Suicide Prevention School Programs Act and the numerous suicide prevention programs established as a result of the Act; (3) that there was not "so little connection between [the] breach of duty contended for[] and the allegedly resulting harm" that no duty should be imposed, insofar as a child's act of suicide could not be said to "a deliberate, intentional and intervening act [that] precludes a finding that [the school] is responsible for the harm" where, by virtue of the Youth Suicide Prevention School Programs Act, schools are deemed to be in a position to intervene effectively; (4) that the Act reflected a "community sense that there should be intervention based on emotional indicia of suicide" and, therefore, that moral blame attached to the school's failure to intervene; (5) that "the consequence of the risk [wa]s so great that even a relatively remote possibility of a suicide" tipped "the scales ... over-whelming in favor of [imposing a] duty" that would obligate counselors to inform parents, which the *Eisel* court deemed a "slight" burden; and (6) imposing the duty to inform parents of their child's suicidal ideation "would not appear to have any substantial adverse impact on" the legislative scheme relating to the school's insurance coverage "or on the community at large." *Id.* at 452–456.

44. The *Carabba* court had observed that a school district owes its students a duty to "anticipate reasonably foreseeable dangers and to take precautions protecting the children in its custody from such dangers." 435 P.2d at 946 (citations omitted). Thus, a child "may sue the school district for injuries resulting from its failure to protect the child," because "a school district may be liable for injuries sustained as a result of negligent supervision or failure to supervise activities of its students." *Id.* (citations omitted). The *Carabba* court noted that "[o]ne basis for the duty thus imposed upon the school district is to be found in the relationship between the parties." *Id.* at 947, 435 P.2d 936.

> It is not a voluntary relationship. The child is compelled to attend school. He [or she] must yield obedience to school rules and discipline

Thus, under our previous case law[,] we have determined that a school district has a duty, exemplified in I.C. § 33–512(4), to act affirmatively to prevent foreseeable harm to its students. . . . Therefore, we find that the question of whether [Jeffrey's teacher] had a duty to seek help for Jeff[rey] is essentially a question that has already been addressed by this Court.

Accordingly, we find that there is a duty [that] arises between a teacher or school district and a student. This duty has previously been recognized by this Court as simply a duty to exercise reasonable care in supervising students while they are attending school.

*Brooks,* 903 P.2d at 79 (some brackets added and some in original).

In our view, *Miller* and *Kim* are reconcilable with *Lee's* tacit acknowledgment that the DOE shares a special relationship with its students, which, we believe, extends to the students' parents as well. *Miller* and *Kim* expressly held that the DOE is subject to a duty reasonably to supervise students. In both cases, the students in question had been injured as an alleged result of their respective school's negligent supervision. Impliedly, then, the purpose of requiring the DOE to exercise reasonable supervision over the students entrusted to them by their parents—under, we note, the compulsion of law, *see* HRS § 298–9 (1993) [45]—is to ensure that the children's educational custodians provide them with a safe environment in which they will be reasonably protected against foreseeable harms that the DOE can or reasonably should anticipate.

▇▇ Moreover, in other contexts, we have approved the rule, set forth in the Restatement (Second) of Torts § 314A (1965), that "[o]ne who is required by law to take . . . the custody of another under circumstances such as to deprive the other of his [or her] normal opportunities for protection is under" a duty to the other "to protect [him or her] against

formulated and enforced pursuant to statute. . . . The result is that the protective custody of teachers is mandatorily substituted for that of the parent.

*Id.* (citations omitted).

unreasonable risk of physical harm." *See, e.g., Touchette,* 82 Hawai'i at 298–99, 922 P.2d at 352–53. A particularized application of this rule is set forth in greater detail in the Restatement (Second) of Torts § 320, at 130 (1965), which provides:

One who is required by law to take or who voluntarily takes the custody of another[,] under circumstances such as to deprive the other of his [or her] normal power of self-protection or to subject him [or her] to association with persons likely to harm him [or her], is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him [or her], if the actor

(a) knows or has reason to know that he [or she] has the ability to control the conduct of the third persons, and

(b) knows or should know of the necessity and opportunity for exercising such control.

Comment a to § 320 remarks that the rule is applicable, *inter alia,* to "teachers or other persons in charge of a public school." *Id.* at 130. Comment b to § 320 clarifies that the foregoing is true because "[t]he circumstances under which the custody of another is taken and maintained may be such as to deprive him [or her] . . . of the protection of someone who, if present, would be under a duty to protect him [or her]. . . ." *Id.* at 130–31. Because "a child[,] while in school[,] is deprived of the protection of his [or her] parents or guardian," "the actor who takes custody . . . of [the] child is properly required to give him [or her] the protection [of] which the custody or the manner in which it is taken has deprived him [or her.]" *Id.* at 131.

▇▇ As we have observed, pursuant to HRS § 298–9, the state required that children attend school and, thereby, deprived

45. In 1996, the legislature repealed HRS § 298–9 and, currently, its provisions are set forth in HRS § 302A–1132 (Supp.2001). HRS § 298–9 provided-and HRS § 302A–1132 currently provides—for the compulsory attendance of children at school.

them of the protection from reasonably foreseeable harm that their parents normally provide. The Washington Supreme Court has reasoned that, in doing so, the state usurps a parent's protective custody of his or her child, replacing it with that of school teachers and administrators. *See Carabba,* 435 P.2d at 946–47, discussed *supra* in note 44. We agree, and in accord with the rules expressed in the Restatement (Second) of Torts §§ 314A and 320, we believe that the DOE shares a "special relationship"—*i.e.,* a quasi-parental or *in loco parentis* custodial relationship—with its students, which obligates the DOE to exert reasonable care in ensuring each student's safety and welfare, as would a reasonably prudent parent. In other words, the DOE owes its students the duty to take whatever precautions are reasonable to prevent harms that it anticipates, or reasonably should anticipate, may befall them. Because it is foreseeable that, should harm befall a student because the DOE breaches the foregoing duty, the student's parents will, at the very least, suffer emotional distress, the DOE's duty runs not only to its students, but to their parents as well.

Thus, we read *Miller* and *Kim* as addressing a specific aspect of the general standard of care to which the DOE must conform its superintendence of public schools. *Miller* and *Kim* stand for the proposition that the DOE fulfills its duty to students and parents by reasonably supervising students while they are attending school or participating in school activities. Our general characterization in *Miller* and *Kim* of the DOE's duty as one of providing "reasonable supervision" does not encyclopedically describe the application of the standard of care to which it must conform under all circumstances, but simply enumerates a particular aspect of the DOE's duty to students and parents in the particularized contexts presented in those cases.

Furthermore, as this court noted in both *Miller* and Kim, *generalized* supervision does not suffice where the DOE is "on notice," or reasonably should be aware, that there is a *specific* danger to the safety and welfare of students. In other words, the DOE is required to take affirmative steps specifically to ensure the safety and welfare of students if it reasonably anticipates, or reasonably should anticipate, a particular harm. In *Miller,* the record failed to establish that the DOE knew or reasonably should have anticipated that an unsupervised area of the school grounds was dangerous; thus, the DOE did not owe a duty specifically to supervise that area because it was not reasonably foreseeable that the plaintiff would be injured there. 56 Haw. at 341–42, 536 P.2d at 1200–201. Similarly, in *Kim,* because the DOE neither knew nor reasonably should have foreseen that a particular student would harm another, it did not owe a duty specifically to supervise either the assailant or the student harmed by him. 62 Haw. at 491–93, 616 P.2d at 1381–82. What is significant for present purposes, however, is that in neither *Miller* nor *Kim could* a duty reasonably to supervise arise under *any* circumstances if the DOE did not, in the first instance, owe a *general* duty to students to anticipate foreseeable harms and take whatever reasonable steps were necessary to prevent that harm.

Cases like *Eisel* and *Brooks* exemplify the proposition that, if a school knows, or reasonably should foresee, that a student intends to commit suicide, then a duty arises to take reasonable steps to prevent the child's suicide, including, at the very least, to warn the child's parents or guardian of his or her suicidal ideation. Both the *Eisel* and *Brooks* courts expressly recognized that the *specific* duty to warn parents of their child's suicidal ideation arises out of the school's *general* duty to anticipate reasonably foreseeable harm to students and to exert reasonable care to prevent that harm.

Accordingly, we hold that the duty of care that the DOE owes to students and their parents is, on a general level, a duty to take whatever precautions are necessary reasonably to ensure the safety and welfare of the children entrusted to its custody and control against harms that the DOE anticipates, or reasonably should anticipate. Although we have not expressly said so in the past, it is readily apparent that the foregoing duty arises from the "special relationship" that the DOE shares with its students and their parents, which the DOE policies re-

ceived into evidence in this case,[46] as well as those upon which this court relied in *Miller*, *see supra* note 41, confirm. Thus, whether the DOE's duty is characterized as one of "reasonable supervision of its students," as we did in *Miller* and *Kim*, or as a "special" duty, "*in loco parentis*," to exercise reasonable care to protect a student from foreseeable harm, as the *Eisel* and *Brooks* courts did, does not alter what the DOE's duty quintessentially entails—to exercise reasonable care in ensuring that students are educated in a safe environment free from any unreasonable risks of harm. *See, e.g., Brooks*, 903 P.2d at 79; *Carabba*, 435 P.2d at 946–47, discussed *supra* in note 44. It therefore follows that the circuit court did not, as the DOE suggests, "greatly expand" the duty of care that the DOE owes to students and their parents when it expressed the self-evident, namely, that the DOE's duty stems from its custodial relationship, *in loco paren-*

*tis*, with students and, thus, obligates the DOE reasonably to anticipate, as would a reasonably prudent parent, foreseeable harm and to take whatever action is reasonable to protect a student from that foreseeable harm. *Cf. Figueroa v. State*, 61 Haw. 369, 376, 604 P.2d 1198, 1202 (1980) ("The State's duty to Michael to exercise reasonable care arises from the relationship created between the two as a result of Michael's commitment to the Boys' Home by the Family Court and so long as he was in the custody, the law provides that the director of social services shall be the guardian of the person of every child committed to or received at [the Boys' Home]. HRS § 352-9 (1976); *see* Restatement (Second) of Torts § 314A(4).").

As a final matter, however, we note that the circuit court may have inartfully characterized as "included" duties the DOE's obligations to: (1) "conduct a reasonably thorough administrative investigation of

---

46. The parties have not cited to any statute that codifies the DOE's general responsibility for the safety and welfare of students. However, the record on appeal contains a copy of the DOE's administrative regulations and policies relating to student misconduct, discipline, school searches and seizures, reporting offenses, police interviews and arrests, and restitution for vandalism and negligence. Presumably, the DOE adopted these regulations pursuant to HRS § 296–71 (1993), which mandates that the board of education promulgate rules governing the "[r]eporting of crime-related incidents"; in any event, these regulations were in effect at the time that Norton molested students at Mōkapu. Section 8-19-1 of the regulations, pertaining to the DOE's "[p]hilosophy," notes that the "purpose of school administered discipline" upon ill-behaving students is, in part, to "promote and maintain a safe and secure educational environment[.]"

More to the point, and with particular regard to the DOE's investigation of the T.Y. incident, the record on appeal contains a copy of the State of Hawai'i's "School Code, Certified Personnel Policies and Regulations (5000 Series)." Regulation No. 5110-67, which was apparently in effect at the time Norton molested the Mōkapu students, provides that "[c]ertified employees may be suspended without pay, demoted, discharged and/or otherwise disciplined by the [DOE] for proper cause." Regulation No. 5110-69, which relates to "imposing suspension without pay on teachers," imposes upon a principal or an appropriate supervisor the "[r]esponsibility[y,] ... upon receipt of concerns, complaints, problems, etc., [to] conduct[] a thorough investigation into the matter." To this end, the princi-

pal or appropriate supervisor is directed to inform the teacher and the district superintendent (or other appropriate supervisor) of the complaint and, after "the investigation is completed, determine[] whether suspension without pay should be recommended." Any recommendation that the teacher should be suspended without pay must be made in writing, contain specific information with documentation, and be transmitted to the district superintendent. With respect to Schlosser's interviews of Melony and Nicole regarding Norton's molestation of them, the circuit court found that the DOE had a policy "requir[ing] that he not conduct any interviews of alleged victims in possible sexual misconduct cases because school level administrators were not adequately trained to deal with these issues." Although Schlosser's testimony, both at trial and in his pretrial deposition, supports the circuit court's finding, neither the court nor the parties cite to any document reflecting this policy.

Finally, we note that the record in this case does not include documentation of any of the policies or regulations that were in effect during Norton's employment with the DOE and that are akin to those that this court set forth in *Miller, see supra* note 41. However, assuming that such regulations and polices were still in effect, we note that they clearly reflected that the DOE bears not only the responsibility to supervise students, but that the purpose of supervising students is reasonably to ensure their safety and welfare while they are under the DOE's control and care. Indeed, Sosa's testimony in the present matter further reflects that a primary purpose of his investigation into Norton's misconduct was to ensure the safety of Norton's students.

T.Y.'s allegations against Norton"; (2) "adequately supervise its employees, including teachers, who are in a position to cause injury to students"; (3) "provide adequate training to its administrators in appropriate issues, such as the proper methodology for conducting administrative investigations, pedophilia, and the procedures for conducting interviews of [ ] students who may be victims of sexual molestation by a teacher"; (4) "properly conduct interviews of students who may be victims of sexual molestation by a teacher"; and (5) "immediately contact the parents of such students unless good cause exists not to contact the parents." The circuit court's characterization of the foregoing as "duties" should be read in conjunction with its findings relating to the specific means by which the DOE breached its general duty of care on the facts of this case. So read, the circuit court did not, as the DOE urges, impose "law enforcement" responsibilities upon the DOE's administrators to investigate allegations of child abuse or to hold DOE administrators to a standard of care requisite to mental health professionals or attorneys. Rather, the circuit court highlighted the particular conduct that, on the record before it, was unreasonable and that, therefore, constituted breaches of the DOE's duty to exert reasonable care in ensuring the safety and welfare of its students.

### b. *Breach of duty*

"Whether there was a breach of duty or not, *i.e.*[,] whether there was a failure on the defendant's part to exercise reasonable care, is a question for the trier of fact." *Knodle*, 69 Haw. at 386, 742 P.2d at 383; *see also Bidar v. Amfac, Inc.*, 66 Haw. 547, 552, 669 P.2d 154, 159 (1983). Generally, the defendant's conduct is measured against "what a reasonable and prudent person would ... have done under [the] circumstances" in determining whether there has been a breach of a duty of care owed to the plaintiff. *Knodle*, 69 Haw. at 387, 742 P.2d at 384 (citations omitted). However, "[t]he conduct of [the mythical reasonable and prudent] person will vary with the situation with which he [or she] is confronted" because

"what is reasonable and prudent in the particular circumstances is marked out by the foreseeable range of danger." *Id.* (citations omitted) (some brackets added and some in original). This court has observed that

> [d]anger in this context "necessarily involves a recognizable danger, based upon some knowledge of the existing facts, and some reasonable belief that harm may possibly follow." ... The test of what is reasonably foreseeable is not one of a balance of probabilities. "That the danger will more probably than otherwise not be encountered on a particular occasion does not dispense with the exercise of care." *Tullgren v. Amoskeag Manufacturing Co.*, 82 N.H. 268, 276, 133 A. 4, 8 (1926). The test is whether "there is some probability of harm sufficiently serious that [a reasonable and prudent person] would take precautions to avoid it." *Id.* ... "As the gravity of the possible harm increases, the apparent likelihood of its occurrence need be correspondingly less to generate a duty of precaution." ... And "[a]gainst this probability, and gravity, of the risk, must be balanced in every case the utility of the type of conduct in question."

*Id.* at 387–88, 742 P.2d at 385 (some citations omitted) (some brackets added and some in original).

The circuit court found that the DOE had breached the duty of care that it owed to the plaintiffs in several respects, only three of which are relevant for present purposes. First, the circuit court found that the DOE's failure to conduct a reasonably thorough investigation in connection with T.Y.'s allegation against Norton was unreasonable. Second, the circuit court found unreasonable the DOE's failure properly to train its administrators regarding the problem of pedophilia, such that, presumably, they would have anticipated the danger that Norton posed even though he had been acquitted of criminal charges in the T.Y. matter. Third, the circuit court found that Schlosser's interviews of Melony and Nicole and his failure to inform their parents of what they reported to him was unreasonable.[47]

47. The circuit court also found that Sosa's mis-

*representation to KMCAS base command—i.e.,*

The DOE argues that, because the circuit court erred in defining the duty of care that the DOE owed to the plaintiffs, it clearly erred in finding that the DOE breached that duty. The DOE asserts that "it acted within the standard of care applicable to DOE employees"—which, it contends, is generally to supervise students unless it is on notice that special circumstances necessitate specific supervision—and that it was not reasonably foreseeable that Norton would molest Melony and Nicole. According to the DOE, "[f]rom an objective view, an educator, acting within the duties of school administrators and other DOE personnel, and believing, from all of the available facts adduced during the investigation and prosecution of Norton[,] that there was no evidence to support T.Y.'s allegations, would not be on notice that Norton presented a specific risk to Melony and Nicole." More precisely, the DOE argues, in light of the fact that no further allegations against Norton arose for approximately a year and a half, that it had "no specific, advance warning that Melony and Nicole were at risk from Norton's unknown deviate nature." Accordingly, the DOE concludes that it "fulfilled its duty" to the plaintiffs.

■ With regard to the DOE's investigation of the T.Y. incident and its reinstatement of Norton, we believe that Estomago's initial "school level investigation" and Sosa's subsequent "district level" investigation, as cursory and biased as they may have been, were reasonably conducted through the point at which Norton was acquitted in the criminal proceedings arising out of T.Y.'s accusations. Neither Estomago nor Sosa was able to interview Norton or T.Y. concerning the latter's accusations *until* Norton was acquitted. Norton was counseled to invoke his right against self-incrimination in the face of Estomago's and Sosa's attempts to elicit his "version" of events. Similarly, the HPD instructed T.Y. and her mother not to discuss the incident with the school. Quite literally, there was very little that the DOE could do

pending the outcome of Norton's criminal trial, other than, as it did, to remove Norton from a teaching position.

Nevertheless, once Norton was acquitted in the T.Y. criminal matter, the foregoing impediments to the DOE's administrative investigation into Norton's alleged misconduct were no longer present. For that matter, nothing precluded the DOE from observing the criminal proceedings. Instead of resuming its investigation after Norton was acquitted, however, the DOE inaccurately and naively assumed, apparently without consulting its legal advisors, that Norton's acquittal signified that a jury had determined that he was innocent beyond a reasonable a doubt. This assumption was patently unreasonable. *See United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984) (observing that "an acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt" and that a jury's verdict acquitting a defendant "in [a] criminal action d[oes] not negate the possibility that a preponderance of the evidence could show" that the defendant had engaged in the activity for which he or she was criminally prosecuted and, thus, holding that "the difference in the relative burdens of proof in the criminal and civil actions precludes the application of the doctrine of collateral estoppel"); *accord State v. Tuipuapua*, 83 Hawai'i 141, 152 n. 27, 925 P.2d 311, 322 n. 27 (1996) (observing that HRS § 712A–11 (1993) "provides that '[a]n acquittal or dismissal in a criminal proceeding shall not preclude civil proceedings under this chapter' " (emphasis omitted)); *Marsland v. International Society for Krishna Consciousness*, 66 Haw. 119, 125–26, 657 P.2d 1035, 1039–40 (1983) (agreeing with other courts that had addressed the issue *sub judice* and holding that "an acquittal in a criminal prosecution for violation of a zoning ordinance is not *res judicata* in a civil proceeding for the enforcement of the zoning

that the DOE's administrative investigation into Norton's alleged misconduct in the T.Y. matter had absolved Norton—was unreasonable. Because we have held that the DOE is immune from liability to the plaintiffs to the extent that their claims arise out of Sosa's misrepresenta-

tion, *see supra* note 38 and accompanying text, we do not discuss the DOE's arguments challenging the circuit court's determination that Sosa's misrepresentation constituted a breach of the duty of care that the DOE owed to the plaintiffs.

ordinance"); and *Mew Sun Leong v. Honolulu Rapid Transit Co., Ltd,* 52 Haw. 138, 144, 472 P.2d 505, 509 (1970) (observing that "[t]he fact that [a civil defendant] was acquitted in the criminal proceedings (brought against him in connection with the accident [that was the basis of the civil proceeding]) is not admissible in evidence, nor should [it] be mentioned by counsel to the jury"). On the basis of its unreasonable assumption, the DOE believed that any further investigation that it might undertake was without purpose or justification and, thus, summarily reinstated Norton without conducting any further inquiry into the matter. The reinstatement, without more, was unreasonable, and the circuit court did not clearly err in so ruling.

We do not believe that a reasonably prudent parent would have done what the DOE did. At the very least, a reasonably prudent parent would have ascertained the legal significance of Norton's acquittal before allowing him unsupervised contact with his or her child. Upon discovering that an acquittal was not a finding or adjudication of *innocence*—beyond a reasonable doubt, or otherwise—and that, to the contrary, the acquittal merely signified that the prosecution had failed to convince twelve people that Norton was *guilty* beyond a reasonable doubt, we are convinced that a reasonably prudent parent would *not* have permitted Norton unfettered access to his or her child. In a nutshell, the DOE should have known that the question whether Norton actually molested T.Y. remained an open one and, therefore, should have resumed its investigation into Norton's alleged misconduct, confronting him, at the very least, with T.Y.'s videotaped accusations, free from the shield that his right against self-incrimination had afforded him prior to his acquittal.

Under the circumstances, then, "there [was] some probability of harm sufficiently serious [—*i.e.,* that Norton would molest a Mōkapu student—] that a reasonably prudent [parent] would [have] take[n] precautions to avoid it[.]" *Knodle,* 69 Haw. at 388, 742 P.2d at 385 (citation and brackets omitted). That it is, ultimately, unknowable whether the DOE would have concluded that Norton had molested T.Y. or unearthed his

extensive history of pedophilia does not affect our analysis because, "[a]s the gravity of the possible harm increases, the apparent likelihood of its occurrence need be correspondingly less[.]" *Id.* at 388, 742 P.2d at 385 (citation omitted). Thus, there need only be a reasonable possibility that, had the DOE investigated, it would have at least anticipated the potential threat that Norton posed and, thus, would have imposed *some* reasonable restrictions upon his contact with children, such as precluding him from gathering students in his room during the lunch recess, or requiring him to adhere to the DOE's "unspoken policy" that teachers not touch students in any manner that might be misinterpreted, or, indeed, forbidding him from touching students at all. In the absence of *any* determination that Norton had not actually molested T.Y. as she claimed, we hold that the DOE should have reasonably anticipated that Norton posed a potential threat to students and, therefore, that it was reasonably foreseeable that he would molest other students.

■ Furthermore, the foreseeability that Norton would do so increased once, after being reinstated, he resumed issuing hall passes, gathering students in his room (particularly female fourth and fifth graders with light-colored hair) during recesses, and hugging them as they departed his room. All of this conduct is precisely what had given rise to T.Y.'s accusations in the first place. It does not require specialized training or education as a mental health professional for such conduct to trigger an alarm that Norton potentially posed a risk to Mōkapu students. Indeed, as we have noted, we have no doubt that a reasonably prudent parent would, upon learning that Norton was once again exhibiting the precise pattern of behavior that gave rise to T.Y.'s allegations, have restricted his access to their child. As such, we hold that it was unreasonable at that point for the DOE to have failed specifically to supervise Norton and to restrict him from issuing hall passes and "hugging" students. That being the case, the circuit court did not clearly err in finding that the DOE's failure to supervise Norton or restrict his conduct constituted a breach of the duty that it owed to the plaintiffs.

We further hold that the circuit court correctly determined that Schlosser's interrogations of Melony and Nicole constituted breaches of the DOE's duty of care. Indeed, he acknowledged in his testimony that the DOE's regulations precluded him from conducting such interviews and that he was aware that mental health professionals were specifically trained to conduct them so as to minimize the potential psychological trauma that disclosure might cause the girls. Nor can it be gainsaid that Schlosser acted unreasonably in failing promptly to notify the girls' respective parents regarding their disclosures to him, insofar as he advanced no reason for failing to do so.

Accordingly, we affirm the circuit court's findings that the DOE breached the duty that it owed to the plaintiffs by (1) reinstating Norton without conducting a reasonable investigation to ascertain whether he had molested T.Y. as she had alleged, (2) failing to supervise Norton or restrict his contact with children after Schlosser became aware, or should have become aware, that Norton had resumed the very conduct that gave rise to T.Y.'s prior accusation, (3) Schlosser's personally interviewing Melony and Nicole and inducing them to disclose to him whether Norton had molested them, notwithstanding his awareness that he lacked the requisite training to minimize the trauma associated with such disclosures, and (4) Schlosser's failure to notify the girls' parents of their disclosures to him.

#### c. *Legal causation*

We have held that an "actor's negligent conduct is a legal cause of harm to another if (a) his or her conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his or her negligence has resulted in the harm." *Taylor–Rice*, 91 Hawai'i at 74, 979 P.2d at 1100 (citations and brackets omitted). The first prong of the test for the presence of legal causation "contemplates a factual determination that the negligence of the defendant was more likely than not a substantial factor in bringing about the result complained of." *Id.* at 74–75, 979 P.2d at 1100–01 (citations omitted). In this regard, "a defendant's negligence need not have been the whole cause or the only factor in bringing about the harm. It [i]s enough that his or her negligence was a substantial factor in causing [the] plaintiff's injuries." *Id.* at 74, 979 P.2d at 1100 (citations, brackets, and emphases omitted). The second prong "contemplates ... whether there are policy concerns or rules of law that would prevent imposition of liability on the negligent party although his [or her] negligence was clearly a cause of the resultant injury." *Id.* at 75, 979 P.2d at 1101 (citation omitted).

For present purposes, it is significant that the circuit court found that (1) the DOE's failures (a) to conduct a reasonably thorough administrative investigation in connection with T.Y.'s allegations and (b) reasonably to supervise Norton after it reinstated him, (2) Schlosser's failure to conduct proper interviews of Melony and Nicole, and (3) Schlosser's failure to inform the girls' respective parents of what they had reported to him were all substantial factors in causing the plaintiffs' injuries.

Although the DOE's argument with respect to the first prong of the test for legal causation is less than clear, it appears that it is contending that "any conclusion that the failure to conduct a different type of investigation was a legal cause of [the plaintiffs'] damages is speculative at best." The DOE defends the actions of its employees, generally observing that their assessments of Norton's and T.Y.'s credibility were not "arbitrary, capricious, or clearly erroneous" such that, presumably, the circuit court should not have determined otherwise. The DOE also appears to believe that the circuit court should not have determined that the negligent conduct of its employees legally caused forty-nine percent of the plaintiffs' damages because the plaintiffs' damages included trauma directly caused by the ultimately unsuccessful criminal proceedings against Norton. Correlatively, the DOE contends that the plaintiffs' participation in the criminal proceedings against Norton conducted in connection with Melony's and Nicole's accusations is a superceding, intervening cause of

their damages.[48] Thus, the DOE urges us to hold that, to the extent that any of its employees were negligent, their negligence was not a legal cause of the plaintiffs' damages.

We perceive no clear error in the circuit court's determinations regarding legal causation. That the plaintiffs' respective trauma includes that associated with Norton's molestation of Melony and Nicole, as well as that associated with their participation in subsequent criminal proceedings conducted in connection with his molestation of the two girls, is irrelevant. *See, e.g., Taylor–Rice,* 91 Hawai'i at 74, 979 P.2d at 1100 ("a defendant's negligence need not have been the whole cause or the only factor in bringing about the harm"). Moreover, such trauma is a part of the very harm that the DOE was subject to a duty to take reasonable steps to prevent, given the foreseeability (a) that Norton's molestations would be criminally prosecuted and (b) Norton could be acquitted, given Dr. Annon's testimony, *see supra* note 20, that pedophiles were often acquitted of criminal charges.

Insofar as the DOE's negligent acts contributed to the conditions that facilitated Norton's molesting the girls, the DOE's negligence was a substantial factor in causing the plaintiffs' injuries. Accordingly, we hold that the circuit court did not clearly err in finding that the DOE's negligence legally caused the plaintiffs' various psychological injuries.

B. *The Plaintiffs' Appeal*

██ Under the STLA, the DOE "shall be liable in the same manner and to the same extent as a private individual under like cir-

cumstances[.]" HRS § 662–2. Nevertheless, pursuant to HRS § 663–10.5, "in any case where a government entity is determined to be a tortfeasor along with one or more other tortfeasors, the government entity shall be liable for no more than that percentage share of the damages attributable to the government entity." Undertaking to apply HRS § 663–10.5 in the present matter, the circuit court determined that the "percentage share" of the plaintiffs' damages that was "attributable" to the DOE was forty-nine percent of the total.

The plaintiffs urge us to hold that the DOE is liable to them for *all* of their damages, rather than merely forty-nine percent. They argue that, under the circumstances of this case, that HRS § 663–10.5·does not limit the DOE's liability for its negligence. Citing the statute's nonretroactivity clause, which expressly renders it applicable to "causes of action based upon *acts or omissions* " occurring on or after June 22, 1994, *see* 1994 Haw. Sess. L. Act 214, § 4 at 517 (emphasis added), the plaintiffs posit that, "since the key negligent act" of the DOE's employees that predicated their claim for relief in negligence occurred "on January 19, 1993[,] when Norton was put [b]ack in the classroom without having undergone an appropriate administrative investigation," HRS § 663–10.5's nonretroactivity clause renders the statute inapplicable to their claims. The plaintiffs contend that the circuit court consequently erred in construing the statute's nonretroactivity clause to bar claims that "accrued" before June 22, 1994. As such, the plaintiffs posit that the circuit court erroneously determined

48. As to the second prong, the DOE enumerates several "sound policy principles" that, it contends, "support not imposing liability." The DOE posits that, as with its breach-of-duty analysis, the circuit court's analysis of legal causation is tainted because it was "based upon the unprecedented, expansive duties" that it imposed upon the DOE. According to the DOE,

if this Court were to impose new duties upon the DOE to perform independent investigations of crimes occurring on school grounds and adjudications of guilt, the duty would be unbearable and intolerable. At a time when the budget for the DOE is taking such a hit from its responsibilities to provide education to its special education students, such a new and

unnecessary duty would require an equally expansive hiring of qualified individuals with the newly required special expertises.

... [T]o the extent that the circuit court imposed the duties of police, prosecutors, and counselors upon DOE personnel, it should have recognized the coordinate immunities that these actors have in the fulfillment of their duties.... For these reasons, sound policy principles support not imposing liability upon the DOE.

As we have noted, we do not believe that the circuit court imposed any "new duties" upon the DOE. It therefore follows that "sound policy principles" do not militate in favor of disturbing the circuit court's determination that the DOE's negligence legally caused the plaintiffs' injuries.

that the plaintiffs' negligence and NIED claims did not "accrue" until well after June 22, 1994, *i.e.*, at the earliest, when Norton molested Melony and Nicole, and, at the latest, when the plaintiffs became aware that Norton had done so. Thus, the plaintiffs maintain that—HRS § 663–10.5 being inapplicable—the circuit court should have determined that the DOE was liable to them for the full extent of their damages, as a private employer would be under like circumstances.[49]

■ We agree and hold that the circuit court erred in limiting the DOE's liability to the plaintiffs. The plain language of HRS § 663–10.5's nonretroactivity clause focuses upon the specific *acts or omissions* that predicate a plaintiff's claim, and, therefore, the clause's applicability is not keyed to when the plaintiff's cause of action "accrues." The legislative intent underlying HRS § 663–10.5 was clearly to insulate governmental entities, like the DOE, from being held accountable to plaintiffs for more than the degree of fault associated with its employee's tortious contribution to the plaintiff's injury, under circumstances in which the injury is legally caused not only by the government employee's tortious conduct—*i.e.*, his or her act or omission that is a substantial factor in bringing about the plaintiff's injury—but also by the conduct of other, nongovernmental, tortfeasors. Thus, the relevant inquiry is not focused upon when a plaintiff's claim for relief "accrues," which, given that a plaintiff's claim may not "accrue" until he or she discovers the injury, may often be long after the time when the state employee has engaged in the conduct that has legally caused the plaintiff's injury. Rather, the plain language of HRS § 663–10.5's nonretroactivity clause requires a determination of when a government entity's employee engaged in the act or omission for which the entity is being held liable.

As discussed *supra* in section III.A, the DOE is liable to the plaintiffs for (1) its employees' negligent retention of Norton in January 1993, (2) Schlosser's negligent supervision of Norton once he became aware that Norton had resumed issuing hall passes so that he could gather fourth and fifth grade girls in his classroom and continued to "hug" them (a period spanning the time between Norton's reinstatement to a teaching position in January 1993 and his molestation of A.C. in January 1995), (3) Schlosser's interrogations of Melony and Nicole in January 1995, and (4) Schlosser's failure to inform their respective parents of their accusations against Norton after he had questioned the girls. Accordingly, HRS § 663–10.5 does not apply to the plaintiffs' claims to the extent that they are based upon the DOE negligently retaining Norton. The statute does, however, apply to the alternative bases of the plaintiffs' claims against the DOE and, as to them, would operate to limit the DOE's liability to the "percentage share of the [plaintiffs'] damages attributable to" Schlosser's negligent supervision of Norton, his interrogations of Melony and Nicole, and his failure to inform the girls' respective parents of their accusations.

■ Yet, because HRS § 663–10.5 does not apply to the plaintiffs' claims to the extent that they are based upon the DOE's negligently retaining Norton, the DOE is, as we have noted, liable to the plaintiffs "in the same manner and to the same extent" as a private individual would be. Generally speaking, a private individual, whose negligence legally causes another person injury, is liable to the other person for the full extent of the plaintiffs' resulting damages. *See, e.g.*, Restatement (Second) of Torts § 910 (1965) ("[o]ne injured by the tort of another is entitled to recover damages from the other for all harm, past, present, and prospective, legally caused by the tort").[50]

49. As explained *infra* in note 51, HRS § 663–10.9, which generally abolishes joint and several liability among "joint tortfeasors," as defined in HRS § 663–11, is not implicated in the present matter.

50. HRS § 663–10.9 does not apply in the present matter. HRS § 663–10.9 provides in relevant part that "[j]oint and several liability for joint

tortfeasors as defined in [HRS § ] 663–11 is abolished," subject to several exceptions. HRS § 663–11 defines "joint tortfeasors" to mean *"two or more persons* jointly and severally *liable in tort* for the same injury to person or property, whether or not judgment has been recovered against all or some of them." (Emphases added.) Because the circuit court dismissed the

Accordingly, we hold (1) that the circuit court erred in apportioning liability between the DOE and Norton and, therefore, (2) that the DOE is liable to the plaintiffs for the full extent of their damages. *See supra* section III.A.2.c.

## IV. CONCLUSION

Based on the foregoing analysis, we vacate the circuit court's final judgment and remand the matter to the circuit court for the entry of an amended final judgment consistent with this opinion.

### Concurring Opinion of ACOBA, J.

I concur in the result reached, but differ as to the analysis and reasoning that supports the result. As these issues are likely to reoccur in our cases, I set forth my position that: (1) the State is not immune under the State Tort Liability Act when independent governmental negligence is a legal cause of an employee's foreseeable intentional tort against a third person; (2) the serious mental stress standard adopted in *Rodrigues v. State*, 52 Haw. 156, 472 P.2d 509 (1970), applies to claims of psychic injury suffered by the minor plaintiffs and their parents, rather than a new exception to the "physical injury" rule; (3) the duty owed by Defendant–Appellee/Cross–Appellant Department of Education (DOE) to the Plaintiffs is based on the special relationship of *in loco parentis* and not on some formulation of an affirmative duty; (4) the DOE's negligence rests primarily on the absence of a well defined procedure for administering allegations of criminal behavior by teachers; and (5) DOE's obligation to pay the full amount of damages rests on joint and several liability rather than Lawrence J. Norton's dismissal from the case. The foregoing propositions are discussed *in seriatim.*

### I.

Norton's actions, that of offensively touching Melony and Nicole, plainly fall within the common law definition of battery. A defendant causes battery when he or she "intentionally causes bodily contact to the plaintiff in a way not justified by the plaintiff's apparent wishes or by a privilege, and the contact is in fact harmful or against the plaintiff's will." Dobbs, *The Law of Torts*, § 28 at 52–53 (2000) (citations omitted). As Norton touched both Melony and Nicole "against [their] will[,]" *id.*, he committed the common law tort of battery. Thus the exception to state tort liability of "any claim arising out of . . . battery[,]" § 662–15(4) (1993 & Supp. 2001), is implicated.

Two lines of cases have developed with regard to governmental immunity when an employee negligently hired or supervised by the government, commits an intentional tort against a third person. The majority of courts hold that inasmuch as the plaintiff's cause of action "arises out of" an intentional tort, the claim is barred by governmental immunity. *See, e.g., Leleux v. United States*, 178 F.3d 750 (5th Cir.1999) ("Only negligent conduct, undertaken within the scope of employment and *unrelated to an excluded tort* . . . may form the basis for a cause of action." (Emphasis added.)); *Franklin v. United States*, 992 F.2d 1492, 1498 (10th Cir.1993) ("the argument advanced to avoid [the tort liability act] in the present case should be rejected as an ineffective attempt to recast a battery claim (surgery without competent consent) as a negligent failure to prevent the battery"). "In dismissing these claims, the courts have often underscored the belief that an intentional tort formed the basis of the action by declaring that the plaintiff could not 'circumvent' the express statutory language of [the tort liability act] by 'artful pleading,' that is, an assault or battery negligence to avoid dismissal of the suit." K. de Jonge, *Recovery Under the Federal Tort Claims Act for Governmental Negligence Which Leads to an Intentional Tort by a Governmental Employee*, 30 Ariz. L.Rev.

---

plaintiffs' claims against Norton with prejudice (an action, we note, that neither party has challenged on appeal), Norton cannot be liable in tort to the plaintiffs. As such, the DOE and Norton are not "joint tortfeasors" as defined in HRS § 663–11 and, therefore, HRS § 663–10.9

does not authorize apportionment of liability between the DOE and Norton. *See Ozaki v. Association of Apartment Owners of Discovery Bay*, 87 Hawaiʻi 265, 270–71 n. 5, 954 P.2d 644, 649–50 n. 5 (1998).

497, 502 (1988) [hereinafter *Recovery Under the FTCA* ] (citations omitted).

In a second opposing line of cases, courts focus on the independent nature of the governmental negligence that allows the intentional tort to occur, such as the negligent hiring or supervision of an employee, and hold that the cause of action is rooted in the negligent act, not the intentional tort itself. *See, e.g., Senger v. United States,* 103 F.3d 1437 (9th Cir.1996) ("[G]ranting broad immunity would be inconsistent with the purposes of the [Federal Tort Claims Act], which is to 'provide a forum for the resolution of claims against the federal government for injury caused by the government's negligence.' " (Quoting *Bennett v. United States,* 803 F.2d 1502, 1504 (9th Cir.1986).)); *Doe v. Durtschi,* 110 Idaho 466, 716 P.2d 1238, 1245 (1986) ("We do not believe the Idaho legislature, by creating an exception to governmental liability for actions arising out of assault and battery, thereby intended to relieve state agencies from any duty to safeguard the public from employees whom they know to be dangerous."). "Courts adopting the minority rule have applied traditional tort principles and arrived at the conclusion that, although the plaintiffs' injuries directly resulted from assaults or batteries, their claims were reasonably alleged to have roots in negligence" of the government. K. de Jonge, *Recovery Under the FTCA, supra,* at 503.

As stated by this court in *Rogers v. State,* 51 Haw. 293, 459 P.2d 378 (1969), the purpose of the Act is "to compensate the victims of negligence in the conduct of governmental activities in circumstances like unto those in which a private person would be liable[.]" *Id.* at 296, 459 P.2d at 381 (quoting *Indian Towing Co. v. United States,* 350 U.S. 61, 68,

76 S.Ct. 122, 100 L.Ed. 48 (1955)). Additionally, in *Breed v. Shaner,* 57 Haw. 656, 562 P.2d 436 (1977), it was directed that "the State Tort Liability Act should be *liberally* construed to effectuate its purpose to compensate the victims of negligent conduct of state officials and employees[.]" *Id.* at 665, 562 P.2d at 442 (citations omitted) (emphasis added). The second line of cases and the rationale underlying them best comports with a liberal construction of the Act.

This latter line of cases require that, for a claim of negligent hiring or supervision to succeed against the government, it must be established that the government knew, or should have known about an employee's propensity to commit an intentional tort.[1] Such an approach does not premise the State's liability to a third person on respondeat superior grounds, *i.e.,* imputing the wrongful act of an employee to the State simply because of an employer-employee relationship. *See Senger,* 103 F.3d at 1441 ("These cases distinguish between negligence based entirely on a theory of respondeat superior (which cannot give rise to liability on the part of the United States under the [Federal Tort Claims Act] for the intentional torts of government employees)...").

Our holding in this case means that the battery exemption does not apply and the State is liable to a third party for its own independent negligence, such as the negligent hiring or supervision of an employee, if the State knew or should have known that the employee was likely to commit an intentional tort and the State's negligence was a legal cause, *i.e.,* a substantial factor, of the tortious injury suffered by the third party. *See Durtschi,* 716 P.2d at 1244 ("It is clearly

---

1. The parameters established by this qualification should preclude unnecessary litigation. Liability would not attach if a plaintiff merely claims that the State was negligent in not preventing an intentional tort from happening. In *Durtschi,* the Idaho Supreme Court expressly noted that, under the facts of its case, "the government knew or should have known that one of its employees was likely to commit an intentional tort" and, thus, the case was distinguishable from the cases that failed to recognize liability under the intentional tort exception. 716 P.2d at 1245.

A plaintiff cannot merely point to an assault and battery and then claim, based simply on its

occurrence, that the state was negligent in not preventing it. For example, in the present case the school district would clearly not be liable if it had no knowledge of [the co-defendant's] proclivities. In order to withstand dismissal under the intentional tort exception ... a plaintiff must [establish] facts which, if proven, would demonstrate that the governmental entity should have reasonably anticipated that one of their employees would commit an intentional tort.

*Id.*

unsound to afford immunity to a negligent defendant because the intervening force, the very anticipation of which made his conduct negligent, has brought about the expected harm." (Citing *Gibson v. United States*, 457 F.2d 1391, 1395 (3d Cir.1972).)); *Bennett*, 803 F.2d at 1503 ("[B]ecause the government had notice and could have prevented the crime . . . by the exercise of due care by government employees, the government was liable for its own negligence."). Under the facts of this case, the independent conduct of the DOE, *e.g.*, the negligent supervision of Norton, under circumstances in which it should have known he posed a risk to children, was a substantial factor in causing Plaintiffs' injuries and, thus, the State is not immune from suit.

## II.

In *Rodrigues*, this court first established that a physical injury is not a predicate requirement for a negligent infliction of emotional distress (NIED) claim. *See* 52 Haw. at 170–71, 472 P.2d at 519–20 ("We hold that serious mental distress may be found where a reasonable [person], normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case."). *Rodrigues* reasoned that "[i]t can no longer be said that the advantages gained by the courts in administering claims of mental distress by reference to narrow categories outweigh the burden thereby imposed on the plaintiff." *Id.* at 174, 472 P.2d at 520. After *Rodrigues* was decided, however, this court ruled that recovery for emotional distress generally requires some physical injury to property or a person resulting from the defendant's conduct. *See Guth v. Freeland*, 96 Hawai'i 147, 157, 28 P.3d 982, 992 (2001) (Acoba, J., concurring and dissenting).

Nevertheless, this court has been compelled to abandon the "physical injury" rule in light of real life experiences. Indeed, the physical injury rule has been criticized as an "inadequate method . . . of distinguishing between worthy and unworthy claims." *John & Jane Roes v. FHP, Inc.*, 91 Hawai'i 470, 473, 985 P.2d 661, 664 (1999) (quoting *Larsen v. Pacesetter Sys., Inc.*, 74 Haw. 1, 40, 837

P.2d 1273, 1293 (1992)). In *FHP*, this court held that an exception to the "physical injury" rule was created when airline employees unknowingly handled human immunodeficiency virus (HIV) contaminated blood. *See id.* at 477, 985 P.2d at 668. While citing to *Rodrigues*, which established a general standard based on the seriousness of the mental stress, this court applied the HIV exposure rule as a categorical *exception* to the general rule that recovery was permitted only when there was some predicate injury to person.

Subsequently, in *Guth*, this court established another exception to the physical injury rule, holding that "the policies behind the NIED cause of action and HRS § 663–8.9 support allowing a claim for NIED arising from the negligent mishandling of a corpse." 96 Hawai'i at 154, 28 P.3d at 989 (footnote omitted). It was explained by the majority that "we believe that the minority view, that does not require the plaintiff's emotional distress to manifest itself in a physical injury, is the better reasoned approach." *Id.* As I noted in that case, a categorical approach lacks "a cohesive rationale and can produce unjust results[,]" *id.* at 158, 28 P.3d at 993 (Acoba, J., concurring and dissenting) (citations omitted), as opposed to a general reasonableness standard:

> [T]he appropriate measure for determining whether plaintiffs have alleged an actionable claim [for emotional distress] in this jurisdiction is that set forth in *Rodrigues*— that is, whether a reasonable person, normally constituted, would suffer severe mental distress under the circumstances of the case.

*Id.* at 159, 28 P.3d at 994.

In the instant case, the majority creates yet another exception to the "physical injury" rule, this time for school children subjected to unauthorized contact by a teacher and for parents of such children. Predictably, then, "[r]ecognition of negligently inflicted psychic injury as an independent tort, like the life experiences that compel it, . . . cannot be confined in a doctrinal straitjacket." *Id.* It is apparent that the "physical injury" rule will, as cases come before us, press this court to create more categorical exceptions. The experiences of more than three decades has

shown that "[t]he fears of unlimited liability have not proven true[,]" *id.* (quoting *Campbell v. Animal Quarantine Station,* 63 Haw. 557, 565, 632 P.2d 1066, 1071 (1981)), and that the legal interest in psychic security is entitled to independent protection:

> [T]he advantages gained by the courts in administering claims of mental distress by reference to narrow categories was outweighed by the burden thereby imposed on the plaintiff and that the "interest in freedom from negligent infliction of serious mental distress is entitled to independent legal protection."

*Id.* (quoting *Rodrigues,* 52 Haw. at 173–74, 472 P.2d at 520).

"Applying [the *Rodrigues*] standard returns reason and symmetry to the law and easily resolves the issue presented to us in this case." *Id.* First, there would be near universal agreement that "a reasonable person [such as a child or the parent of such a child], normally constituted, may be unable to adequately cope with the mental stress engendered" by the acts perpetrated by Norton, *id.,* even in the absence of a physical injury. Second, *Rodrigues* "is precedent in our jurisdiction and controls on the question of who is entitled to claim mental distress resulting from" the conduct of Norton and the DOE. *Id.*

> *Rodrigues* instructs that a "limitation on the right of recovery, as in all negligence cases, is that the defendant's obligation to refrain from particular conduct is owed only to those plaintiffs who are foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous." 52 Haw. at 174, 472 P.2d at 521 (citations omitted). Under *Rodrigues,* then, the nature of the risk defines the scope of liability. *As a result, in devising a rule as to who should recover in this case, there is justification for affording the right to sue to those most likely to suffer mental distress because of the [child abuse] for they are those "foreseeably affected by the wrongful conduct."*

*Id.* at 159–160, 28 P.3d at 994–95 (Acoba, J., concurring and dissenting) (brackets omitted) (emphasis added). "Those most likely affected are those who are also most likely to suffer the greatest [distress]" over such inappropriate touching of a child, *id.* at 160, 28 P.3d at 995,—and a child's parents plainly fall within this formulation.

### III.

The court made several hundred findings of fact regarding four major acts of negligence. According to the court, these acts "include" the DOE's negligent investigation subsequent to Norton's acquittal; the negligent supervision of Norton, particularly after he repeatedly engaged in issuing hall passes and hugging children; and the lack of training and/or implementation of standards regarding allegations of sexual abuse, including the interview by Principal Schlosser and the failure to notify the children's parents regarding the potential abuse.[2]

It would be less than accurate not to acknowledge the difficulty facing the DOE in resolving allegations of sexual assault as it was brought to its attention, particularly in light of conflicting facts and views. While this court has the faultless perspective of hindsight, the allegations must be considered in the context presented to the DOE. Here there was a large number of parents and children who were "extremely upset" that Norton "would no longer be teaching their children[.]" On the advice of counsel and the police, respectively, neither Norton nor T.Y.'s parents provided information to DOE personnel. Additionally, Norton was acquitted in criminal trials arising out of T.Y.'s allegations and subsequently, Melony's and Nicole's accusations, further demonstrating the difficulty in discerning the truth of T.Y.'s original charge and in assessing the potential risks that Norton might pose in the future.

I do not believe the many findings of the court as "indicating" negligence are to be taken as an enumeration of factors for judging or governing the future conduct of DOE

---

**2.** The majority rejects the final allegation of negligence, that of misrepresentation by Administrator Sosa to the Kaneohe Marine Corps Air Station Base Commander's Executive Officer.

teachers, principals, or administrators.[3] DOE personnel are charged with a myriad of other tasks, not the least of which is to accomplish their primary obligation of educating children.[4] In my view, the negligence in this case is grounded in the apparent absence of clear and definite DOE procedures for administering accusations of criminal behavior.

The disposition of such matters cannot be accomplished appropriately as a matter of internal school policy or ad hoc administrative action, for the resolution of such questions are generally beyond the normal purview of professional educators. No written policy or regulation pertaining to such matters was entered into evidence in this case. There must be a separate administrative track established for determining such complaints irrespective of the pendency or outcome of any criminal case. Allegations of abuse or criminal behavior must be recognized as a distinct and separate matter from the day-to-day operation of a school. To avoid future occurrences of this type, and to protect both children and DOE personnel, a defined, coherent and uniform procedure for resolving such matters must be enacted by rule or statute. *See, e.g.,* Regotti, *Negligent Hiring and Retaining of Sexually Abusive Teachers,* 73 Ed. Law Rep. 333, 339–40 (1992) (listing suggestions for school officials regarding sexually abusive teachers).

## IV.

In general, this court is "reluctant to impose a new duty upon members of our society without any logical, sound, and compel-

---

**3.** In describing the several hundred findings of negligence committed by the DOE, the court used the word "indicating" to depict the overall conclusion of negligence. Inasmuch as these findings may "indicate" negligence, they do not each establish singular and independent liability.

**4.** I do not agree with some of the characterizations of the DOE personnel or their actions, as set forth by the majority.

**5.** This comment states:
This Section is concerned only with the negligent character of the actor's conduct, and not with his [or her] duty to avoid the unreasonable risk. In general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable [person] to

---

ling reasons[,] taking into consideration the social and human relationships of our society." *Lee v. Corregedore,* 83 Hawai'i 154, 166, 925 P.2d 324, 336 (1996). Generally, a "person does not have a duty to act affirmatively to protect another person from harm." *Id.* at 159, 925 P.2d at 329. However, as the majority notes, where there is a "special relationship," then a defendant may owe a duty to "control the conduct of [the] third person so as to prevent him or her from causing physical harm to the plaintiff." Majority opinion at 71, 58 P.3d at 582 (citations omitted). Here, it is apparent that a special relationship of *in loco parentis* exists between the DOE and the students, and that that relationship gives rise to a duty of reasonable care to protect students from foreseeable harm.

But the majority continues on and indicates that a duty may arise because the DOE is "required to exercise . . . 'ordinary care' in the activities it affirmatively undertakes to prevent foreseeable harm[.]" Majority opinion at 72, 58 P.3d at 583 (citing *Upchurch v. State,* 51 Haw. 150, 154, 454 P.2d 112, 115 (1969)). This appears to be a reference to Restatement (Second) of Torts § 302 comment a (1965).[5] But as this court recently stated in *McKenzie v. Hawai'i Permanente Med. Group, Inc.,* 98 Hawai'i 296, 47 P.3d 1209 (2002), that "Restatement (Second) § 302 by itself does not create or establish a legal duty; it merely *describes* a type of negligent act." *Id.* at 300, 47 P.3d at 1213 (emphasis in original). Quoting comment a of section 302, this court noted:

> protect them against an unreasonable risk of harm to them arising out of the act. The duties of one who merely omits to act are more restricted, and in general are confined to situations where there is a special relation between the actor and the other which gives rise to the duty. As to the distinction between act and omission, or "misfeasance" and "non-feasance," see § 314 and Comments. *If the actor is under no duty to the other to act, his [or her] failure to do so may be negligent conduct within the rule stated in this Section, but it does not subject him [or her] to liability, because of the absence of duty.*
> Restatement (Second) of Torts § 302 comment a, at 82 (1965) (emphasis added).

Section 302 is concerned only with the negligent character of the actor's conduct, and *not with the actor's duty to avoid the unreasonable risk*. In general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable person to protect them against an unreasonable harm to them arising out of the act. . . . *If the actor is under no duty to the other to act, his [or her] failure to do so may be negligent conduct with the rule stated in this Section, but it does not subject him [or her] to liability, because of the absence of duty.*

*Id.* (brackets omitted) (emphases in original). It was explained that "the fact that [the defendant's] negligent conduct falls under the rubric of Restatement § 302 does not establish per se that he owes a duty to the [plaintiffs]; it only describes the *manner* in which he may be negligent *if* he owed a duty to the [plaintiffs]." *Id.* at 301, 47 P.3d at 1214 (emphases in original). Similarly, the DOE's negligent conduct, by itself, does not create a duty of care to school children; rather, this duty arises out of the special relationship between the DOE and the children. To the extent that any other basis for a duty is alluded to, *see* majority opinion at 72, 58 P.3d at 583 ("[r]egardless of the source of a particular duty"), I must disagree that it is necessary in this case to so extend our holding. "Duty . . . is a legal conclusion which depends upon 'the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' " *Rodrigues*, 52 Haw. at 170, 472 P.2d at 519 (quoting *Prosser on Torts* § 53 at 332 (3rd ed.1964)); *see also Blair v. Ing*, 95 Hawai'i 247, 259, 21 P.3d 452, 463 (2001) (citations omitted); *Cootey v. Sun Invest-*

*ment Inc.*, 68 Haw. 480, 484, 718 P.2d 1086, 1090 (1986) (citations omitted). In light of the well recognized legal relationship between school and student, we are not called on anew to make a duty calculus.

## V.

Relying on HRS § 663–10.5 (Supp.1994),[6] the court held that the DOE, as a governmental entity, was liable for forty-nine percent of the total damages, its apportioned amount. The 1994 version of § 663–10.5, since amended (Supp.2001),[7] abolished joint and several liability for a governmental party for "acts or omissions occurring on or after" June 22, 1994, the date it was enacted. HRS § 663–10.5 (Supp.1994). The majority rejects the court's view and holds that HRS § 663–10.5 is inapplicable and does not limit the DOE's liability. The majority further concludes that (1) Norton and the DOE are not "joint tortfeasors" as defined by HRS § 663–11 (1993), (2) inasmuch as Norton and the DOE are not "joint tortfeasors[,]" HRS § 663–10.9 (Supp.2001), which generally repealed joint and several liability, does not apply, (3) "[b]ecause the circuit court dismissed the [P]laintiffs' claims against Norton with prejudice . . ., Norton cannot be liable in tort to the plaintiffs[,]" Majority opinion at 87–88 n.50, 58 P.3d at 598 n.50, and, hence, (4) the State is liable for all the damages.

I must disagree with this analysis. I agree that HRS § 663–10.5, abolishing joint and several liability for government entities, is inapplicable. However, in my view, (1) Norton and the DOE are indeed joint tortfeasors under HRS § 663–11; (2) 663–10.9, the prohibition against joint and several liability, does not apply because this case "in-

---

6. This statute states in pertinent part as follows:

**§ 663–10.5 Government entity as a tortfeasor; abolition of joint and several liability.** Notwithstanding the provisions of sections 663–11 to 663–17 and section 663–31, in any case where a government entity is determined to be a tortfeasor along with one or more other tortfeasors, the government entity shall be liable for no more than that percentage share of the damages attributable to the government entity.

. . . .

For purposes of this section, the liability of a government entity shall include its vicarious

liability for the acts or omissions of its officers and employees.

. . . .

(3) This Act shall apply only to causes of action based *upon acts or omissions occurring on or after its effective date.*

(4) This Act shall take effect upon its approval.

(Boldfaced font in original.) (Emphasis added.)

7. The amended version of HRS § 663–10.5 no longer contains the qualifying words "occurring on or after" the date of the statute's enactment.

volv[es]" the intentional tort exception to such a ban; and (3) the DOE's obligation to pay the judgment is based upon its several liability, *i.e.*, its obligation as a joint tortfeasor to pay all the damages caused by it and Norton, because Norton is apparently judgment proof.

## VI.

On appeal, Plaintiffs maintain, as we hold, that HRS § 663–10.5 was misapplied by the court because DOE's negligent acts occurred before its effective date. Plaintiffs argue that the court erred in establishing as the pertinent date, the date the cause of action "accrued[,]" *i.e.*, the dates of the assault on the Plaintiffs, rather than the date of DOE's negligent acts or omissions. DOE's negligence in failing to complete its investigation of T.Y.'s allegations of abuse after Norton's acquittal and the subsequent reinstatement of Norton to a teaching position occurred on January 19, 1993.

This precipitating negligent act occurred before the effective date of HRS § 663–10.5, June 22, 1994. By the plain language of HRS § 663–10.5, this statute did not take effect on the accrual date of the cause of action, as the DOE argues and the court held, but rather, on the date of the "act or omission" on which the action is based. Accordingly, as the majority notes, the court erred in applying HRS § 663–10.5 and this statute did not absolve the DOE from joint and several liability.

## VII.

I believe that the DOE and Norton are "joint tortfeasors" under the 1939 Uniform Contribution Among Tortfeasors Act (UCATA), HRS §§ 663–11 to 663–17. *See Saranillio v. Silva*, 78 Hawaiʻi 1, 9, 889 P.2d 685, 693, *reconsideration denied*, 78 Hawaiʻi 421, 895 P.2d 172 (1995) (noting that Hawaiʻi adopted the 1939 version of UCATA in 1941). HRS § 663–11 (1993) defines "joint tortfeasors" as "two or more persons jointly or severally liable in tort for the same injury to person or property, *whether or not judgment has been recovered against all or some of them*." (Emphasis added.). *See also Ginoza v. Takai*, 40 Haw. 691, 691 (1955) (holding that judgment does not need to be recovered "to constitute a [party as] a joint tortfeasor

for purposes of the Uniform Act"). The term "liable[,]" as employed in this statute, has been construed to mean "subject to suit or liable in a court of law or equity." *Tamashiro v. De Gama*, 51 Haw. 74, 75, 450 P.2d 998, 1000 (1969) (internal quotations omitted); *see Petersen v. City and County of Honolulu*, 51 Haw. 484, 462 P.2d 1007, 1008 (1969) ("whether contribution may be had from a person depends upon whether the original plaintiff could have enforced liability against him [or her], had he [or she] chosen to do so."); *Gump v. Walmart Stores*, 93 Hawaiʻi 428, 446, 5 P.3d 418, 436 (App.1999), *overruled on other grounds*, 93 Hawaiʻi 417, 5 P.3d 407 (2000) (Under the UCATA, " 'liable' means 'subject to suit' or 'liable in a court of law or equity.' " (quoting *Tamashiro*, 51 Haw. at 75, 450 P.2d at 1000)); *cf. Karasawa v. TIG Ins. Co.*, 88 Hawaiʻi 77, 80–81, 961 P.2d 1171, 1174–75 (App.1998) (omitting liability discussion, but holding that "tortfeasors are 'joint' for purposes of the Act if they individually or collectively cause the same injury.").

In *Tamashiro*, it was held that a "minor child is liable in tort to his parent," and thus, he is "subject to contribution to his joint tortfeasor under the [UCATA]." 51 Haw. at 79, 450 P.2d at 1002. In that case, the parents sued for injuries sustained in an automobile accident between their automobile, driven by their minor son, and a vehicle driven by the defendant. *See id.* at 74, 450 P.2d at 999. The defendant joined the minor as a third-party defendant, attempting to obtain contribution from the minor as a joint tortfeasor. *See id.* at 74, 450 P.2d at 1000. The trial court dismissed the third party complaint, based on the assumption that a minor child is legally immune from suit from his parents. *See id.* This court reversed and held that a minor child is liable for contribution as a joint tortfeasor under the UCATA. *See id.* at 79, 450 P.2d at 1002. In doing so, this court construed the term "liable" in the phrase "joint and severally liable in tort," as "having acquired the technical, legal meaning of 'subject to suit' or 'liable in a court of law or equity[.]' " *Id.* at 75, 450 P.2d at 1000 (footnote and citations omitted).

In *Saranillio*, this court considered the common law rule, which mandated that the release of an employee from liability in a tort

action automatically released the employer from respondeat superior liability. *See* 78 Hawai'i at 8–9, 889 P.2d at 692–93. It was explained that the UCATA definition of joint tortfeasors, "which is based on liability rather than negligence, 'is exceedingly broad and goes beyond the traditional meaning of the term.' " *Id.* (quoting *Holve v. Draper*, 95 Idaho 193, 505 P.2d 1265, 1267 (1973)). Thus, this court held that the "plain and unambiguous language of the 1939 version [of the UCATA] abrogates the common law rule that the release of an employee automatically releases his/her vicariously liable employer." *Id.* at 12, 889 P.2d at 696.

Other jurisdictions have adhered to the same view. *Cf. New Amsterdam Cas. Co. v. Holmes*, 435 F.2d 1232, 1234 (1st Cir.1970) ("liable in tort" does not require present liability to whoever might be a particular plaintiff); *MetroHealth Med. Center v. Hoffmann–LaRoche, Inc.*, 80 Ohio St.3d 212, 685 N.E.2d 529 (1997) (a contribution claim is not barred by the fact that the underlying claimant failed to comply with the statute of limitation as to the contribution defendant); *Hayon v. Coca Cola Bottling Co. of New England*, 375 Mass. 644, 378 N.E.2d 442, 445 (1978) ("The term 'liable in tort' . . . is broad in scope and not suitable language for implying a narrow or restricted range of application within the framework of potential tort defendants."); *Zarrella v. Miller*, 100 R.I. 545, 217 A.2d 673, 676 (1966) ("[A] tort-feasor may recover such contribution even though, for some reason, the plaintiff who has obtained a judgment against both of them is precluded from enforcing liability thereunder against the joint tort-feasor.)" (Citing *Puller v. Puller*, 380 Pa. 219, 110 A.2d 175, 177 (1955)). In *MetroHealth*, the Supreme Court of Ohio held that a tortfeasor's contribution claim did not fail "merely because the underlying claimant failed to comply with a statute of limitations as to the contribution defendant." 685 N.E.2d at 533. The *MetroHealth* court recognized that a contrary position would allow a plaintiff to "wait to file a complaint until a claim against one of the

defendants, but not the other, was time-barred, thereby destroying the disfavored defendant's statutory right to contribution." *Id.*

But in *Ozaki v. Association of Apt. Owners of Discovery Bay*, 87 Hawai'i 265, 954 P.2d 644 (1998) [hereinafter *"Ozaki II"*], this court stated in a brief footnote, without analysis, that only parties as to whom damages could be recovered are joint tortfeasors. *Id.* at 270 n. 5, 954 P.2d at 649 n. 5. While acknowledging that "[t]he definition of 'joint tortfeasors' . . . 'is based on liability[,]' " this court, quoting *Black's Law Dictionary*, said that parties "cannot be jointly and/or severally liable with another unless '[t]he person who has been harmed can sue *and recover* from both[.]" *Id.* (quoting to *Black's Law Dictionary* 914 (6th ed.1990) (emphasis in original)). Such language implies that a person or entity can only be a joint tortfeasor if recovery is possible. *See also Gump v. Wal–Mart Stores, Inc.*, 93 Hawai'i 417, 5 P.3d 407 (2000) [hereinafter *Gump II* ] ("A party is liable within the meaning of section 663–11 if the injured person could have recovered damages in a direct action against that party, had the injured person chosen to pursue such an action.)" (Quoting *Velazquez v. National Presto Ind.*, 884 F.2d 492, 495 (9th Cir.1989)); *Ozaki II*, 87 Hawai'i at 270 n. 5, 954 P.2d at 649 n. 5.[8] Following this rationale, a bankrupt or judgment-proof party could never be considered a joint tortfeasor.

It should be further noted that the definition employed by the *Ozaki II* court was incomplete. An accurate rendition of the definition of "[j]oint and several liability" in *Black's Law Dictionary* is that "[t]he person who has been harmed can sue and recover from both wrongdoers *or from either one of the wrongdoers* (if he [or she] goes after both of them, he [or she] does not, however, receive double compensation)." *Black's Law Dictionary* at 914 (emphasis added). The correct definition of joint and several liability then, as used in *Black's*, indicates that two parties may be considered joint tortfeasors even if recovery can be obtained from only

---

8. In *Velazquez v. National Presto Ind.*, 884 F.2d 492 (9th Cir.1989), the Ninth Circuit Court of Appeals, without explanation, indicated that *recovery* is necessary for joint tortfeasor status. The *Velazquez* court cited to *Petersen*, 51 Haw. at 485–86, 462 P.2d at 1008 and *Tamashiro*, 51 Haw. at 75 n. 3, 450 P.2d at 1000 n. 3. However, neither of these cases indicated that the ability to recover damages is a prerequisite to joint tortfeasor status.

one of them. Accordingly, I would distinguish *Ozaki II* to the extent that it suggests that a party is a joint tortfeasor only if a plaintiff can sue and recover from it.

## VIII.

Under the foregoing analysis, the DOE and Norton were joint tortfeasors. Norton was originally "subject to suit or liable in a court of law or equity[,]" although he was later dismissed as the result of a bankruptcy court stay. Accordingly, "subject to suit or liable in a court of law or equity" in HRS § 663–11 may designate a party as a joint tortfeasor if the party was subject to suit, even if subsequent events may ultimately preclude recovery from that party. Here, the court found that the DOE was forty-nine percent liable and Norton was fifty-one percent liable. This court has held that a court in its discretion may treat a non-party to the suit as a party for purposes of apportioning damages. *See Gump II*, 93 Hawai'i at 423, 5 P.3d at 413. Plainly, the court did that in this case.

Under joint and several liability, each defendant is "completely and fully liable toward the injured person" for the full amount of damages. *Ozaki v. Association of Apt. Owners of Discovery Bay*, 87 Hawai'i 273, 284, 954 P.2d 652, 663 (App.), *overruled in part by, Ozaki II*, 87 Hawai'i 265, 954 P.2d 644 (1998) [hereinafter "*Ozaki I*"]. Accordingly, both the DOE and Norton may be treated as joint tortfeasors pursuant to HRS § 663–11. If Norton was incapable of paying his apportioned percentage of damages, as was apparently the case, then the DOE became liable for all the Plaintiffs' damages. This is not because of Norton's dismissal at trial, as apparently the majority concludes, but because the DOE was severally liable for the injuries suffered by the Plaintiffs.[9] *See Ozaki I*, 87 Hawai'i at 284, 954 P.2d at 663 (referring to the UCATA and stating that the section "would permit apportionment of pro rata shares of liability of the joint tortfeasors as among themselves.... [However,] each tortfeasor is still completely and fully liable toward the injured person." (citation omitted)); *see also* Dobbs, *The Law of Torts* § 170, at 413 (2000) (several liability means that "the plaintiff may obtain a judgment against both tortfeasors and enforce it against both; but ... the plaintiff may not actually collect more than one compensation").

## IX.

HRS § 663–10.9, which generally repealed joint and several liability, would not bar recovery in this case. Inasmuch as DOE's negligence made it a joint tortfeasor in an action "involving" an intentional tort, this case comes within the intentional tort exception to the general repeal contained in HRS § 663–10.9. *See Ozaki I*, 87 Hawai'i at 285–86, 954 P.2d at 664–65. In *Ozaki I*, the ICA reasoned that joint and several liability is not abolished in an action, as HRS § 663–10.9(2)(A) states, "involving ... intentional torts[.]"

As set forth in HRS § 663–10.9(2)(A), joint and several liability was not "abolished" for recovery of both economic and noneconomic damages against "joint tortfeasors *involving:* (A) Intentional torts[.]" (Emphasis added.) "Involving" is the participle form of the "involve." The word "involve" means, among other things, "to have within or as part of itself: INCLUDE." *Webster's Ninth New Collegiate Dictionary* 637 (1990).

An action "involving" intentional torts, accordingly, is one which has within it, or as a part of it, or includes an intentional tort. *Such an action, therefore, is not one which only or exclusively concerns intentional torts, but which, as denoted, would include an intentional tort as at least one of the stated theories or grounds on which liability is found.*

9. In addition, if the court had found the Plaintiffs partially liable, I would apply a pure comparative negligence standard in apportioning fault among all the parties involved. "[C]onsideration of the plaintiff's negligence in the damage calculations, even where intentional tortfeasors are involved, best adheres to the principle that loss should be distributed according to the respective faults of the parties." *Ozaki I*, 87 Hawai'i at 283, 954 P.2d at 662, *overruled in part by, Ozaki II*, 87 Hawai'i 265, 954 P.2d 644 (1998) (citations omitted); *see also* Restatement (Third) of Torts § 14 (2000) (citing to *Ozaki I* for the proposition that "negligent and intentional tortfeasors could be apportioned responsibility but that the negligent tortfeasor who failed to protect should be liable for the intentional tortfeasor's share of comparative responsibility as well[.]").

*Id.* at 285, 954 P.2d at 664 (italicized emphases in original) (underscored emphasis added). Here, the action alleged an intentional tort, namely the conduct of Norton. Therefore, this case falls "squarely within the HRS § 663–10.9(2)(A) category of cases as to which 'joint and several liability for joint tortfeasors as defined in [HRS § ] 663–11 [was not] abolished.' " *Id.*